IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOSEPH E. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3145 |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD T. SMITH, in his official and | ) | MEMORANDUM AND ORDER ON |
| individual capacities, BURDETTE | ) | DEFENDANTS' MOTION TO DISMISS |
| SEARCEY, Dep., in his official and | ) | |
| individual capacities, GERALD LAMKIN, | ) | |
| Dep., in his official and individual | ) | |
| capacities, KENT HARLAN, Dep., in his | ) | |
| official and individual capacities, MARK | ) | |
| MEINTS, Dep., in his official and | ) | |
| individual capacities, JERRY O. DEWITT, | ) | |
| Sheriff, in his official and individual | ) | |
| capacities, WAYNE R. PRICE, PhD., in his | ) | |
| official and individual capacities, COUNTY | ) | |
| OF GAGE, NEBRASKA, a Nebraska | ) | |
| political subdivision, GAGE COUNTY | ) | |
| SHERIFF'S OFFICE, a Nebraska political | ) | |
| subdivision, and GAGE COUNTY | ) | |
| ATTORNEY'S OFFICE, a Nebraska | ) | |
| political subdivision, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

On July 15, 2009, the plaintiff, Joseph E. White, filed a complaint against Defendants Richard T. Smith, Dep. Burdette Searcey, Dep. Gerald Lamkin, Dep. Kent Harlan, Dep. Mark Meints, Sheriff Jerry O. DeWitt, Wayne R. Price, the Gage County Sheriff's Office, the Gage County Attorney's Office, and the County of Gage, Nebraska. (Compl., filing 1.) Smith, Searcey, Lamkin, Harlan, Meints, DeWitt, and Price are named as defendants in both their official and individual capacities.

The defendants have filed a motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (See filing 32.) My analysis of this motion follows.

## I.    BACKGROUND

In summary, the plaintiff's complaint alleges as follows.

The plaintiff is a resident of Cullman County, Alabama.  (Compl., filing 1, ¶ 1.)  At relevant times, DeWitt served as the elected Sheriff of Gage County, Nebraska, and as the direct supervisor of Deputies Searcey, Lamkin, Meints, and Harlan; Wayne R. Price, Ph.D., served as a reserve deputy and as a consulting psychologist for the Gage County Sheriff's Office; and Smith served as the Gage County Attorney.  (Id. ¶¶ 2-4.)  Gage County, the Gage County Sheriff's Office (GCSO), and the Gage County Attorney's Office (GCAO) are alleged to be "Nebraska political subdivision[s]."  (Id. ¶ 5.)

At approximately 9:30 a.m. on February 6, 1985, the body of Helen Wilson was discovered in an apartment in Beatrice, Nebraska.  (Compl., filing 1, ¶ 9.)  The Beatrice Police Department (BPD), the GCSO, the Nebraska State Patrol (NSP), and the Federal Bureau of Investigation (FBI) all became involved in the investigation of Wilson's death.  (Id.)

Wilson was last seen alive by her son Darrell, who left Wilson's apartment at approximately 9:45 p.m. on February 5, 1985.  (Compl., filing 1, ¶ 10.)  Someone later "gained entry to Wilson' apartment by prying the doorstop from the doorframe and slipping the lock." (Id.)  A large amount of dried blood and "considerable disarray" indicated that a struggle occurred in Wilson's bedroom.  (Id. ¶ 11.)  Wilson' body was discovered in the living room, however, where there was little evidence of a struggle and "virtually no evidence of dried blood." (Id.)  Wilson was found on the floor near a sofa, where she was left lying on her back with an afghan wrapped tightly around her face and a towel loosely binding her hands in front of her. (Id.)  Her hands bore defensive cuts, and a steak knife similar to knives found in Wilson's kitchen was found in her bedroom.  (Id.)  She was exposed below the waist.  (Id.)  Cash totaling $1,180.00, an unspecified number of checks, and "several large money market certificates" were found in the apartment.  (Id.)

An autopsy indicated that Wilson died due to suffocation.  (Compl., filing 1, ¶ 12.)  She also suffered a number of fractures, and she had been sexually assaulted.  (Id.)  Blood and semen collected at the scene were tested serologically, and "[o]nly two blood groups and serological profiles were identified–type O blood consistent with Wilson, and blood consistent with a type B

2

non-secretor." (Id. ¶ 13.) The FBI concluded that the crime was not motivated by robbery and that it was almost certainly committed by a single individual acting alone. (Id. ¶ 12.)

"Under Smith's direct supervision, the BPD, the GCSO and the NSP interviewed every individual in the Beatrice vicinity with a known history of sexual assault behavior." (Compl., filing 1, ¶ 14.) After the scope of the investigation was broadened, White was interviewed–though he was not "considered to be a serious suspect[] by the BPD, the GCSO or the NSP during the 1985 phase of the Wilson homicide investigation." (Id.)

Although Searcey was not a member of the GCSO in 1985, he conducted his own inquiry into the Wilson homicide. (Compl., filing 1, ¶ 15.) During his investigation, he falsely informed his interviewees that he was a private investigator working on the case. (Id.) He also sought–unsuccessfully–to obtain access to the BPD's crime scene photographs and reports. (Id.) Searcey did not record his interviews, nor did he make records or reports of them. (Id.) Evidently, however, he interviewed Lisa Podendorf during the course of his investigation, and according to Searcey, Podendorf provided evidence implicating White in Wilson's homicide. (Id. ¶ 16.)

In January 1987, Searcey joined the GCSO as a deputy sheriff. (Compl., filing 1, ¶ 16.) Shortly after joining the GCSO, he obtained access to the Wilson investigation file. (Id.) In January 1989, he re-interviewed Podendorf. (Id.) On March 14, 1989, with assistance from Smith, Searcey used Podendorf's statement–along with statements taken from Charlotte Bishop and Thomas Winslow–to prepare an affidavit in support of a warrant for the arrest of White and Ada Joann Taylor. (Id. ¶ 17.) This affidavit, along with a supplementary addendum that Smith and Searcey later prepared to accompany it, are alleged to contain a number of "false statements," "deliberately misleading statements," and "claims inconsistent with the immutable evidence from 1985." (Id.) First,

> Searcey claimed Podendorf . . . told him that "within 24 hours of the Wilson homicide's . . . discovery," Joann Taylor told Podendorf that the police cars at Wilson's apartment building were there because Taylor and White murdered Helen Wilson. . . . Podendorf actually told Searcey that Taylor made this statement to her at around 7:30 a.m. on February 6, 1985, while they were watching the police cars at Wilson's building. However, the immutable fact is that Wilson's body was not discovered until 9:30 a.m., and as such, no police cars

would have been at the apartment building until at least 9:30 a.m.
(Id.)  The complaint alleges that Searcey used the words "within 24 hours" in a deliberate effort
to disguise the fact that Podendorf's statement was contrary to the facts.  (Id.)

Second, "Smith and Searcey falsely represented in Searcey's affidavit that Podendorf was
a reliable informant because she knew about 'the binding of Mrs. Wilson's body . . . .'" (Compl.,
filing 1, ¶ 18.)  In fact, Podendorf told Searcey that, according to Taylor, Wilson would be found
with her hands tied behind her back, and Podendorf did not mention the afghan wrapped tightly
around Wilson's head.  (Id.)

Third, Smith and Searcey falsely claimed in Searcey's affidavit that Thomas Winslow's
statements corroborated Podendorf's statements.  (Compl., filing 1, ¶ 19.)  Podendorf claimed
that she saw White, Taylor, Thomas Winslow, and Beth Johnson Winslow exit Winslow's
automobile at 10:18 p.m. on February 5, 1985, and enter Wilson's apartment building.  (Id.)
Thomas Winslow stated, however, that he loaned his car to White and Taylor on February 5,
1985, and they returned the car early the next morning.  (Id.)

Fourth, after realizing that Thomas Winslow's statement did not corroborate Podendorf's
statement, Smith and Searcey arranged to take a second statement from Winslow, who was being
held in Lancaster County on an unrelated assault.  (Compl., filing 1, ¶ 20.)  Smith, Searcey,
DeWitt, and Harlan were present for the taking of Winslow's new statement.  (Id.)  In exchange
for his statement, "Winslow was promised use immunity as to the Wilson homicide, a reduction
in the Lancaster County assault charge, and a reduction of his bond."  (Id.)  Initially, Winslow
stated that he loaned his car to White and Taylor on the evening of February 5, which was
consistent with his original statement.  (Id.)  After Searcey told Winslow that someone identified
him entering Wilson's apartment building, Winslow stated that he entered the building.  (Id.)
Searcey then asked leading questions of Winslow in order to generate a statement that was
consistent with the known facts of the case.  (Id.)  Winslow's new statement was used by Smith
and Searcey to prepare the aforementioned addendum to Searcey's original affidavit, wherein
Searcey claimed that Winslow's new statement "totally corroborated" Podendorf's statement.
(Id.)

Evidently, the warrant for the arrest of White and Taylor was issued.  The Cullman,

4

Alabama, police arrested White on the evening of March 15, 1989, and Searcey, Price, and a BPD detective named Stevens (who is not a defendant in this case) began questioning White at approximately 12:10 a.m. on March 16. (Compl., filing 1, ¶ 21.) White denied involvement in the Wilson homicide and stated that he had no knowledge of who might have committed the crime. (Id.)

Ada Joann Taylor was arrested in North Carolina just before midnight on March 15. (Id. ¶ 22.) While Searcey and Stevens remained in Alabama with White, North Carolina police interrogated Taylor. (Id.) The police told Taylor that White was under arrest and had implicated her in Wilson's homicide. (Id.) Taylor then attempted to describe details about the crime to the police. (Id.) In doing so, Taylor stated that Wilson lived in a house, that White went to Wilson's house to do yard work or trim some trees, that the assault occurred at approximately 5:30 or 6:00 p.m., and that White stabbed Wilson with a knife. (Id.)

Searcey and Stevens traveled to North Carolina and interrogated Taylor on March 16, beginning at approximately 8:17 p.m. (Compl., filing 1, ¶ 23.) After Taylor repeated the "factually implausible story she told the North Carolina police," Searcey and Stevens began to supply Taylor with information consistent with the evidence of the crime. (Id.)

> For example, Searcey repeatedly suggested to Taylor that Wilson lived in an apartment, and not in a light-colored house as she initially indicated. Searcey and Stevens suggested that White did not go to Wilson's house to do yard work given that the homicide occurred in February. Searcey and Stevens suggested who accompanied White and Taylor to Wilson's apartment, as well as who did not accompany them when Taylor selected the wrong person for Searcey's false narrative.

(Id.) Searcey also "tried to get Taylor to name Thomas Winslow as the boy who accompanied White to Wilson's apartment." (Id.) "Although Taylor knew Winslow well, she could not come up with Winslow's name, but told Searcey that she could recognize his photograph." (Id.)

Taylor, Searcey, and Stevens traveled back to Beatrice, Nebraska, on March 17. (Compl., filing 1, ¶ 24.) Searcey showed Taylor six photographs and asked her to "identify the boy she knew, but whose name she could not remember." (Id.) Four of the photos depicted persons unknown to Taylor, and the other two depicted Mark Goodson and Thomas Winslow. (Id.) It seems that Goodson was known to Taylor, but Searcey had previously informed Taylor that

Goodson was not involved in Wilson's homicide. (Id.) Taylor then identified Winslow as a participant in the crime. (Id.) She also agreed with various facts about the crime that were suggested to her by Searcey during a second interrogation on March 17. (Id.)

Smith and Searcey knew that Taylor received psychological counseling from Price in 1984, and "Price knew that Taylor had a limited education, frequently abused alcohol and illegal drugs, had a diagnosed personality disorder, and was prone to magical thinking." (Compl., filing 1, ¶ 25.) The complaint alleges, "Price used his knowledge of Taylor's mental deficiencies to assist Smith and Searcey in building the false narrative of Wilson's rape and homicide," though the complaint does not describe when, where, and how Price accomplished this. (See id.)

Searcey learned that White and Taylor each had type O blood, and Winslow's blood was type A. (Compl., filing 1, ¶ 26.) Because "a significant amount of type B blood was found in Wilson's bedroom," and because none of the suspects in custody had type B blood, "Searcey, at Smith's direction, began contacting and interviewing every person known to have been associated with White, Taylor or Winslow in 1985." (Id.) During the course of this investigation, on March 24, 1989, Searcey and Stevens contacted Debra Shelden, who had been one of Taylor's roommates in early 1985. (Id.) Debra Shelden denied having direct knowledge of the Wilson homicide, but she stated that her husband, Clifford Shelden, received a letter from Taylor stating that Taylor and White were responsible for the crime. (Id.)

Searcey and Lamkin interviewed Clifford Shelden on April 12. (Compl., filing 1, ¶ 27.) Although they began their interview at 1:30 p.m., they did not begin recording the interview until 4:55 p.m. (Id.) At the time of the interview, Shelden was being held at the Lancaster County Corrections Center, where he was awaiting sentencing for his role in an assault that he committed with Thomas Winslow. (Id.) Shelden had provided statements to Lincoln Police Detective Tim Domgard on two prior occasions, and neither of these statements "provided any meaningful evidence" about the Wilson case. (Id.) On this occasion, however, Shelden told Searcey and Lamkin that Taylor wrote him a letter stating that Taylor, White, and Winslow were responsible for Wilson's homicide. (Id.) Shelden also stated, for the first time, that Thomas Winslow told him several details about the crime. (Id.) For example, Shelden stated that according to Winslow, Shelden's wife Debra was present at the time of the homicide; that White pushed

6

Debra against a dresser in Winslow's apartment, which caused the attached mirror to break and cut the back of Debra's head; and that "White, Winslow, and Taylor ransacked Wilson's apartment looking for money." (Id.) These (and other) claims made by Clifford Shelden conflicted with the evidence found at the scene of the crime. (See id.)

Searcey and Lamkin re-interviewed Debra Shelden on the following day. (Compl., filing 1, ¶ 28.) Although the interview commenced at 3:00 p.m., the deputies did not begin recording the interview until 7:12 p.m. (Id.) Debra claimed for the first time during this interview that "she was present when White, Winslow and Taylor raped, robbed and murdered Wilson." (Id.) Her statement corresponded to that of her husband, and it included the claim that Debra sustained a cut to the back of her head. (Id.) Debra also claimed that the crime occurred between 8:00 and 9:30 p.m., though it should be recalled that Wilson was last seen by her son at 9:45 p.m. (Id.) Searcey and Lamkin placed Debra Sheldon under arrest for the murder of Helen Wilson, and she agreed to provide a blood sample. (Id.) Tests revealed, however, that Debra Shelden's blood was not type B. (Id.)

After learning that Debra's blood was not type B, Searcey and Lamkin interviewed Debra Shelden again. (Compl., filing 1, ¶ 29.) During this interview, Searcey suggested that another person, James Leroy Dean, was involved in the crime. (Id.) Although Debra previously stated that only she, White, Winslow, and Taylor were involved in the homicide, she agreed with Searcey's suggestion. (Id.) At Smith's direction, a warrant for Dean's arrest was obtained. (Id.) Dean was arrested on April 15, and Searcey and Lamkin interrogated him on April 16. (Id.) "Dean denied all involvement in the Wilson homicide and volunteered to provide a blood sample, which demonstrated that his blood type was type O." (Id.)

On April 24, Debra Shelden's lawyer requested that Price perform an evaluation of Debra. (Compl., filing 1, ¶ 30.) Price had evaluated Debra Shelden in the past, and he knew that she "received special education services as an adolescent, . . . had low intelligence, acted impulsively, and lacked an awareness of the consequences . . . of her actions." (Id.) According to the complaint,

> Price counseled Shelden about how to better remember the events of the Wilson homicide. Price told Shelden that she was traumatized by the violence to Wilson that she witnessed . . . and was repressing her memories of the event. Price

7

instructed Shelden that if she could relax she would recall more of the details of the homicide . . . and that she might recall more of the homicide in her dreams rather than while awake.  Following her meeting with Price, Shelden started to claim that all of her memories of the Wilson homicide came to her in dreams and nightmares, some going back to 1985.

(Id.)

Meanwhile, Smith requested that Dean submit to a polygraph examination, and Dean agreed.  (Compl., filing 1, ¶ 31.)  On April 29, Harlan transported Dean to Lincoln for the examination.  (Id.)  As before, Dean denied involvement in the Wilson homicide.  (Id.)  But the examiner, who had been provided with copies of Clifford and Debra Shelden's statements, told Dean that "he did not do well" on the examination and that he needed to "consider pleading to a lesser charge rather than face conviction for first-degree murder and execution in the electric chair."  (Id.)  The complaint does not allege whether Dean truly "did not do well" on the polygraph examination.

On May 2, Smith and DeWitt arranged for Dean to meet with Price.  (Compl., filing 1, ¶ 31.)  Price interviewed Dean and determined that he "lacked education, had low intelligence, was easily influenced, and had a significant psychiatric history including instances of institutional treatment."  (Id.)  "Price told Dean that he failed the polygraph examination, and that this revealed at a subconscious level his involvement in the Wilson homicide."  (Id.)  Price also told Dean that he was "traumatized by the violence" of Wilson's murder and was repressing his memories.  (Id.)  "Price counseled Dean that if he relaxed, lay down on his bunk in his jail cell, and tried to picture Wilson's apartment, his memory of the Wilson murder would come back to him."  (Id.)  Dean possessed copies of Clifford and Debra Shelden statements in his jail cell, and he had access to media accounts of the Wilson case.  (Id.)  At some unspecified time after he received this counseling from Price, Dean began to recite a version of the homicide similar to that described by Clifford Shelden in his statement.  (Id.)

After realizing that none of the suspects in custody had type B blood, DeWitt, Harlan, Lamkin, Meints and Searcey contacted Shelden and Dean in the Gage County Jail and suggested

to them that Kathy Gonzalez was also involved in the crime.  (Compl., filing 1, ¶ 31.)[1]  Later, on May 24, both Shelden and Dean stated that Kathy Gonzalez was a participant in the murder, and they claimed that they were able to remember her participation through a nightmare, through a dream, or by relaxing.  (Id.)

On May 25, Kathy Gonzalez was arrested in Denver, Colorado, and interrogated by Searcey, DeWitt, and Lamkin.  (Compl., filing 1, ¶ 32.)  She denied knowledge of, and involvement in, Wilson's homicide.  (Id.)  She was then evidently transported to the Gage County Jail, were she was interrogated by Price and Meints on May 26.  (Id.)  After she again denied knowing about or participating in the crime, Price began to suggest to Gonzalez that she had memory problems, that she was repressing her memories of the incident, and that her memory would return in her dreams.  (Id.)  Gonzalez denied that she was repressing her memories or that she suffered from memory problems.  (Id.)

Gonzalez provided a blood sample, and an NSP serologist determined that Gonzalez's blood type was B.  (Compl., filing 1, ¶ 33.)  However, "[t]he type B blood found in Wilson's apartment was not consistent with Gonzalez's blood, in that [the samples] differed as to one key enzyme."  (Id.)  The complaint states that the "Defendants deliberately and purposefully ignored this evidence . . . demonstrating that Gonzalez could not be tied to the Wilson homicide."  (Id.)

Between June and October 1989, the "defendants continued to suggest new evidence for Shelden, Dean, and Taylor to 'remember,'" and Smith "reduced the charges against Shelden, Dean, and Taylor in exchange for their agreement to testify at White's trial consistent with the false narrative of the Wilson homicide constructed by the defendants."  (Compl., filing 1, ¶¶ 34-35.)  White's trial began on November 3, 1989, and concluded on November 8.  (Id. ¶ 36.)  Debra Shelden, Dean, and Taylor testified against White at the trial.  (Id.)  White was convicted of first-degree murder, and he was sentenced on February 16, 1990, to life imprisonment.  (Id.)

"On October 26, 2005, White filed a motion for DNA testing pursuant to the DNA Testing Act."  (Compl., filing 1, ¶ 37.)  This motion was denied by the district court, but the Nebraska Supreme Court reversed the district court's decision on November 2, 2007.  (Id.)  On

---

[1]Two successive paragraphs in the complaint are numbered 31.  The facts summarized here appear in the second paragraph 31.

9

remand, the district court ordered testing, and "[t]he results of the testing conclusively demonstrated that White was not the contributor of the semen" found in Wilson's apartment. (Id.) "Further testing conclusively demonstrated that the sole contributor of the semen and blood found at the Wilson apartment was Bruce Allen Smith, an individual completely and totally unassociated with White, Winslow, Taylor, Dean, Shelden or Gonzalez." (Id.) "On November 7, 2008, White was released from prison and all charges against him were dismissed." (Id.)

      On July 15, 2009, White filed a three-count complaint against the defendants. (See generally Compl., filing 1.) Count I, which is titled "42 U.S.C. § 1983 – Malicious Prosecution, False Arrest, Use of Unreliable and Fraudulent Investigatory Techniques, Procurement of Unreliable and Fabricated Evidence," alleges that the defendants 1) purposefully brought about the plaintiff's illegal arrest, prosecution, and conviction, although they knew or should have known of his innocence; 2) "solicited, fabricated, manufactured and coerced evidence that was demonstrably unreliable, misleading, false," and inconsistent with the "known immutable evidence of the Wilson homicide"; 3) unreasonably seized the plaintiff in violation of the Fourth and Fourteenth Amendments; 4) deprived the plaintiff of his liberty without due process of law in violation of the Fifth and Fourteenth Amendments; 5) deprived the plaintiff of his right to a speedy public trial by an impartial jury in violation of the Sixth and Fourteenth Amendments; and 6) deliberately inflicted cruel and unusual punishment upon the plaintiff in violation of the Eighth and Fourteenth Amendments. (See Compl., filing 1, ¶¶ 43-47.) Count II, which is titled "42 U.S.C. § 1983 – Conspiracy to Violate Civil Rights," alleges that the defendants collectively "reached an understanding, engaged in a course of conduct and otherwise conspired among and between themselves to deprive" the plaintiff and others of their constitutional rights "to free association and privacy, to be free from unreasonable arrest and seizure, to be free from wrongful imprisonment and punishment, to be free from malicious prosecution and abuse of process, to fair access to the courts, to effective assistance of competent counsel, to due process of law, and to be free from cruel and unusual punishment." (Id. ¶ 48; see also id. ¶ 49-50.) Count III, which is titled "42 U.S.C. § 1983 – Violations Committed by Gage, GCSO and GCAO," alleges that GCSO, GCAO, and Gage County "had in effect policies, practices, and customs that operated to deprive White of his constitutional rights," including a policy, practice, or custom of 1) "failing

10

to properly train and supervise officers in the techniques of investigating serious crimes"; 2) "using interrogation techniques that had an extreme likelihood of obtaining false and unreliable information from suspects and witnesses"; 3) "failing to discipline officers who violate . . . the rights of criminal suspects during the course of a criminal investigation"; 4) "investigating crimes in a manner designed to prove a case against a convenient suspect by procuring unreliable evidence and, when necessary, falsifying and fabricating evidence without regard to whether policies, practices or customs might result in the conviction of persons who are actually innocent"; and 5) "being deliberately indifferent to the violation of the rights of a suspect by an officer or employee." (Id. ¶¶ 51-52; see also id. ¶¶ 53-54.)  As noted above, the defendants have moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (See filing 32.)

## II.    ANALYSIS

The defendants argue that the complaint, or aspects of the complaint, should be dismissed for several reasons.  Specifically, they argue that: 1) "The case is barred by the applicable statute of limitations and must be dismissed"; 2) "The plaintiff cannot recover against defendants Gage County or the individual Defendants in their official capacities under 42 U.S.C. § 1983 using a theory of respondeat superior"; 3) "Defendants Gage County Sheriff's Office and Gage County Attorney's Office are not suable entities under Nebraska law"; 4) "Defendant [S]mith is entitled to absolute prosecutorial immunity"; 5) "The complaint fails to state a cause of action against Defendant DeWitt"; 6) "Malicious prosecution is not an action that can be brought pursuant to 42 U.S.C. § 1983"; 7) "Plaintiff's complaint fails to state a cause of action against the individual defendants"; 8) "Plaintiff Lacks Standing to Challenge Alleged Violations of Others' Constitutional Rights During the Helen Wilson Homicide Investigation," and 9) The "court lacks pendant jurisdiction over any state law tort claims."  (Filing 32 at 1-2; filing 33 at 19.)  I shall analyze each of the defendants' arguments below.

## A.    Whether the Plaintiff's Claims Are Barred by the Applicable Statute of Limitations

The defendants argue first that the plaintiff's claims are untimely because he "has basically alleged false arrest and false imprisonment in his Complaint," and the statute of limitations for those claims expired four years after his March 15, 1989, arrest or his February 16, 1990, conviction.  (Defs.' Br., filing 33, at 6, 8.)[2]

The forum state's statute of limitations for personal injury torts applies in § 1983 actions, see Wallace v. Kato, 549 U.S. 384, 387 (2007), and there is no dispute that Nebraska's four-year statute of limitations governs the plaintiff's claims, see Bridgemen v. Nebraska State Pen, 849 F.2d 1076, 1077 (8th Cir. 1988); Neb. Rev. Stat. § 25-207.  The date on which the statute began to run is at issue.  If, as the defendants argue, the statute of limitations on the plaintiff's claims began to run at the time of his arrest or conviction, then his claims are not timely filed.[3]  On the other hand, if the plaintiff's claims accrued on November 7, 2008 (when charges against him were dismissed), then his claims are timely filed.

In Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), the Supreme Court held,

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship

---

[2]The defendants do not specify which of these dates triggered the running of the statute. They argue, "At the latest, Plaintiff had until February 16, 1994 to file his complaint pursuant to 42 U.S.C. § 1983."  (Defs.' Br., filing 33, at 8.)

[3]"The use of a state's statute of limitations also requires the use of its tolling statutes," Bridgeman, 849 F.2d at 1078, and Revised Statutes of Nebraska section 25-213 states that a person who is imprisoned is "entitled to bring [his] action within [the appropriate limitations period] after such disability is removed."  The Nebraska Supreme Court has held, however, that "a showing of a recognizable legal disability, separate from the mere fact of imprisonment, which prevents a person from protecting his or her rights is required to entitle a prisoner to have the statute of limitations tolled during imprisonment" pursuant to section 25-213.  Gordon v. Connell, 545 N.W.2d 722, 726 (Neb. 1996).  The plaintiff here does not argue that "a recognizable legal disability, separate from the mere fact of imprisonment, [prevented him] from protecting his . . . rights."  (See Pl.'s Response Br., filing 39, at 3-5.)  Tolling under section 25-213 does not appear to be an issue in this case.

to a conviction or sentence that has not been so invalidated is not cognizable
under § 1983.

(Footnote omitted).  The Court added that "a § 1983 cause of action for damages attributable to
an unconstitutional conviction or sentence does not accrue until the conviction or sentence has
been invalidated." Id. at 489-90.

The Court's holding in Heck clearly applies to claims that persons acting under color of
state law "engaged in an unlawful, unreasonable, and arbitrary investigation leading to [the
plaintiff's] arrest; knowingly destroyed evidence which was exculpatory in nature and could have
proved [the plaintiff's] innocence; and caused an illegal procedure to be used at [the plaintiff's]
trial." 512 U.S. at 479 (internal quotation marks omitted).  The Court explained that these claims
are most closely analogous to "[t]he common-law cause of action for malicious prosecution"–an
element of which requires proof that the prior criminal proceeding was terminated in favor of the
accused–"because, unlike the related cause of action for false arrest or imprisonment, it permits
damages for confinement imposed pursuant to legal process." Id. at 484.  False arrest claims, in
contrast, permit damages from "the time of detention up until issuance of process or arraignment,
but not more." Id. (citation omitted).  In Wallace v. Kato, 549 U.S. 384, 389-90 (2007), the court
elaborated on this distinction, stating,

Reflective of the fact that false imprisonment consists of detention without
legal process, a false imprisonment ends once the victim becomes held pursuant to
such process–when, for example, he is bound over by a magistrate or arraigned on
charges.  Thereafter, unlawful detention forms part of the damages for the
"entirely distinct" tort of malicious prosecution, which remedies detention
accompanied, not by absence of legal process, but by wrongful institution of legal
process.

(citation omitted).  Thus, while Heck holds that § 1983 claims analogous to malicious
prosecution accrue when the underlying conviction or sentence has been invalidated, Wallace
holds that "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in
violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins
to run at the time the claimant becomes detained due to legal process." 549 U.S. at 397
(emphasis added).

As noted above, the defendants argue that the plaintiff's claims in this case are "basically

13

. . . false arrest and false imprisonment," and therefore the four-year statute of limitations began to run no later than the date of the plaintiff's February 16, 1990, conviction. (Defs.' Br., filing 33, at 6; see also id. at 7-8.)  It is true that Count I of the complaint includes "False Arrest" in its title, (see Compl., filing 1, at 26), and it alleges in paragraph 46 that the plaintiff was unreasonably seized in violation of the Fourth Amendment.  Count II also alleges that the defendants conspired to deprive the plaintiff of his constitutional right "to be free from unreasonable arrest," among other things.  (See id. ¶ 48.)[4]  I agree with the defendants that the plaintiff's "false arrest" claims accrued more than four years before his complaint was filed, and I find that, in accordance with Wallace, they are untimely.  I disagree with the defendants, however, to the extent that they argue that the remainder of Counts I and II, or the complaint in its entirety, must be dismissed on the ground that the complaint alleges nothing more than a false arrest claim.  The complaint plainly includes claims that are distinct from mere false arrest claims; indeed, Counts I and II incorporate claims that are analogous to those before the Supreme Court in Heck.

In their reply brief, the defendants submit a relatively lengthy discussion of Simmons v. O'Brien, 77 F.3d 1093 (8th Cir. 1996), which they cited without discussion on page 7 of their opening brief.  (See Defs.' Reply Br., filing 42, at 2-3.)  According to the defendants, Simmons illustrates that it "is not necessarily true" that the plaintiff's Fourth, Fifth, Sixth, and Eighth Amendment claims would have impugned his conviction if he had pursued those claims successfully prior to November 7, 2008.  In other words, the defendants suggest that "it is not necessarily true" that the Heck rule applies to the plaintiff's non-false-arrest claims.  In Simmons, the Eighth Circuit held that a judgment in favor of a § 1983 plaintiff on a claim that his confession was coerced would not necessarily impugn the conviction that followed from that confession, and therefore his claim accrued even though a habeas court had not ruled on the validity of his conviction.  77 F.3d at 1094-95.  I fail to grasp Simmons' applicability to the

---

[4]I note parenthetically that the plaintiff submits that he "is making no claim of false arrest or false imprisonment."  (Pl.'s Response Br., filing 39, at 3.)  The plain language of the complaint contradicts this assertion.  In any event, for the reasons explained below, the plaintiff's false arrest claims will be dismissed.

instant case, as the plaintiff has not raised a claim that he was coerced into confessing to the Wilson homicide.  In any event, I find that the defendants' nonspecific, belated argument that claims other than the plaintiff's false arrest and false imprisonment claims <u>might</u> not fall within the <u>Heck</u> rule is insufficient to warrant dismissal of any such claims.

In summary, in accordance with <u>Wallace v. Kato</u>, 549 U.S. 384 (2007), I shall dismiss the plaintiff's false arrest and false imprisonment claims as untimely, but I reject the defendants' arguments that the plaintiff's remaining claims are barred by the applicable statute of limitations.

**B.    Whether the Gage County Sheriff's Office and Gage County Attorney's Office Are "Suable Entities" or "Persons" Within the Meaning of § 1983**

The defendants argue that the Gage County Sheriff's Office and Gage County Attorney's Office must be dismissed from this action because "they are not . . . separate entit[ies] suable under Nebraska law and are not 'persons' for the purposes of 42 U.S.C. § 1983 litigation." (Defs.' Br., filing 33, at 14.)  Whether the GCSO and the GCAO are "suable" and whether they are "persons" within the meaning of § 1983 are two distinct questions.  I need not address the latter question, however, because I find that the GCSO and the GCAO are not entities capable of suing or being sued under Nebraska law.

Federal Rule of Civil Procedure 17(b)(3) states that a court must look to "the law of the state where the court is located" to determine whether parties such as the GCSO and the GCAO[5] have the capacity to sue or be sued.  Nebraska law provides that counties may sue and be sued, <u>see</u> Neb. Rev. Stat. § 23-101, but the plaintiff has referred me to no authority stating that county departments, agencies, or offices–such as the GCSO and the GCAO–may sue or be sued independently from the county.

The Nebraska Court of Appeals has held that a plaintiff who intends to sue the York County Sheriff's Department must bring his suit "in the proper name of the county."  <u>Holmstedt</u>

---

[5]Rule 17(b)(3) applies to parties that are neither individuals nor corporations, subject to exceptions that are not applicable here.  <u>See</u> Fed. R. Civ. P. 17(b).

v. York County Jail Supervisor, 739 N.W.2d 449, 461 (Neb. Ct. App. 2007) rev'd on other grounds, 745 N.W.2d 317 (Neb. 2008). I see no reason why this principle should not apply with equal force to both the Gage County Sheriff's Office and the Gage County Attorney's Office. Cf. Jameson v. Plischke, 165 N.W.2d 373 (Neb. 1969) (holding that county board of supervisors is not a proper party under § 23-101); Meyer v. Lincoln Police Department, 347 F. Supp. 2d 706 (D. Neb. 2004) (holding that the Lincoln Police Department is an agency of the City of Lincoln, and has no separate legal status under Nebraska law).

In opposition to the defendants' motion, the plaintiff submits that because the Lincoln County Sheriff's Office was once a party to an employment discrimination suit, "there is authority that in Nebraska the office of a county sheriff is subject to suit." (Pl.'s Response Br., filing 39, at 7 (citing Lincoln County Sheriff's Office v. Horne, 423 N.W.2d 412 (Neb. 1988)).) There is no indication, however, that the Lincoln County Sheriff's Office raised any objection to its designation as a party in Horne, and I note that the County of Lincoln was also named as a party in that suit. In any event, Horne does not specifically address the issue at hand, and I find therefore that it offers little support for the plaintiff's position. See Meyer, 347 F. Supp. 2d at 708 (rejecting a similar argument that the mere fact of the existence of suits against local government departments establishes that those entities have the capacity to be sued over their objection).

For the foregoing reasons, the GCSO and the GCAO will be dismissed as defendants. It should be noted, however, that this finding does not necessarily mean that the plaintiff's claims against those entities cannot proceed against Gage County, which is a properly-named defendant in this case.

**C.    Whether the Plaintiff's Claims Against Gage County Must Be Dismissed for Failure to State a Claim**

The defendants argue that the plaintiff's claims against Gage County (and against Smith, Searcey, Lamkin, Harlan, Meints, DeWitt, and Price insofar as they are sued in their official capacities) must be dismissed because the plaintiff has not alleged "that a constitutional injury resulted from an official municipal policy or a widespread custom or practice of Gage [County]."

16

(Defs.' Br., filing 33, at 12.)

Preliminarily, I note that "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. Dept. of Social Services of the City of New York, 436 U.S. 658, 690 n.55 (1978)). In other words, the plaintiff's official-capacity claims against Smith, Searcey, Lamkin, Harlan, Meints, DeWitt, and Price are "in all respects other than name, to be treated as a suit against [Gage County]." Id. at 166 (citing Brandon v. Holt, 469 U.S. 464, 471-72 (1985)).[6]

It is well-established that a governmental entity cannot be held liable under § 1983 for the actions of its employees or agents on a theory of respondeat superior. See, e.g., Monell v. Dept. of Social Services of the City of New York, 436 U.S. 658, 691 (1978); Riehm v. Engelking, 538 F.3d 952, 962 (8th Cir. 2008); Springdale Educational Assoc. v. Springdale School Dist., 133 F.3d 649, 651 (8th Cir. 1998). "Rather, a plaintiff seeking to impose such liability is required to identify either an official [government] policy or a widespread custom or practice that caused the plaintiff's injury." Springdale Educational Assoc., 133 F.3d at 651 (citations omitted). See also Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (noting the distinction between "policy" and "custom or practice" theories of governmental liability in § 1983 cases).

The plaintiff argues that he has pleaded "sufficient facts to show, at least, a widespread custom or practice by the County Attorney and County Sheriff of Gage County, directed at securing White's conviction for first-degree murder for a crime he did not commit, by coercing falsely accused accomplices to lie under oath." (Pl.'s Response Br., filing 39, at 6.) More specifically, he argues,

> White alleged facts showing actual participation by all seven individual
> defendants in the effort to develop the false narrative that became the testimony

---

[6]To be precise, the complaint alleges that DeWitt, Searcey, Lamkin, Meints, Harlan, and Price are agents of the Gage County Sheriff's Office, which in turn is alleged to be "a Nebraska political subdivision"; and Smith is alleged to be an agent of the Gage County Attorney's Office, which also is alleged to be "a Nebraska political subdivision." (Compl., filing 1, ¶¶ 2-5.) As I have explained previously, however, the GCSO and GCAO are not subject to suit under Nebraska law. (See supra Part II.B.) The plaintiff's official capacity claims against DeWitt, Searcey, Lamkin, Meints, Harlan, and Price will be treated as claims against Gage County.

> that was the only evidence used to convict White of rape and murder he did not commit. Each of the individual defendants played a role in inducing White's accused accomplices to adopt the false narrative of the Wilson murder through coercion, including threatened use of the death penalty, if they did not cooperate. Both the duly elected County Attorney and duly elected County Sheriff played significant roles in inducing those falsely accused as White's accomplices to implicate others, and eventually give false testimony at White's trial.

(Id. at 5-6 (citation omitted).) The plaintiff's theory appears to be that the actions taken by the individual defendants reveal a widespread custom or practice "directed at securing White's conviction" for Wilson's murder. In other words, the plaintiff argues that a custom of "coercing falsely accused accomplices to lie under oath" was used in the Wilson homicide investigation by persons who participated in that investigation, including the county sheriff and the county attorney, and that their actions in this particular case amount to a "widespread custom or practice" that triggers county liability.[7]

In order to state a claim based on a "custom or practice" theory of governmental liability, a plaintiff must allege facts that, when taken as true, tend to prove the following elements:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

Springdale Educational Assoc. v. Springdale School Dist, 133 F.3d 649, 653 (8th Cir. 1998).

The defendants argue that the plaintiff's claims against Gage County must be dismissed because the plaintiff has failed to allege "a continuing, widespread, persistent pattern of

---

[7]I pause to emphasize that the plaintiff has not identified an official county policy that allegedly caused his injuries; nor does he argue that the defendants' actions were the result of decisions made by persons with the authority to establish final county policy concerning the matter in question. (See Pl.'s Response Br., filing 39, at 5-6.)

unconstitutional misconduct by Gage County and its law enforcement officers." (Defs.' Reply Br., filing 42, at 4.) In support of this argument, the defendants cite <u>Williams v. County of Scotts Bluff</u>, No. 7:05CV5018, 2005 WL 3159661, at *5 (Nov. 28, 2005), which includes the following quotation from <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985): "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." The language relied upon by the defendants clearly relates to the "policy" prong of <u>Monell</u>–not the "custom or practice" prong at issue here. <u>See Tuttle</u>, 471 U.S. at 824. Indeed, <u>Williams</u> goes on to state that, although the plaintiff's allegations of excessive force failed to satisfy the "policy" prong, his allegations could "be construed to allege a continuing, widespread, persistent pattern of unconstitutional misconduct by . . . law enforcement officers." 2005 WL 3159661, at *5.

In this case, the plaintiff has alleged that seven Gage County employees, including the county attorney and the county sheriff, repeatedly engaged in unconstitutional conduct against the plaintiff and several other persons over a period of approximately seven months. Although it is true that all of the allegations relate to a single homicide investigation, I cannot say that the plaintiff has failed to allege facts stating a facially plausible claim that there was a "continuing, widespread, persistent pattern of unconstitutional misconduct by the [county's] employees." <u>Springdale Educational Assoc.</u>, 133 F.3d at 653. <u>See also</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007) (holding that a pleading must include "enough facts to state a claim to relief that is plausible on its face"). Accordingly, I shall deny the defendants' motion to dismiss the plaintiff's claims against Gage County.

### D.    Whether Smith Is Entitled to Absolute Immunity

The defendants argue that the plaintiff's claims against Smith must be dismissed because Smith is entitled to absolute immunity. (Defs.' Br., filing 33, at 14-15.) I agree.

A prosecutor is entitled to absolute immunity from civil liability under § 1983 whenever he is acting as "an officer of the court." <u>Van de Kamp v. Goldstein</u>, 129 S. Ct. 855, 861 (2009).

19

That is, absolute immunity applies to prosecutors' "conduct in 'initiating a prosecution and presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" Burns v. Reed, 500 U.S. 478, 486 (1991) (quoting Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976)). However, "absolute immunity may not apply when a prosecutor . . . is instead engaged in other tasks, say, investigative or administrative tasks." Van de Kamp, 129 S. Ct. at 861. Thus, courts use a "functional approach" to determine whether absolute immunity applies in a given case. Burns, 500 U.S. at 486. See also Van de Kamp, 129 S. Ct. at 861; Kalina v. Fletcher, 522 U.S. 118, 127 (1997) ("Thus, in determining immunity, we examine 'the nature of the function performed, not the identity of the actor who performed it." (internal quotation marks and citation omitted)). In Imbler, the Supreme Court held that a prosecutor was absolutely immune from charges that the prosecutor "had permitted a fingerprint expert to give false testimony, that the prosecutor was responsible for the expert's having suppressed important evidence, and that the prosecutor had introduced a misleading artist's sketch into evidence." Van De Kamp, 129 S. Ct. at 860 (citing Imbler, 424 U.S. at 416).

> In the years since Imbler, [the Court has] held that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding or appears in court to present evidence in support of a search warrant application. [The Court has] held that absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, when the prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness in support of a warrant application.

Van De Kamp, 129 S. Ct. at 861 (citations omitted). Most recently, the Court held that prosecutors are entitled to absolute immunity from claims that certain administrative procedures–specifically, their methods of supervision and training concerning "how and when to make impeachment information available at trial" and their "[trial-related] information-system management"–were "constitutionally inadequate." Id. at 861, 863, 864-65. In every case, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns, 500 U.S. at 486.

The defendants argue,

> The facts alleged by Plaintiff as to Smith amount to Smith doing his job as county prosecutor. Although Plaintiff uses the words "investigate" in an attempt to keep Smith outside of absolute immunity, his specific facts fail to allege that

20

Smith's acts were investigatory, administrative, or otherwise outside the scope of a prosecutor. Smith is entitled to absolute immunity and he should be dismissed from the action.

(Defs.' Br., filing 33, at 15.)

In response, the plaintiff argues that "Smith was involved in the investigation of the Wilson homicide at its inception, some four years before White was even arrested," and that Smith "was . . . involved in drafting and filing two materially false affidavits that were use[d] to obtain legal process for White's arrest." (Pl.'s Response Br., filing 39, at 7-8.) I shall consider each of the plaintiff's arguments in turn.

First, the complaint does allege that Smith 1) "worked closely with the BPD and the GCSO during the [1985] investigatory phase" of the Wilson case, and 2) directly supervised the BPD, GCSO, and NSP as they conducted interviews in 1985. (See Compl., filing 1, ¶¶ 9, 14.) But the complaint does not allege that Smith (or any of the officers under his supervision) engaged in any unconstitutional misconduct at that stage of the investigation. On the contrary, the complaint states that "White . . [and] those later accused as his accomplices . . . were never considered to be serious suspects by the BPD, the GCSO or the NSP during the 1985 phase of the Wilson homicide investigation." (Id. ¶ 14.) Because the complaint does not seek to hold Smith liable for any investigatory actions that he took in 1985, the question whether he is entitled to absolute immunity for those actions is moot.

I now turn to the plaintiff's argument that Smith is not entitled to absolute immunity for his role in the "drafting and filing" of misleading affidavits. The complaint does allege that in March 1989, Smith assisted Searcey in the preparation of a "misleading" affidavit in support of a warrant for the arrest of White and Taylor. (See Compl., filing 1, ¶ 17.) The complaint also alleges that Smith assisted Searcey in the preparation of an addendum to that affidavit. (See id.) Notably, however, there is no allegation that Smith attested to the facts alleged in the affidavit or the addendum.

In Kalina v. Fletcher, 522 U.S. 118, 123 (1997), the Supreme Court specifically addressed the extent to which "a prosecutor may be held liable for conduct in obtaining an arrest warrant." In lieu of an "affidavit or 'sworn testimony establishing the grounds for issuing the warrant,'" the prosecutor in Kalina supported her motion for an arrest warrant with a "'Certification for

Determination of Probable Cause' . . . that summarized the evidence supporting the charge." <u>Id.</u> at 121. "She personally vouched for the truth of the facts set forth in the certification under penalty of perjury." <u>Id.</u> (footnote omitted). The arrestee later brought an action under § 1983, alleging that the prosecutor violated his constitutional right to be free from unreasonable seizures. <u>Id.</u> at 122. The Supreme Court concluded that the prosecutor was not entitled to absolute immunity for her conduct in executing the certification because, "[i]n doing so, [the prosecutor] performed an act that any competent witness might have performed." <u>Id.</u> at 129-30. Importantly, the Court explained that in other respects, the prosecutor's work was that "of an advocate and was integral to the initiation of the prosecution," stating,

> That characterization is appropriate <u>for her drafting of the certification</u>, her determination that the evidence was sufficiently strong to justify a probable-cause finding, her decision to file charges, and her presentation of the information and the motion to the court. Each of those matters involved the exercise of professional judgment; indeed, <u>even the selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause required the exercise of the judgment of an advocate.</u> But that judgment could not affect the truth or falsity of the factual statements themselves. Testifying about facts is the function of the witness, not the lawyer.

<u>Id.</u> at 130 (emphasis added).

I agree with the defendants that, because there are no allegations that Smith made any sworn statements in support of the arrest warrant, his conduct (i.e., assisting Searcey in the preparation of his affidavit and addendum) is protected by absolute immunity. (<u>See</u> Defs.' Reply Br., filing 42, at 9.) Therefore, to the extent that Smith is sued in his individual capacity, the plaintiff's claims against him shall be dismissed.

I note in passing that the plaintiff's brief includes a quote from <u>McGhee v. Pottawattamie County, Iowa</u>, 547 F.3d 922, 933 (8th Cir. 2008), <u>cert. granted</u>, 129 S. Ct. 2002 (April 20, 2009) (No. 08-1065), stating, "We find immunity does not extend to the actions of a County Attorney who violates a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not 'a distinctly prosecutorial function.'" (Pl.'s Response Br., filing 39, at 8.) Here, however, the plaintiff has not argued that Smith obtained, manufactured, coerced, and fabricated evidence, or engaged in any other non-prosecutorial functions that violated the plaintiff's constitutional rights; rather, he argues that

22

Smith was "involved in drafting and filing two materially false affidavits that were used to obtain" arrest warrants, (Pl.'s Response Br., filing 39, at 8), and <u>Kalina</u> establishes that this conduct is a prosecutorial function protected by absolute immunity. Though a finding of absolute immunity may "leave unredressed . . . wrongs done by [a] dishonest officer[]," it reflects a "balance of evils" that has been explained and developed in American jurisprudence for many years. <u>Van de Kamp</u>, 129 S. Ct. at 859 (citations and internal quotation marks omitted).

For the foregoing reasons, the individual-capacity claims against Smith will be dismissed.

### E.    Whether the Complaint Fails to State a Claim Against DeWitt

The defendants argue next that DeWitt must be dismissed from this action because the complaint fails to state a claim against him. (Defs.' Br., filing 33, at 15-16.) More specifically, the defendants argue that DeWitt must be dismissed because he is named as a defendant "solely on the basis of his supervisory capacities," and "there are no specific allegations that he had any personal involvement in or the requisite personal knowledge with respect to this case." (<u>Id.</u>) In opposition to the defendants' motion, the plaintiff argues that the complaint alleges "facts showing that [D]efendant DeWitt was a participant in coercing false statements from no less than three of White's claimed accomplices." (Pl.'s Response Br., filing 39, at 8 (citing Compl., filing 1, at pages 11, 20-21).) He adds that "Defendant DeWitt's conduct in this regard is sufficient to hold him liable to White both as an actual participant and as the supervisor of the other defendants who were deputies under his direct supervision." (<u>Id.</u>)

"A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation." <u>Brockinton v. City of Sherwood, Ark.</u>, 503 F.3d 667, 673 (8th Cir. 2007). "The standard of liability for failure to supervise is 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'" <u>Id.</u>

The complaint alleges that DeWitt was present for the taking of Winslow's second statement, which was allegedly manufactured by Searcey through suggestion. (<u>See</u> Compl.,

23

filing 1, ¶ 20.)  It also alleges that DeWitt helped arrange for Dean to meet with Price, heard Dean claim "that he was remembering pieces of the Wilson homicide in his dreams," and suggested to Shelden and Dean that Kathy Gonzalez was involved in the Wilson homicide (which both men later claimed to "remember" through dreams or relaxation).  (See id. at ¶¶ 31-31.)[8]  It seems to me that the complaint includes factual allegations that are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face."  Drobnak v. Andersen Corp., 561 F.3d 778, 783 (8th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  More specifically, the allegations that DeWitt was present when Searcey took Winslow's second statement state a plausible claim that DeWitt "demonstrated deliberate indifference or tacit authorization of the offensive acts" allegedly performed by Searcey, and the complaint plainly alleges that DeWitt directly participated in the generation of the false statements implicating Kathy Gonzalez.  I shall therefore deny the defendants' motion to dismiss DeWitt from the case.


**F.    Whether the Malicious Prosecution Claim Alleged in Count I Must Be Dismissed**


The defendants argue that the malicious prosecution claim alleged in Count I of the complaint must be dismissed.  (Defs.' Br., filing 33, at 16-17.)  In response, the plaintiff argues that he "is not bringing a state law claim for the tort of malicious prosecution," and that "[h]is complaint clearly states a civil rights claim pursuant to § 1983 for the violation of his constitutional rights causing injury."  (Pl.'s Response Br., filing 39, at 9.)

Based on the plaintiff's response, I find that, to the extent Count I can be read to raise a state law claim based on malicious prosecution, it is dismissed.  For the reasons stated in Part II.A., supra, the plaintiff's Fourth Amendment "false arrest" claims have already been dismissed. To the extent that the remainder of the claims alleged in Count I allege violations of constitutional rights, they will not be dismissed.

---

[8]Recall that the complaint contains two successive paragraphs numbered 31.

**G.    Whether the Complaint Fails to State a Cause of Action Against Defendants Lamkin, Meints, Harlan, Price, and Searcey**

The defendants argue that the complaint fails to state a claim against Defendants Lamkin, Meints, Harlan, Searcey, and Price because there are no allegations that any of these defendants "did some affirmative act, participated in the affirmative act of another, or failed to perform an act which resulted in 'an objectively serious deprivation' of the Plaintiff's constitutionally protected rights.'" (Defs.' Br., filing 33, at 18.)

"[W]hen ruling on a defendant's [Rule 12(b)(6)] motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curium) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)), and "all reasonable inferences from the complaint must be drawn in favor of the nonmoving party," Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588, 590 (8th Cir. 2004). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Erickson, 551 U.S. at 93. "Specific facts are not necessary; the statement need only '"give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (quoting Bell Atlantic Corp., 550 U.S. at 555). Nevertheless, "a viable complaint must . . . include 'enough facts to state a claim to relief that is plausible on its face.'" Hogue v. Palisades Collection, LLC, 494 F. Supp. 2d 1043, 1046 (S.D. Iowa 2007) (quoting Bell Atlantic Corp., 550 U.S. at 570). This does not mean that a case should be "dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations." Id. at 1046-47 (citations omitted). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1046 (quoting Bell Atlantic Corp., 550 U.S. at 555).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). "Section 1983 . . . requires a causal relationship between a defendant's conduct and a plaintiff's constitutional deprivation," and "[a]bsent such a relationship, the defendant is entitled to dismissal." Gordon v. Hansen, 168 F.3d 1109, 1113 (8th Cir. 1999) (citations omitted).

The complaint alleges, among other things, that in early May 1989, Harlan, Lamkin, Meints, and Searcey persuaded Shelden and Dean to name Kathy Gonzalez as a person who was involved in Wilson's homicide, and that they did so as part of an effort to link the plaintiff and his alleged accomplices to the Wilson crime. It also alleges that Price counseled Debra Shelden, Dean, and Gonzalez literally to dream of evidence linking the plaintiff and his alleged accomplices to the Wilson homicide, and that his efforts were successful with respect to Shelden and Dean. I cannot say that these allegations fail to state a plausible claim that these defendants personally took actions that may have violated the plaintiff's constitutional rights. Therefore, the plaintiff's claims against these defendants will not be dismissed on the ground that there are no allegations of a causal relationship between the defendants' acts and the alleged constitutional deprivations.

### H. Whether the Plaintiff Lacks Standing to Pursue His Claims

The defendants argue next that the plaintiff's claims must be dismissed because "Plaintiff is attempting to recover damages for the violation of third parties' constitutional rights," and "Plaintiff lacks standing to assert violations of a third party's civil rights." (Defs.' Br., filing 33, at 22.) This argument is without merit. It is true that the complaint includes factual allegations tending to establish that certain defendants violated the constitutional rights of persons other than the plaintiff. But it is well-established that "[i]f officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated." Wilson v. Lawrence County, 260 F.3d 946, 955 (8th Cir. 2001). The complaint plainly alleges that the plaintiff's due process rights were violated in this fashion.

### I. Whether this Court Lacks Pendant Jurisdiction Over Any State Law Tort Claims

Finally, the defendants argue that the "[p]laintiff is barred as a matter of law from pursuing any alleged state tort action against the Defendants" under the terms of Nebraska Political Subdivision Tort Claims Act (the Tort Claims Act), Neb. Rev. Stat. §§ 13-901 to 926.

(Defs.' Br., filing 33, at 26.)  In response, the plaintiff argues that he "has not asked this court to take pendant jurisdiction of any claim made" under the Tort Claims Act at this time.  (Pl.'s Response Br., filing 39, at 10.)  I take the plaintiff to mean that all of the claims alleged in his complaint are brought under § 1983, and none is meant to be a state tort claim.

Although some of the terms used by the plaintiff in his complaint–and in the complaint's headings in particular–suggest that the plaintiff has raised state law tort claims, the complaint clearly alleges that the plaintiff's claims are brought under § 1983, and that jurisdiction is appropriate under 28 U.S.C. §§ 1331 and 1343.  (See, e.g., Compl., filing 1, ¶ 7.)  To the extent that the complaint states any state law tort claims, those claims are dismissed in accordance with the plaintiff's concession.

**IT IS ORDERED** that:

1.    To the extent that the plaintiff's claims allege a false arrest or false imprisonment in violation of the Fourth Amendment, they are dismissed as untimely;

2.    The GCSO and the GCAO are dismissed as defendants;

3.    Defendant Smith is dismissed from this action insofar as he is sued in his individual capacity;

4.    To the extent that the complaint alleges state law claims based on malicious prosecution or other torts, those claims are dismissed; and

5.    In all other respects, the defendants' motion to dismiss, filing 32, is denied.

Dated October 14, 2009.

                    BY THE COURT

                    s/ Warren K. Urbom
                    United States Senior District Judge