IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JOSEPH E. WHITE,                                   )
                                                   )
                        Plaintiff,                 )              4:09CV3145
                                                   )
            v.                                      )
                                                   )
RICHARD T. SMITH, in his official                  )       MEMORANDUM AND ORDER ON
capacity, BURDETTE SEARCEY, Dep., in               )        DEFENDANTS' MOTION FOR
his official and individual capacities,            )       SUMMARY JUDGMENT AND MOTION
GERALD LAMKIN, Dep., in his official               )               TO STRIKE
and individual capacities, JERRY O.                )
DEWITT, Sheriff, in his official and               )
individual capacities, WAYNE R. PRICE,             )
PhD., in his official and individual               )
capacities, and COUNTY OF GAGE,                    )
NEBRASKA, a Nebraska political                     )
subdivision,                                       )
                                                   )
                        Defendants.                )
                                                   )

            On June 29, 2010, Defendants Richard Smith, Jerry DeWitt, Burdette Searcey, Wayne Price,

Gerald Lamkin, Kent Harlan, and Mark Meints filed a motion for summary judgment. (ECF No. 61.)

On January 23, 2011, briefing on this motion was completed, and the defendants filed a motion to

strike certain exhibits that the plaintiff, Joseph E. White, submitted in opposition to the defendants'

motion for summary judgment.  (ECF No. 129.)  My analysis of these motions follows.

## I.   THE DEFENDANTS' MOTION TO STRIKE

            In their motion to strike, the defendants argue that I should not consider the following

exhibits when determining whether the individual defendants are entitled to qualified immunity:  1)

the affidavit of Donald Luckeroth, 2) the affidavit of Richard Leo, 3) "any and all depositions taken

in 2010 submitted as . . . Exhibits by Plaintiffs," and 4) "any exhibits submitted that were created

1

between 1985 and 1989 by the Beatrice Police Department."  (Defs.'s Mot. to Strike at 2, ECF No. 129.)

### A.    The Luckeroth and Leo Affidavits

The defendants have moved to strike the affidavit of Donald F. Luckeroth, (see generally Luckeroth Aff., Pl.'s Ex. 144, ECF No. 113-3), and the affidavit of Dr. Richard A. Leo, (Leo Aff., Pl.'s Ex. 142, ECF No. 112-1 to 113-1).  (See Defs.' Br. at 1, 4-5, ECF No. 130.)  I have found that it is unnecessary for me to consider these affidavits in order to resolve the defendants' motion for summary judgment; therefore, the defendants' motion to strike these affidavits will be denied as moot.

### B.    The 2010 Depositions

The defendants have moved to strike "any and all depositions taken in 2010 submitted as an Exhibits [sic] by Plaintiffs with their opposition."  (Defs.' Mot. at 2, ECF No. 129.)    More specifically, the defendants object to my consideration of the Deposition of Donald Luckeroth (Pl.'s Ex. 89, ECF No. 108-8), the Deposition of Ralph Stevens, (Pl.'s Ex. 91, ECF No. 109-1), the Deposition of William Fitzgerald, (Pl.'s Ex. 99, ECF No. 109-9), the Deposition of Thomas Winslow, (Pl.'s Ex. 104, ECF No. 109-14), the Deposition of Kathleen Gonzalez, (Pl.'s Ex. 109, ECF No. 110-5), the Deposition of Ada Joann Taylor taken on September 28, 1989, (Pl.'s Ex. 115, ECF No. 110-11), the Deposition of James Dean (Pl.'s Ex. 122, ECF No. 111-5), and the Deposition of Ada Joann Taylor taken on November 3, 2010 (Pl.'s Ex. 140, ECF No. 111-23).

The defendants argue first that these depositions must be stricken because they were "taken in violation of the Court's Order to Stay."  (See Defs.' Br., Attach. 1 at 14-18, ECF No. 130-1.)[1]  It is true that on June 30, 2010, the defendants filed a "Motion to Stay Proceedings," (ECF No. 76), and on August 12, 2010, the magistrate judge entered an order stating, "All discovery in this case shall be stayed until 30 days after the court rules on the defendants' pending motion for summary judgment," (ECF No. 102).  With the exception of the Deposition of Ada Joann Taylor taken on September 28, 1989, the depositions listed above were taken during the period covered by the

---

[1] The defendants also object to the Deposition of Corey O'Brien for this same reason, but the chart that they have submitted in support of their motion indicates that this deposition was not filed in the instant case.  (See Defs.' Br., Attach. 1 at 9, ECF No. 130-1.)

discovery stay ordered by the magistrate judge.  However, none of these depositions was taken in the instant case (or any of the cases in the group that includes the instant case).[2]  The Deposition of Ada Joann Taylor dated September 28, 1989, was taken in <u>State v. White</u>, Doc. K, Page 46 (Gage Cnty. Ct.), and the remaining depositions were taken in connection with a group of Nebraska state cases that includes <u>Dean v. State</u>, No. CI 10-90 (Gage Cnty. Ct.), <u>Taylor v. State</u>, No. CI 10-91 (Gage Cnty. Ct.), <u>White v. State</u>, No. CI 10-92 (Gage Cnty. Ct.), <u>Winslow v. State</u>, No. CI 10-93 (Gage Cnty. Ct.), and <u>Gonzalez v. State</u>, No CI 10-94 (Gage Cnty. Ct.).  Because the depositions were taken in state cases that were not subject to the discovery stay imposed in the instant case, it cannot be said that these depositions were taken in violation of the magistrate judge's order.

In their reply brief, the defendants state,

> . . . Plaintiffs White et al. argue that Defendants' contention that the depositions taken in the State case were taken in violation of the Court's Order to Stay is not true.  However, during the hearing on the Defendants' Motion to Stay, the Court indicated that it would not try to control discovery in the State case, but that such evidence that might be obtained through the State case is likely to be inadmissible in the current federal case.  The Plaintiffs continued with discovery in the State case at their own peril.  The Court, upon the Defendants' objections, should disallow discovery submitted in the federal case that was taken during the time in which the Stay was in place.

(Defs.' Reply Br. at 4, ECF No. 134.)  I note in passing that I can find no record of any hearing on the defendants' motion to stay, nor can I verify that the magistrate judge warned the parties that the state court depositions might not be admissible in the instant case.  In any event, I remain unpersuaded that the depositions cannot be considered merely because discovery was stayed in the instant case.

The defendants have also made broad hearsay, relevance, and foundation objections to the depositions.  (<u>See</u> Defs.' Br., Attach. 1 at 14-18, ECF No. 130-1.)  To the extent that these objections are directed to the depositions in their entireties, the objections are overruled.

In the reply brief that they have submitted in support of their motion for summary judgment, the defendants argue that the 2010 depositions of Winslow, Taylor, and Gonzalez should not be

---

[2] See <u>Dean v. Smith</u>, No. 4:09cv 3145 (D. Neb. filed July 14, 2009); <u>Gonzalez v. Smith</u>, No. 4:09cv3146 (D. Neb. filed July 15, 2009); <u>Winslow v. Smith</u>, No. 4:09cv3147 (D. Neb. filed July 15, 2009); <u>Taylor v. Smith</u>, No. 4:09cv3148 (D. Neb. filed July 15, 2009).

considered because they are "self-serving" and because there is "nothing in the record to support the allegations contained therein." (Defs.' Reply Br. at 9, ECF No. 128.) In essence, the defendants argue that because there is no evidence apart from the depositions "to dispute the material facts presented by the Defendants," and because there is no evidence of an improper motive on the part of the investigators, I should disregard the depositions. (Id. at 11.) The defendants' argument is not persuasive. I shall not exclude the plaintiff's exhibits on the ground that there is not <u>more</u> evidence available in some other form to corroborate witnesses' sworn statements.

### C.   The Beatrice Police Department Records

The defendants have moved to strike "any exhibits submitted that were created between 1985 and 1989 by the Beatrice Police Department." (Defs.' Mot. at 2, ECF No. 129.)[3] The defendants argue first that I must strike these "BPD Reports" because they are irrelevant and because there has been "no showing that the Defendants considered these documents in their investigation." (See Defs.' Br., Attach. 1 at 7-8, 10-12, 14-16, 18-19.) I note, however, that in the brief filed by the defendants in support of their summary judgment motion, the defendants argue that when Sheriff DeWitt hired Burdette Searcey as a Deputy Sheriff, "Searcey was then able to review BPD reports and obtain more information about the Wilson homicide." (Defs.'s Br. at 11, Statement of Facts ¶ 25, ECF No. 62.) According to Searcey, the BPD reports "verified information [Searcey] received in [his] independent investigation and confirmed his theory that more than one person was involved in the crime." (Id.) In light of these facts, the defendants' argument that the BPD reports are irrelevant is not well-taken.

The defendants also submit–without supporting argument or elaboration–"Hearsay" and "Foundation" objections to the BPD reports. (See Defs.' Br., Attach. 1 at 7-8, 10-12, 14-16, 18-19.) The hearsay objection is overruled. The defendants' foundation objection, however, merits discussion.

---

[3] The relevant exhibits are identified by number in a table that accompanies the defendants' brief–though it appears that the filing numbers cited by the defendants do not correspond to the filing numbers of the exhibits in this case, and some of the exhibits are listed multiple times.. (See Defs.' Br., Attach. 1, ECF No. 130-1.) This table also specifies the defendants' objections to each exhibit.

4

Though their motion to strike does not expressly challenge the authenticity of the BPD reports, I note that in the reply brief submitted in support of their motion for summary judgment, the defendants state, "Most of the Plaintiff's exhibits are inadmissible and presented without authentication." (Defs.' Reply Br. at 4, ECF No. 128.)  A document that has not been authenticated cannot be considered in connection with a summary judgment motion.  See, e.g., DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach, 576 F.3d 820, 825-26 (8th Cir. 2009) (quoting Shanklin v. Fitzgerald, 397 F.3d 596, 602 (8th Cir. 2005)).  "Federal Rule of Evidence 901(a) provides that the requirement of authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims."  Jones v. National American University, 608 F.3d 1039, 1045 (8th Cir. 2010).  "The party authenticating the exhibit 'need only prove a rational basis for that party's claim that the document is what it is asserted to be.'"  Id. (quoting United States v. Wadena, 152 F.3d 831, 854 (8th Cir. 1998)).  "This may be done with circumstantial evidence."  Id. (quoting Wadena, 152 F.3d at 854).  See also United States v. Natale, 526 F.2d 1160, 1173 (8th Cir. 1988) (providing an example of authentication by circumstantial evidence).  Here, the BPD reports submitted for my consideration by the plaintiff are accompanied by an affidavit stating, in pertinent part, that one of the plaintiff's attorneys "prepared the evidence accompanying this affidavit" and "personally know[s] that the exhibits . . . are true and correct copies of the documents received in discover [sic] or pursuant to mandatory disclosure, or obtained from the authentic source of such document."  (Patterson Aff. ¶¶ 1-3, ECF No. 106.)  Although I have no reason to doubt that Mr. Patterson has provided me with exhibits that "are true and correct copies of the documents" that have come into his possession during the course of this litigation, his affidavit is insufficient to support a finding that the BPD documents are what he claims them to be.[4]

I am mindful of the fact that a discovery stay has likely prevented the plaintiff from establishing the authenticity of some exhibits.[5]  Nevertheless, the Eighth Circuit's instructions are

---

[4] I am not certain what to make of the claim that a document was obtained from "the authentic source."  In any event, the plaintiff has not cited a specific source for any of the BPD reports (or any of the other documents appearing in his index of evidence).

[5] It merits mention that although the plaintiff objected to the stay, he has not moved specifically for leave to conduct discovery for the limited purpose of establishing the authenticity

clear, and I cannot consider documents that have not been authenticated.  I therefore grant the defendants' motion to strike the documents to which they have made foundation objections–including several BPD reports and certain other exhibits.  Specifically, I shall strike the plaintiff's exhibits numbered 3-4, 7-13, 19, 44, 85-86, 88, 92-96, 98, 100-103, 105, 139, and 145. (See Defs.' Br., Attach. 1 at 7-8, 10-11, 12, 14-16, 18-19.)[6]  Although I shall not consider these exhibits, I shall occasionally call attention to them when they appear to corroborate other evidence in the record.

### D.   Additional Objections

If I find it necessary to rule explicitly upon any objections that have not been addressed above, those rulings will appear in the pages that follow.

## II.   THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants argue that summary judgment must be entered in their favor because they are entitled to qualified immunity.  (See Mot. for Summ. J. at 1-2, ECF No. 61.)  For the following reasons, I must deny the defendants' motion.

### A.   Background

The facts set forth below are taken from the defendants' statement of facts, (Defs.' Br. at 4-45, ECF No. 62), and the "Factual Background" section of the plaintiff's brief, (Pl.'s Response Br. at 2-65, ECF No. 105).  In setting forth these facts, I have construed the underlying evidence in a light favorable to the plaintiff, and I have afforded him the benefit of all reasonable inferences.  E.g., Preston v. City of Pleasant Hill, 642 F.3d 646, 651 (8th Cir. 2011); McKenney v. Harrison, 635 F.3d 354, 358 (8th Cir. 2011).

### 1.   The Defendants' Objections to the Plaintiff's Facts

Preliminarily, I must address the defendants' arguments that the plaintiff "failed to respond to the Defendants' statement of material facts in the manner required by NECivR 56.1(b)(1)."

of his documents.

[6] The defendants also object to Plaintiff's Exhibit 2 on foundational grounds, but I find that an adequate foundation for this document was established in Ralph Stevens' deposition. (See Pl.'s Ex. 91 at 21-25, ECF No. 109-1.)

(Defs.' Reply Br. at 3, ECF No. 128.)   The defendants claim that the plaintiff: 1) responded to the defendants' statement of facts with a citation to a "self-serving affidavit," and thereby "failed to point to the record to show a material issue of fact"; 2) submitted "a multitude of exhibits not even mentioned in the brief"; 3) distributed citations to exhibits "throughout the brief so it is impossible to determine . . . which of the Defendants' facts" the plaintiff disputes; 4) submitted a narrative discussion of facts that does "not correspond at all to the Defendants' statement of facts"; and 5) failed to submit "a concise response to the [defendants'] statement of material facts" that addresses "each numbered paragraph in the movant's statement" and includes "pinpoint citation[s] to . . . proper [supporting] record[s]."  (Id. at 4-5.)

Many of the defendants' points are well-taken.  I am not obliged to consider any exhibits appearing in the plaintiff's index of evidence that have not been cited in the plaintiff's brief–though the rules allow me to consider those materials if I choose to do so.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  Also, I am not obliged to track down support for factual assertions in the plaintiff's brief if those assertions are not accompanied by pinpoint citations to supporting exhibits.[7]

It is also true that the plaintiff has submitted a narrative response to the defendants' statement of facts, and the plaintiff's narrative lacks references to the numbered paragraphs of the defendants' statement.  The defendants suggest that, as a sanction for the plaintiff's failure to draft a response that corresponds to their statement of facts paragraph-for-paragraph, I should deem all of the facts set forth in the defendants' statement "admitted and uncontroverted."  (Defs.' Reply Br. at 4-5, ECF No. 128.)  The defendants cite Nebraska Civil Rule 56.1(b) in support of their position. (See id.)  In pertinent part, Rule 56.1(b) states,

> **(1)   Response to Movant's Statement.**   The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts.   The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the

---

[7] I note in passing, however, that many of the defendants' statements of fact include citations to lengthy exhibits (such as affidavits, transcripts of statements, and depositions) that lack pinpoint references to the relevant pages of those exhibits.

opposing party relies.  <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

(Emphasis in original).

I have reviewed carefully the plaintiff's response to the defendants' statement of material facts, and although it is not without shortcomings, I cannot say that it offends Rule 56.1(b) in such a way that the defendants' statement of facts must be deemed admitted.

Rule 56.1(b)(1) states that the opposing party's response must be "concise." I would not call the plaintiff's narrative response "concise," because it includes a number of assertions that lack references to supporting materials and/or amount to argument (as opposed to recitations of fact). (<u>See, e.g.</u>, Pl.'s Br. at 55 ("Kathy Gonzalez: The Misfortune of Having Type B Blood").)  It also includes some superfluous details.  (<u>See, e.g.</u>, <u>id.</u> at 9-10 (describing the plaintiff's early life).)  These portions of the plaintiff's response will be disregarded.  I note, however, that unlike Rule 56.1(a), which governs the statements of material facts that must be submitted by moving parties, Rule 56.1(b) does not state that opposing parties must submit a response that consists of "short numbered paragraphs."  NECivR 56.1(a)(2) (emphasis omitted).  The fact that the plaintiff's response lacks numbered paragraphs does not violate the local rule.

Rule 56.1(b)(1) also states that the response  "should address each numbered paragraph in the movant's statement," and that it should include pinpoint citations to the record "in the case of any disagreement." It warns that the "[p]roperly referenced material facts in the movant's statement" are deemed admitted "unless controverted in the opposing party's response."  The defendants interpret this portion of the rule to mean that the plaintiff's response must not only address each of the numbered paragraphs in their statement of facts, but must "correspond" to their statement of facts.  (Defs.' Reply Br. at 5.)  I take it that the defendants mean that the plaintiff's response must be organized in a sequence that matches that of the defendants' statement of facts; or, perhaps the defendants mean that the plaintiff's response must include pinpoint references not only to the records it draws upon for support, but also to the defendants' own statement of facts.

There is support for the defendants' interpretation of the rule.  In <u>VanHorn v. Nebraska State Racing Commission</u>, No. 4:03CV3336, at 3 (D. Neb. July 1, 2005), <u>rev'd on other grounds</u>, 457 F.3d

8

844 (8th Cir. 2006),[8] another court in this district held that Rule 56.1(b)(1) was violated where "[t]he plaintiffs . . . supplied their own statement of material facts in 50 numbered paragraphs that [did] not correspond to the defendants' statement, and . . . interspersed additional facts throughout their 47-page brief." The plaintiff ignores cases such as VanHorn at his peril. Although district court decisions are not binding precedent, see, e.g., Camreta v. Greene, 131 S. Ct. 2020, 2033 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d], p. 134-26 (3d ed. 2011))), a district court is free to interpret its own local rules, and its interpretation is generally owed deference on appeal, see, e.g., Morgan Distributing Co., Inc. v. Unidynamic Corp., 868 F.2d 992, 996 (8th Cir. 1989).

I note, however, that unlike local rules in other jurisdictions, Local Rule 56.1(b)(1) does not provide clear notice that a response must correspond to the movant's statement of facts. Compare NECivR 56.1(b)(1) with W.D. Mo. Local Rule 56.1(a) ("Each fact in dispute shall be set forth in a separate paragraph [in the respondent's suggestions in opposition to summary judgment], . . . and, if applicable, shall state the paragraph number in movant's listing of facts that is disputed."). In other words, it seems to me that one can "address" and "controvert" the numbered paragraphs in a moving party's statement of material facts–and thereby comply with the letter of Rule 56.1(b)(1)–without drafting a response that "corresponds" to the statement of material facts in the manner that the defendants demand.

Because I am not persuaded that the plaintiff has violated the terms of Rule 56.1(b)(1) as currently written, I shall not disregard the plaintiff's facts out-of-hand. See Jenkins v. Winter, 540 F.3d 742, 747 (8th Cir. 2008) (holding that because the plaintiff complied with the terms of the relevant local rule, the district court erred by not considering the plaintiff's statement of facts). Nevertheless, the plaintiff's response is problematic. On the one hand, the response generally does address each paragraph of the defendants' statement of facts wherein disagreement lies, and it generally does include pinpoint citations to the materials upon which the plaintiff relies. On the other hand, because the response does not correspond (or cite) to the defendants' statement of facts,

---

[8] The defendants cite the Eighth Circuit's opinion in VanHorn on page 5 of their reply brief.

and because the parties' submissions are so lengthy, it is difficult for me to gather the undisputed facts and identify areas of dispute.

I have reviewed the plaintiff's response, I have compared the response with the defendants's statement of facts, and I have attempted to identify all of the material facts–including those that are genuinely disputed. However, the plaintiff must bear the risk that, due to the lack of correspondence between his response and the defendants' statement of facts, I might fail to identify a genuine dispute raised somewhere within his narrative.

**2.    The Parties**

Plaintiff Joseph E. White was a resident of Beatrice, Nebraska, in February 1985. (E.g., Pl.'s Ex. 1 at 3, ECF No. 106-1.)  He was known by the nickname "Lobo."  (E.g., Searcey Aff. ¶ 13, Def.'s Ex. 2, ECF No. 71-1.)

Defendant Richard Smith was appointed to the position of Gage County Attorney by the Gage County, Nebraska, Board of Supervisors on April 1, 1980. (Smith Aff. ¶ 1, Defs.' Ex. 1, ECF No. 63-1.) In 1982, Smith was elected to that same position, and he remained Gage County Attorney until January 5, 2007. (Id.)  During all relevant times, Smith also served as the ex officio coroner for Gage County, and he "performed all duties required of a coroner" in the Helen Wilson homicide case. (Id. ¶ 2.) I note in passing that Smith has been dismissed from this action insofar as he is sued in his individual capacity. (See Mem. & Order on Defs.' Mot. to Dismiss, ECF No. 43.)

Defendant Burdette Searcey was employed as an investigator with the Beatrice Police Department (BPD) from 1977 until 1982. (Searcey Aff. ¶ 2.) Donald Luckeroth, who was then the Chief of the Beatrice Police Department, testified in his deposition that he was not sorry to see Searcey leave the department because Searcey "wasn't a team worker." (Pl.'s Ex. 89 at 25, ECF No. 108-8.) According to Luckeroth, Searcey had problems with another BPD Officer, Sam Stevens, during their time together on the force. (Id. at 27-28.) Although Searcey had not been assigned to an investigation that was being conducted by Stevens, Searcey "wanted to take over the investigation," conducted interviews with people, and discussed his findings with the county attorney, but he then failed to prepare reports for the BPD or inform Stevens that he had conducted the interviews. (Id. at 28.) Stevens testified that he was above Searcey in the chain of command, but he felt like Searcey "was out to get [him] for some reason." (Pl.'s Ex. 91 at 49, ECF No. 109-1.)

10

William Fitzgerald, who was Searcey's friend and superior officer at the BPD, testified that Searcey left the department "on good terms," and Fitzgerald was not aware of any problems or bad feelings between Searcey and the BPD. (Pl.'s Ex. 99 at 38, 41, ECF No. 109-9. See also id. at 79 (indicating that Searcey occasionally had to be prodded to turn in reports, but was otherwise a good officer).) According to Luckeroth, however, Searcey said that the BPD had "very poor administration" when he left the force. (Pl.'s Ex. 89 at 65.)

Searcey became a farmer after leaving the BPD in 1982, but he also "began the process of becoming a licensed private investigator." (Searcey Aff. ¶ 2.) He reapplied to the BPD a few years later, but the Civil Service Commission decided not to rehire him. (Pl.'s Ex. 89 at 27, 65.) He was hired as a deputy sheriff for the Gage County Sheriff's Office (GCSO) in 1987. (Id.) He resigned from his position in the GCSO in November 1992. (Id.)

Defendant Wayne Price, Ph.D., was, at relevant times, a part-time deputy sheriff and police psychologist for the GCSO. (Price Aff. ¶¶ 1-2, Defs.' Ex. 3, ECF No. 74-1.) He was involved in "multiple cases with Gage County as a patrol officer [and] as a negotiator," he performed "hundreds of court evaluations and criminal evaluations," and he "consulted on a multitude of criminal cases." (Id.)

Defendant Jerry DeWitt was a Nebraska State Trooper from October 1, 1963, to December 31, 1986. (DeWitt Aff. ¶ 2, Defs.' Ex. 4, ECF No. 74-3.) He was elected Sheriff of Gage County, Nebraska, on January 8, 1987, and he continued to serve in that position until he retired in January 2007. (Id. ¶ 1.)

At relevant times, Defendant Gerald Lamkin, Kent Harlan and Mark Meints were deputy sheriffs for the GCSO. (Lamkin Aff. ¶ 2, Defs.' Ex. 5, ECF No. 75-1; Harlan Aff. ¶ 2, Defs.' Ex. 6, ECF No. 75-3; Meints Aff. ¶ 2, Defs.' Ex. 7, ECF No. 75-5.)

### 3.   The Wilson Homicide and Investigation

During the night of February 5, 1985, Helen Wilson was raped and murdered in her apartment in Beatrice, Nebraska. (E.g., Smith Aff. ¶ 3.) Her body was discovered at approximately 9:30 a.m. on February 6. (Smith Aff. Ex. 1A at 1, ECF No. 63-2.) The BPD opened an investigation, and BPD Chief Donald Luckeroth assigned BPD Sergeant Stevens and BPD Lieutenant William Fitzgerald to the case. (Pl.'s Ex. 89 at 14, ECF No. 108-8.) At Smith's request,

11

the GCSO and the Nebraska State Patrol (NSP) provided assistance to the BPD. (Id. at 16; Smith Aff. ¶¶ 3, 5.) On February 6, 1985, Smith, acting in his capacity as Gage County coroner, authorized an autopsy. (Smith Aff. ¶ 4.) The results of the autopsy indicated that Wilson's death likely occurred sometime between 8 p.m. and midnight on February 5. (Id.)

The BPD's investigation of the crime scene revealed that the door stop at Wilson's apartment appeared to have been pried away from the door frame. (Pl.'s Ex. 2 at 2, ECF No. 106-2.) A "vicious struggle" seemed to have occurred in the bedroom, and blood was found on the bedding and on the wall. (Id. at 1-2.) A small, black-handled steak knife similar to the knives in Wilson's kitchen was found in the bedroom under a box of tissues. (Id. at 2.) Wilson's body was discovered in the living room. (Id. at 1.) A scarf had been wrapped tightly around her head and mouth, and her hands were bound loosely by a towel. (Pl.'s Ex. 45 at 3-4, ECF No. 107-5.) She had suffered traumatic fractures to her sternum, left fifth and sixth ribs, and left humerus. (Id. at 2.) She had also suffered abrasions to her face, anterior thorax, and right knee, and she had "[d]efense wounds" on her left thumb and right wrist "consistent with sharp instrument lacerations." (Id.) The autopsy indicated that Wilson died by suffocation. (Id.) It also indicated that she had been raped vaginally and anally, and evidence suggested that the "rape may have occurred after the heart stopped beating." (Id.)

More than $1000 in cash was found in Wilson's apartment, along with checks and "several large money market certificates." (Pl.'s Ex. 87 at 5, ECF No. 108-6.)[9] Two rings and a wristwatch remained on her body. (Pl.'s Ex. 45 at 4.)

The BPD submitted a request to the NSP Criminalistics Laboratory for an examination of blood, semen, and hairs recovered from Wilson's apartment. (Pl.'s Ex. 90 at 1, ECF No. 108-9.) Dr. Regina Roy, a serologist at the Criminalistics Laboratory, prepared a report stating that blood of types O and B were found among the samples, that the attacker's blood type was B, and that the attacker was "a non-secretor of 'B' blood group substances in his semen." (Id. at 2-4.)

---

[9] The defendants object to my consideration of this exhibit on the grounds that it is "Hearsay" and "Speculative." (Defs.' Br., Attach. 1 at 14, ECF No. 130-1.) These objections are overruled.

Investigators interviewed members of Wilson's family and learned that Wilson's son, Darrell, visited with Wilson until 9:45 p.m. on the night of February 5. (Pl.'s Ex. 99 at 16-17, ECF No. 109-9.)  Darrell or his wife telephoned Wilson's apartment three times on or around midnight that evening, but Wilson did not answer their calls. (Id. at 17-18.)

FBI Agent Peter Klismet prepared an offender profile for the BPD. (Pl.'s Ex. 87.) Klismet opined that it was "highly unlikely" that two offenders were involved in the crime, adding, "[w]e can state with almost total certainty that this crime was committed by one individual acting alone." (Id. at 8.)[10]  He also opined that the "considerable amount of money and other negotiables found inside the victim's residence" showed that "robbery [was] definitely not . . . the motive for this attack." (Id. at 5.)

The record indicates that the BPD investigation focused on identifying a male with type B blood who was a non-secretor. (E.g., Pl.'s Ex. 91 at 35.)  In March 1985, the BPD investigators focused their attention on Bruce Allen Smith and attempted to obtain biological samples from him. (E.g., Pl.'s Ex. 97, ECF No. 109-7; Pl.'s Ex. 99 at 27-29.)  Bruce Smith eventually submitted blood, hair, and fingerprints to the investigators in Oklahoma. (Pl.'s Ex. 97; Pl's Ex. 99 at 29-30.)  A lab technician working for the Oklahoma City police department advised the investigators that Smith appeared to be a secretor. (Pl.'s Ex. 97 at 2.)  As a result, the investigators ruled out Bruce Smith as a suspect in the Wilson homicide. (Id.; see also Pl.'s Ex. 99 at 30.)  Nevertheless, Fitzgerald transported the evidence obtained from Smith back to Beatrice. (Pl.'s Ex. 97 at 2.)

The BPD officers' investigation also brought them into contact with Joseph White, Ada Joann Taylor (generally referred to as "Joann Taylor"), Mark Goodson, Clifford Shelden, and Thomas Winslow. (E.g., Pl.'s Ex. 1 at 2-4, ECF No. 106-1.)  On or about March 2, 1985, Goodson and Clifford Shelden reported to a BPD officer that they had information about the homicide. (Id. at 2.)  Goodson then gave a taped statement in which he claimed to have spoken with Taylor, and Taylor allegedly informed him that she and her brother (whom Goodson erroneously believed to be White) left Beatrice because they were involved in the homicide. (Id. at 2-3.)  In fact, Stevens had already interviewed White sometime during the second week of February, 1985. (Id. at 3.)  Rumors

---

[10] As noted below, Defendant Price also formed an impression that this was "a one-person crime." (Price Aff. Ex. 3L at 22-23, ECF No. 74-2.)

of his alleged involvement in the homicide had reached White, and White visited Stevens on his own accord to dispel those rumors before he followed through on plans to leave town. (Id.; see also Pl.'s Ex. 91 at 35.)  Stevens obtained information from White indicating that White's blood type was O, advised White that he could leave town, and informed White that officers may contact him in the future, if necessary. (Pl.'s Ex. 1 at 3.) Stevens felt that White's blood type "almost eliminated him" as a suspect in the investigation. (Pl.'s Ex. 91 at 35.)   White did leave Beatrice sometime after meeting with Stevens, and it appears that Taylor left at approximately the same time–though it is unclear whether they left town together.

Stevens learned that Clifford Shelden was hospitalized on the night of the homicide. (Pl.'s Ex. 1 at 2.) He also learned on or about June 4, 1985, that Goodson's blood type was O+. (Id. at 3-4.) On December 5, 1985, Stevens spoke with Thomas Winslow and arranged for Winslow to take a blood test on December 9, 1985. (Id. at 4.) This test revealed that Winslow's blood type was A+. (Id.)

Also in December 1985, Stevens came to believe that White was living with Taylor in North Carolina, and he attempted to have law enforcement officers there obtain "major case prints" or a blood sample from White. (Pl.'s Ex. 1 at 4.) Although he was unable to locate White, he did eventually make telephone contact with Joann Taylor (who was in Texas) on December 11, 1985. (Id.) Taylor informed Stevens that she had not seen White since she left Beatrice. (Id.)

During his deposition, Stevens said that he was aware of rumors that White and Taylor were involved in the homicide, but he never believed them. (Pl.'s Ex. 91 at 40-41, 150-151.) He explained that they were the type of people that "wanted to make a name for themselves." (Id. at 40, 150-151.) He added that Joann Taylor was on drugs, carried weapons, fought, and was a "very unreliable person" because "she would change her stories during the conversation." (Id. at 41, 144.) Fitzgerald described Taylor as an aggressive "bully" who used drugs and would only be truthful with law enforcement "if it was a benefit to her or maybe one of her friends." (Pl.'s Ex. 99 at 70-71.) Luckeroth believed that it was common knowledge within the law enforcement community that Joann Taylor was a liar, and he described her as an attention-seeker who occasionally provided unreliable information to the police. (Pl.'s Ex. 89 at 60-61.)

14

Luckeroth reviewed the BPD's reports and discussed the case with Stevens and Fitzgerald, and he felt that there was never enough information to justify an arrest of any of the suspects. (Pl.'s Ex. 89 at 20-21.) He said that Richard Smith also read the reports and agreed that they did not have "anything to arrest anybody for." (Id. at 21.)

At the time of the Wilson homicide, Searcey was no longer with the BPD, but was engaged in farming. (Searcey Aff. ¶¶ 2, 5.) Searcey states that, due to his "experience in law enforcement" and his familiarity with the Wilson family, he "asked Wilson's daughter . . . if she would like [him] to look into the Wilson homicide." (Id.) Searcey does not indicate in his affidavit whether Wilson's daughter responded affirmatively to his offer; however, he does state that he obtained "background" from her. (Id.)[11] He then "attempted to obtain information [about the homicide] from the BPD," but he claims he was unsuccessful because he was "a private citizen" at the time. (Searcey Aff. ¶ 5.)[12] Thereafter, Searcey conducted his own "independent investigation" of the crime. (Id. ¶ 6.) Stevens, who knew Searcey from their time together in the BPD, believed that Searcey was determined "to solve this case one way or another." (Pl.'s Ex. 91 at 48-49, 64-65.) Luckeroth believed that Searcey "wanted to make a name for himself" and possibly wanted to "show up" Stevens. (Pl.'s Ex. 89 at 32-33.) In any event, Searcey did not share with the BPD any of the information he obtained during his private investigation. (E.g., Pl.'s Ex. 89 at 32-33; Pl.'s Ex. 91 at 52-53; Pl.'s Ex. 99 at 44-46.)

During his independent investigation, Searcey contacted "numerous individuals who were known to [him] from [his] years in law enforcement as persons who hung around the streets of Beatrice day and night." (Searcey Aff. ¶ 8.) Searcey learned from these individuals that "White had been arrested by the BPD around the area where assaults had been occurring on elderly women."

---

[11] It appears that Searcey contacted Wilson's daughter and began his investigation sometime during February 1985. (Searcey Aff. ¶ 7; Searcey Aff. Ex. 2B, ECF No. 71-2.)

[12] Searcey's claim that he was unable to obtain information from the BPD is contradicted by Fitzgerald, who testified that he recalled giving Searcey information–but not copies of police reports–concerning the Wilson case. (Pl.'s Ex. 99 at 42-43.) Luckeroth too believed that Searcey was able to obtain information about the Wilson case through either the BPD or the county attorney's office. (Pl.'s Ex. 89 at 31-32.)

15

(Id.)[13]  Searcey's "former confidential informants" also "assisted in identifying several persons who frequented the area where the Wilson homicide occurred."  (Id.)  In addition to White, Searcey's investigation led him to consider Thomas Winslow, Joann Taylor, Cliff Shelden, Mark Goodson, Beth Johnson, Debbie Brown, and Charlotte Mindenhall (also known as Charlotte Bishop and Charlotte Crumb) to be "persons of interest."  (Id. ¶¶ 8, 13, 27.)

As he investigated these persons of interest, Searcey verified that on the night of the homicide, Cliff Shelden was at the hospital and Beth Johnson was with her parents.  (Searcey Aff. ¶ 9.)  Mark Goodson told Searcey that he was out of town on the night of the homicide, and it appears that Searcey credited Goodson's statement.  (Id.)  Thomas Winslow claimed the he was working at a truck stop on the night of the homicide, but Winslow's employer later informed Searcey that Winslow had not shown up for his shift on the night in question.  (Id.)  Searcey's sources informed him that Joseph White and Joann Taylor left Beatrice shortly after the homicide.  (Id.)  Searcey began to form an opinion that "multiple persons committed the crime," and that these persons "included White, Taylor, and Winslow."  (Id. ¶ 6.)

Searcey re-contacted one of his confidential informants, and the informant told him that one of her friends, Lisa Podendorf, was behaving in a way that caused the informant to believe that Podendorf "might have information pertaining to the Wilson homicide."  (Searcey Aff. ¶ 10.)  Searcey contacted Podendorf, and initially Podendorf "indicated she had no knowledge of the homicide."  (Id.)  Upon further questioning from Searcey, Podendorf revealed that Joann Taylor had disclosed certain information about the homicide to her, but had threatened to kill Podendorf if Podendorf divulged this information.  (Id.)

On April 7, 1985, Searcey took a statement from Podendorf.  (Searcey Aff. ¶ 11.)  Evidently, however, Searcey did not make a record of this statement at the time of its taking.  According to a

---

[13] Agent Klismet's report states that three previous assaults upon older women occurred between June 27, 1983, and August 23, 1983, within approximately four blocks of Wilson's apartment.  (Pl.'s Ex. 87 at 6-8.)  The defendants have not referred me to any information verifying that White was, in fact, arrested in this area–though I note that the plaintiff's index includes an unauthenticated copy of a BPD incident report that might relate to this arrest.  (See Pl.'s Ex. 105, ECF No. 110-1.)  Because this document has not been authenticated, however, I shall disregard it.  The defendants have not claimed that the BPD was unaware that White had been arrested in the general area of the assaults.

report prepared by Searcey on February 28, 1989, Podendorf provided Searcey with the following information in April 1985:

> Lisa stated that at approximately 0730 hours or 0800 hours on February 6, 1985, while she was standing in Charles Park located by the Junior High School in the City of Beatrice, Nebraska, she was approached by JoAnn Taylor who began to visit with her.  She stated that during their conversation she noted that there were several police cars in and about the apartment building located across the street from the Junior High building . . . and that she had made a comment to JoAnn Taylor . . . that she wondered why all the police cars were at that location. . . . JoAnn Tayler then replied to her[,] "Oh haven't you heard, there was an older lady killed there last night."  Lisa . . . asked JoAnn Taylor what had happened, and JoAnn Taylor stated to her that an older lady was killed there and that she was killed by suffocation.  Lisa . . . asked JoAnn how she knew that and JoAnn stated that I know that because Lobo (Joseph White) and myself did it.  Lisa . . . replied back to JoAnn "Oh sure" in disbelief and . . . JoAnn Taylor said[,] "Look I can tell you where the lady is laying and what happened to her." . . . JoAnn then advised her that the woman could be found laying in her living room near a hallway on her back with her hands bound and that her face would be covered with an afghan.  Lisa . . . made a comment to JoAnn "Oh sure I'll bet you did it." . . . JoAnn Taylor then replied to Lisa[,] "Hey look I can prove it, I can even tell you the color of the foot stool that's laying by the body" and JoAnn Taylor proceeded to state that there would be a foot stool laying by the body turned upside down and that the foot stool was vinyl covered, green in color.

(Searcey Aff. Ex. 2B at 4, ECF No. 71-2.)

As noted above, Wilson's body was not discovered until approximately 9:30 a.m. on February 6, 1985.  Thus, Podendorf's conversation with Taylor could not have been triggered by the presence of police cars at 7:30 or 8:00 a.m., as Podendorf indicated in her statement.[14]  In addition, it merits mention that according to Stevens, Podendorf may have been motivated to retaliate against Taylor because Podendorf was injured during a prior confrontation between the women.  (Pl.'s Ex. 91 at 108.)  Fitzgerald described Podendorf as someone with "limited intelligence."  (Pl.'s Ex. 99 at 85.)  Nevertheless, it is also quite true that other individuals—e.g., Mark Goodson—had come

---

[14] Of course, this discrepancy does not demonstrate conclusively that Podendorf's statement is entirely false.  And there is evidence indicating that some of the details purportedly supplied by Podendorf to Searcey–e.g., the facts that Wilson was suffocated, that her body was left in the living room, and that her hands and face were bound–are accurate.  Searcey does not claim that these details were not generally known in the community by April 1985.  (Searcey Aff. ¶ 11.)

forward to say that Taylor was claiming involvement in the Wilson homicide. As Stevens noted in his deposition, "[i]t was no secret to me that [Taylor] was . . . talking to people." (Id.)

Although the BPD had dismissed Taylor's claims of involvement in the homicide, Searcey continued to focus his attention upon Taylor. Searcey took a second statement from Lisa Podendorf on April 15, 1985, after Searcey learned from the BPD that one half of a torn $5 bill was found at the scene of the Wilson homicide. (Searcey Aff. Ex. 2B at 4, ECF No. 71-2; See also Searcey Aff. ¶ 12.) Again, however, Searcey did not make any record concerning this statement until several years after he claims to have taken it. According to Searcey's report of February 28, 1989, Searcey asked Podendorf "if she had ever known Tom Winslow, Cliff Shelden or Joseph White to ever have any torn money or halves of dollar[] bills in their possession." (Searcey Aff. Ex. 2B at 4, ECF No. 71-2.) Lisa Podendorf responded that she had seen Joseph White perform a joke "probably twenty or thirty times while she was attending parties" or at a bar, and this joke involved the tearing of a one- or five-dollar bill in half. (Id. at 4-5.) In his affidavit, Searcey states that Lisa Podendorf "had knowledge of the torn $5 bill in the apartment, which she gained from Taylor." (Searcey Aff. ¶ 12.) His report of February 28, 1989, does not corroborate this statement, however. (See generally Searcey Aff. Ex. 2B, ECF No. 71-2.)

At the time of the Wilson homicide, DeWitt was serving as a Nebraska State Trooper. (DeWitt Aff. ¶ 2.) After he became Sheriff of Gage County in 1987, DeWitt hired Searcey as a deputy sheriff. (Id. ¶ 4.) Approximately three months after he was hired as a deputy sheriff, "Searcey began expressing interest in the Wilson homicide investigation." (Id.) Searcey states that when he became a deputy, he was "able to review BPD reports and obtain information about the Wilson homicide," including such "pertinent information" as "the torn $5 bill, the turned over footstool," the fact that "the phone [was] jerked out of the wall," and "blood reports from Dr. Reena Roy . . . indicat[ing] that the blood samples were mixed and could have come from more than one perpetrator." (Searcey Aff. ¶ 7.)[15] He adds that this information "verified" the information he

---

[15] The defendants do not refer me to any evidence confirming that these facts are accurate, though I have noted during my review of the record that a torn $5 bill was found in Wilson's apartment and that an overturned footstool was found near Wilson's body. (E.g., Pl.'s Ex. 87 at 5-6.)

uncovered during his independent investigation and "confirmed [his] theory . . . that more than one person was involved." (Id.) During the next five or six months, Searcey and DeWitt met several times to discuss the information Searcey uncovered during his independent investigation and, as Searcey had "not prepared official reports on that investigation," DeWitt instructed Searcey to write a report about it. (Id.; see also DeWitt Aff. ¶ 4.) Searcey wrote a report as instructed, and I have made references to that report, which is dated February 28, 1989, above. After Searcey prepared his report and presented it to DeWitt, DeWitt conferred with Smith about it, and Smith and DeWitt decided that Searcey should continue to investigate the case through the sheriff's office. (DeWitt Aff. ¶ 4.)[16]

The record indicates that the BPD provided reports to the sheriff's office to assist Searcey in his investigation; however, the sheriff's office did not reciprocate. (Pl.'s Ex. 89 at 33-36; Pl.'s Ex. 91 at 53; Pl.'s Ex. 99 at 49-50, 53.) Fitzgerald described the sheriff's department as "secretive about what they were doing on many things," and said that "their philosophy at that time might have been [']we want to solve the crime to show you didn't do it right[.']" (Pl.'s Ex. 99.) As will be seen below, the sheriff's office did include the BPD in the investigation after arrest warrants were issued for Taylor and White.

Acting now as a member of the GCSO, Searcey took a third statement from Lisa Podendorf on January 12, 1989. (Searcey Aff. ¶ 13.) This statement was recorded, and a transcript of Podendorf's statement is included in the record. (Searcey Aff. ¶ 13; Searcey Aff. Ex. 2C, ECF No.

---

Also, as I have noted above, the record suggests that Searcey had been able to obtain information from the BPD–including information about the torn $5 bill–before he joined the sheriff's department.

[16] There appears to be a discrepancy between DeWitt's affidavit, which suggests that Searcey was instructed to prepare the report approximately nine months after he was hired by the GCSO in 1987, and the date of the report. (See also Smith Aff. ¶ 9 (indicating that Smith and DeWitt discussed the need for Searcey to draft a written report "[d]uring early January, 1989").) I note too that although DeWitt states that Searcey was directed to "proceed with the [Wilson homicide] investigation through [the GCSO] office" after DeWitt discussed the February 28, 1989, report with Richard Smith, (DeWitt Aff. ¶ 4), Searcey's affidavit indicates that he began his investigation as a member of the GCSO in January 1989, before he prepared the report, (see Searcey Aff. ¶¶ 13-15).

71-2.)  As in her previous statement, Podendorf said that Joann Taylor spoke to her at the Beatrice High School at 7:30 on the morning after Wilson was killed.  (Searcey Aff. Ex. 2C at 3-4.) According to Podendorf, Taylor approached her and asked her if she knew why police cars were around Wilson's apartment building on 6th Street.  (Id. at 5.)  Podendorf replied to Taylor, "I had heard that somebody had killed her."  (Id.)  Taylor then told Podendorf that she knew who did it, and she showed Podendorf some scratch marks on her neck that, according to Taylor, were put there by Wilson.  (Id.)  Taylor told Podendorf that "me and Lobo" did it, and she threatened to kill Podendorf if she told anyone.  (Id.)  According to Podendorf, Taylor said that the police would find Wilson "laying on the living room floor by a foot-stool" that had been turned over, and that Wilson would be found with "her hands tied behind her back."  (Id. at 6.)  Taylor then said that she needed money so that she could leave town before the police found her.  (Id.)

Podendorf told Searcey that she knew Taylor to be friends with Charlotte Bishop, Deb Shelden, Cliff Shelden, "Todd [sic] Winslow," and Beth Johnson, among others.  (Searcey Aff. ¶ 13; Searcey Aff. Ex. 2C at 6.)  Podendorf said that she often saw White tear a piece of currency in half while telling a joke at parties.  (Searcey Aff. Ex. 2C at 8-9.)  She also said that White bragged about using "more than one name" and talked about being "involved with killing somebody in North Carolina."  (Id. at 10.)

Podendorf's third statement also includes additional details that she evidently failed to report to Searcey nearly four years before.  Podendorf told Searcey that on the night of the homicide, she was "riding around" with her husband, and the couple found themselves behind Tom Winslow, Beth Johnson, Joann Taylor, and Joseph White, who were riding in a green 1972 Oldsmobile with a brown top.  (Searcey Aff. Ex. 2C at 10, 13.)  Podendorf said that she and her husband followed them, and she saw them park and exit their vehicle near Wilson's apartment building at precisely 10:18 p.m. (Id. at 10.)  In his affidavit, Searcey says that Podendorf claimed to have seen Winslow, Johnson, Taylor, and White "go into the apartment building."  (Searcey Aff. ¶ 13.)  In her statement, however, Podendorf says that she did not "see anything else" after she watched the group exit their vehicle. (Searcey Aff. Ex. 2C at 11.)

On February 13, 1989, Searcey re-interviewed Tom Winslow, and Winslow admitted that he lied about being at work on the night of the homicide.  (Searcey Aff. ¶ 14.)  According to

20

Searcey's February 28, 1989, report, Winslow said during this interview that he loaned his vehicle–"a 1973 Oldsmobile Cutlass brown over green"–to Joann Taylor and Joseph White on the evening of the homicide;[17] that Winslow was aware that his vehicle had been "seen in and about the alley located by the apartment complex where Helen Wilson resided"; that Winslow became scared that Taylor and White were involved in the homicide after he heard them say that "the police are going to be coming and questioning" Winslow; and that Winslow was scared that he would become "involved" in the case.  (Searcey Aff. Ex. 2B at 5-6.)

According to Searcey's February 28, 1989, report, Winslow "believed that JoAnn Taylor was possibly living in" a certain apartment on Ella Street at the time of the homicide, and Searcey knew that this apartment had been rented by Charlotte Bishop.  (Searcey Aff. Ex. 2B at 6.)  On February 25, 1989, Searcey interviewed Charlotte Bishop in the presence of her attorney.  (Id.)  Fitzgerald described Bishop as someone like Podendorf (i.e., of "limited intelligence").  (Pl.'s Ex. 99 at 85.)  Stevens said that Bishop's credibility was "three times as bad" as Taylor's, that Bishop was widely known to be a liar, and that she was "very, very unsanitary," "almost . . . a mental case," and "maybe retard[ed]."  (Pl.'s Ex. 91 at 59-60, 153.)

During the interview, Bishop told Searcey that Joann Taylor was living with her in her apartment on Ella Street above Dole Floral at the time of the Wilson homicide, and Bishop "became aware" that Taylor was involved in the homicide when Bishop came into the apartment at noon on the day after the crime.  (Searcey Aff. Ex. 2B at 6.)  Bishop said that Taylor was nervous and upset, and Taylor said that "she may have been involved in a murder."  (Id.)  Bishop also said that Taylor left the apartment "one to one and a half days later," and Bishop had not seen her since then.  (Id.)  Bishop added that she did not come forward with this information previously because no one questioned her and because Taylor threatened her life.  (Id. at 6-7.)  She then described an incident

_____

[17] According to a transcript of Winslow's February 13, 1989, statement, Winslow said that he loaned his car to White, Taylor, and Clifford Shelden on the night of the homicide.  (Pl.'s Ex. 18 at 4-5, ECF No. 106-14.)  The reference to Clifford Shelden, which was omitted from Searcey's written report, conflicts with the fact that Clifford Shelden was in the hospital on the night of the homicide.

that occurred prior to the Wilson homicide, during which Taylor filled Bishop's bathtub with scalding water and, with the help of two male friends, forced Bishop into the tub.  (Id. at 7.)[18]

Stevens recalled, however, that Taylor and Bishop were "kicked out" of their Ella Street apartment by the landlord on February 5, 1985, which is the day preceding the Wilson homicide.  (See, e.g., Pl.'s Ex. 91 at 41-42, 128, 153.)[19]   Thus, the pair could not have had a conversation in that apartment on February 6, 1989, as Charlotte Bishop described in her statement.

Also during her statement, Bishop stated that she went out for cigarettes on the night that Wilson was murdered, and from outside her apartment she saw police cars "all around the apartment building" where Wilson lived.  (Searcey Aff. Ex. 2D at 7-8, ECF No. 71-2.)  Searcey asked, "All right, I want to make sure your [sic] not confused . . . .  Was it the night before or could it have been sometime after when she told you?"  (Id. at 8.)  Bishop responded, "Well it was, it could have been the night after that too or the day after too there was a whole bunch of police cars."  (Id.)  Searcey

---

[18] As will be discussed below, Taylor later told Searcey that she had indeed attacked Bishop with boiling water after discovering Bishop with her "man" (i.e., Cliff Shelden).

[19] The plaintiff has submitted an exhibit marked 19 (ECF No. 106-15) that has not been properly authenticated–and for this reason, it has not been considered by me.  I note in passing, however,  that this exhibit purports to be a BPD report bearing the dates 2-4-85 and 2-5-85. The exhibit states,

> Mr. Buss advised that he has given Joann Taylor and Charlotte Mendenhall notice to move out of this apt but they refuse to.  He would like an officer to go with him on Tuesday morning 2-5-85 to ask them to leave again.

> 2-5-85 Mr. Buss was contacted outside the apartment.  He contacted the tenant and checked the apartment while I stood by outside.  All quiet on departure.

(Pl.'s Ex. 19.)  If authenticated, this exhibit would seem to corroborate Stevens' recollection that Taylor and Bishop had been removed from their apartment just prior to the Wilson homicide.  In any event, I find that the plaintiff is entitled to the benefit of the inference–reasonably drawn from Stevens' testimony alone–that Bishop and Taylor were not in their Ella Street apartment together on February 6, 1985.

22

asked, "Are you sure?  Are you sure?" and Bishop replied, "Well I had you know I had went out that day and there was or that next day and there was still police cars around."  (Id.)[20]

In early March 1989, someone at the GCSO contacted Smith to discuss "whether or not use immunity would be offered to induce [Thomas] Winslow to give a statement."  (Smith Aff. ¶ 11.) At the time, Thomas Winslow was being held in Lancaster County on felony charges in an unrelated matter.  (Id.)  Smith discussed the proposed terms of an immunity agreement with deputies in the Lancaster County Attorney's Office, members of the GCSO, and Winslow's attorney.  (Id. ¶ 12.) On March 13, 1989, Smith and DeWitt traveled to Lincoln, Nebraska, to discuss the case with Winslow's attorney, and Smith advised Winslow's attorney that he "would agree to use immunity for Winslow for his truthful statement concerning the Wilson homicide."  (Id.)  Winslow's attorney indicated that Winslow would: 1) state that Joann Taylor and Joseph White "discussed committing a felony at Wilson's apartment"; 2) state that Winslow "wanted nothing to do with it and walked away"; 3) "corroborate Lisa Podendorf's statement that a vehicle . . . matching the description of Thomas Winslow's car and having occupants Joann Taylor and Joseph White was seen [on the night of the homicide] parking next to the location [where] Mrs. Wilson was found dead"; 4) state that "Taylor and White admitted to Winslow that they killed Wilson"; and 5) "bracket the time of the homicide."  (Id. ¶ 13.)

On March 14, 1989, Smith, DeWitt, Searcey, and Harlan interviewed Thomas Winslow in Lincoln, Nebraska, in the presence of Winslow's attorney.  (Smith Aff. ¶ 14.)  During the interview, Winslow stated that on the evening of February 5, 1985, he was riding around in his 1973 Oldsmobile with Beth Johnson, Joann Taylor, and Joseph White, and White "mentioned something about robbing an old lady."  (Searcey Aff. Ex. 2E at 4, ECF No. 71-2.)  Winslow stated that the group proceeded to the apartment building where Wilson resided, and all four of them exited the vehicle and entered Wilson's apartment.  (Id.)  An argument ensued between White and Wilson, and when Winslow saw White and Taylor attacking Wilson, "he panicked and left with . . . Beth Johnson."  (Id.)

---

[20] Of course, Bishop's eviction and her claim that police cars were about Wilson's apartment prior to the discovery of the body do not establish that all of the information obtained from her is necessarily false.

That same day–March 14, 1989–Searcey prepared an affidavit in support of arrest warrants for Joann Taylor and Joseph White.  (Smith Aff. ¶ 15; Pl.'s Ex. 112, ECF No. 110-8.)  In his affidavit, Searcey noted that Wilson's body was discovered "at approximately 9:00 a.m. on February 6, 1985," and he said that his confidential informant (i.e., Podendorf) spoke with Taylor "within 24 hours of the Wilson homicide." (Pl.'s Ex. 112 at 2-3.)  He did not indicate, however, that Podendorf claimed to have seen police cars at Wilson's apartment before 8:00 a.m. on that day.  Searcey also noted in his affidavit the conversation that allegedly occurred between his second confidential informant (i.e., Bishop) and Taylor in Bishop's apartment "located in close proximity to Helen Wilson's apartment."  (Id. at 4.)  In addition, Searcey's affidavit includes a summary of the information he obtained from Winslow during his February 13, 1989, interview, and adds that "within approximately one week of the Helen Wilson homicide, Ada JoAnn Taylor and Joseph White . . . left Beatrice . . . and have not been seen or heard of since." (Id. at 5-6.)[21]  The warrants issued, but before their execution Searcey prepared an addendum to his affidavit "to correct some of the statements in the original affidavit" in light of Winslow's March 14 statement.  (Smith Aff. ¶¶ 15-16.)[22]  The Gage County Court reviewed the addendum and "allowed the original warrants to stand."  (Id. ¶ 17.)  Complaints were filed against Taylor and White in the Gage County Court.  (Id. ¶ 18.)

On March 15, 1989, the Buncombe County, North Carolina, Sheriff's Department (BCSD) arrested Joann Taylor.  (Searcey Aff. ¶ 18.)  Following Taylor's arrest, BCSD officers "Mirandized" her and took her statement.  (Id.; see also Searcey Aff. Ex. 2G, ECF No. 71-2.)  In her statement to the BCSD officers, Taylor said that White asked her to "help him do something" and threatened to kill Taylor's daughter if Taylor refused.  (Searcey Aff. Ex. 2G at 1.)  Taylor said that she could

---

[21] In fact, and as I have noted above, White contacted Stevens before leaving town, and Stevens had been in contact with Taylor since her departure from Beatrice.

[22] Indeed there are material inconsistencies between Winslow's February 13, 1989, statement and his March 14, 1989, statement.  Specifically, in the former statement Winslow said that he merely loaned his car to Taylor and White on the evening of the homicide, whereas in the latter statement Winslow claimed that he, Beth Johnson, White, and Taylor all entered Wilson's apartment together after White spoke about "robbing and old lady," and Winslow claimed he witnessed White attacking Wilson before he (Winslow) left with Beth Johnson.

"visualize the outline of the house as it was on that day in February" when the homicide occurred, (id.), and she offered the following account of the crime.

> According to [Taylor's] statement, [White] was going over to do some yard work or trim this lady's trees.  That was the explanation he gave her.  Also with him was another guy but she didn't know his name.  When they arrived at the house, according to [Taylor's] statement, they knocked on the door and when the lady came to the door [White] asked for a glass of tea which she offered to him. [Taylor] asked the lady if she could use the bathroom.  The lady let her use the bathroom and at this time both [White] and the other guy walked in also.  The lady asked both of them to leave.  The best that [Taylor] can remember, [White] said why should I, in that he wasn't going to leave.  Sometime at this point, [White] took the lady by the arm.  According to [Taylor], the lady asked [White] to let her go but [White] shoved her down. [Tayor] said she struck a table that was in the livingroom.

(Id.)  Taylor went on to state that White began having sex with Wilson while the other "kid" held her, that White began stabbing Wilson, that "the other guy that was with [White] raped her again" after she had been killed, and that Taylor "could see the blood and the wounds on the body."  (Id. at 1-2.)  Taylor said that she and the other individual walked outside, and about ten minutes later White came out and retrieved a bag of clothes from their car–which Taylor described as a "small" car that was "baby blue in color."  (Id. at 2.)  Taylor said that White then went back into Wilson's house, changed clothes, and then came back out.  (Id.)  She added that she thought White went to Wilson's house to rob her, and she noted that White did not have any money until after the attack on Wilson.  (Id.)  She also said that she thought that the attack occurred at dusk "or maybe 5:30 or 6:00 in the afternoon."  (Id.)  Taylor concluded her statement by saying that "[s]he can still shut her eyes and see the blood, the stab wounds, and each of them taking turns raping this lady."  (Id. at 3.)

Although Taylor implicated herself in the homicide, much of her account of the crime was either highly implausible (e.g., it is unlikely that the group went to Wilson's house to trim trees in February or that White intended to rob Wilson but left behind hundreds of dollars in cash) or irreconcilable with the known facts (e.g., Wilson did not live in a house, Wilson was not stabbed, and the crime could not have been committed at 6 p.m.).  After reviewing this statement during his deposition, Stevens labeled it "trash" and said it did not "make a bit of sense" to him.  (Pl.'s Ex. 91 at 92-93.)

To this point the BPD generally, and Stevens in particular, had not been privy to the sheriff's department's investigation.  Nevertheless, as Searcey, DeWitt, Price, and other officers flew to Alabama to arrest Joseph White on or about March 15, 1989, they stopped their plane in St. Louis to pick up Stevens to accompany them.  (Pl.'s Ex. 89 at 35; Pl.'s Ex. 91 at 75-76; see also Searcey Aff. ¶ 19; Searcey Aff. Ex. 2H, ECF No. 71-2.)  During the plane ride, the sheriff told Stevens "numerous times that he wanted [Stevens] to know that the sheriff's office solved the case."  (Pl.'s Ex. 91 at 77-78.)

After their arrival in Alabama, Searcey questioned White on March 16, 1989, in the presence of Price and Stevens.  (Searcey Aff. ¶ 19; Searcey Aff. Ex. 2H, ECF No. 71-2.)  A partial transcript of this interview appears in the record.  (See Searcey Aff. Ex. 2H.)  At the outset of the interview, White received Miranda warnings and agreed to answer questions without the services of an attorney.  (Id. at 1-2.)  White denied any involvement in the Wilson homicide, and he claimed that much of the information that Searcey collected from his sources was false.  (See generally Searcey Aff. Ex. 2H.)  Searcey's questioning intensified, and White asked to see a lawyer on three separate occasions.  His first request for counsel was preceded by the following exchange:

| Searcey: | Do you know where [Joann Taylor] is right now? |
| --- | --- |
| White: | No. |
| Searcey: | She's in custody too, for Murder I.  We've been talking to her.  I got a feeling that somebody ain't telling something right.  I don't know which one it is, but somebody is in a world of hurt. |
| White: | Yeah. |
| Searcey: | Don't you think? |
| White: | Yeah. |
| Searcey: | So which one is it? |
| White: | She's lying to you. |
| Searcey: | I got other witnesses that can verify what she said is true.  More than one.  You were in that apartment that night. |

26

| | |
|---|---|
| White: | No. |
| Searcey: | Only one thing, you lost something when you were in there, Joe. |
| White: | What? |
| Searcey: | Mr. Stevens, (unintelligible) |
| Stevens: | The other part of a five dollar bill. |
| Searcey: | You lost it, Joe.  It's got fingerprints on it. |
| White: | What five dollar bill? |
| Stevens: | It was lying on the floor. |
| Searcey: | You forgot to take everything out with you.  You made a mistake.  It looked good for a while, but you made a mistake. |
| White: | I don't know what you're talking about. |
| Searcey: | That's not what Joann is telling us. |
| White: | I want to see a lawyer. |

(Searcey Aff. Ex. 2H at 17.)  Questioning continued, and White continued to deny having any involvement in the Wilson homicide.  The following exchange then occurred:

| | |
|---|---|
| White: | [Tom Winslow] didn't have a car at the time I was there that I knew of. |
| Searcey: | Now that's a lie Joe.  You road [sic] around with him the same night that his happened in his car, okay.  You were seen by many people.  You were seen pulling in the alley of a parking lot by the apartment complex at 10:30 in the evening.  So I know that's not true, now how much other stuff have you told me that ain't true. |
| White: | Somebody has been lying to you because I have never ridden in a car with Tom Winslow. |
| Searcey: | You were all four seen in the car.  And you were all four seen getting out, and all four seen going into the apartment building.  And not only |

27

can we show you doing that, but we got the people involved in the damn thing telling us the same thing.  Admitting it.

White:          Well I tell you what, until I see a lawyer, I'm saying nothing else because apparently you are trying to prove me a liar when I'm not.

(Id. at 24.)  Questioning continued, and White and Searcey had the following exchange:

Searcey:        Would you take a polygraph test for us Joe?  To verify what you are telling us is the truth?

White:          Sure.

Searcey:        What if you fail?  What if?

White:          What if?  I'd say somethings [sic] wrong with your machine.

Searcey:        So everything you tell us is true and what everybody else does and the machines are all going to be wrong, is that what you are saying?  Huh?

White:          No what I'm saying is I am telling you the truth.

Searcey:        No no I think you are trying to fashion and you want to tell me what you want me to hear.  You're not telling me the truth at all.

White:          I am telling the truth.

Searcey:        No you haven't, no no.  Joe, there's to [sic] many [ . . . ]

White:          I want a lawyer.

(Id. at 26.)  Stevens then asked White whether he would "volunteer to go back to Nebraska . . . to get [this] cleared up," and White agreed.  (Id.)  White also agreed to answer questions from Price, who asked White whether he understood the questions posed to him during the interview, the charge against him, and the "difference between right and wrong."  (Id. at 27.)  At the conclusion of the interview, "White waived extradition and returned to Nebraska with Price and another officer." (Searcey Aff. ¶ 19.)  Upon his arrival in Nebraska, Meints booked White in to the Gage County Jail. (Meints Aff. ¶ 6.)

After participating in the interview with White, Stevens believed that White was telling the truth, and he remembers telling White's mother that White would be returned home "soon and safe."

(Pl.'s Ex. 91 at 80, 84, 89.)  He added that Price later accused him of "trying to prove White's innocent in the interrogation and not . . . trying to get a guilty plea from him or whatever." (Id. at 81.)

Price used White's answers to the questions that Price posed on March 15, 1989, to prepare a "Consultation Note" stating, among other things, that "during the interrogation [White] was able to differentiate right from wrong, . . . was able to understand the allegations that he was confronted with," and was able to respond "to the allegations in a knowing and meaningful manner." (Price Aff. Ex. 3B, ECF No. 74-2.)  Price states that "[t]his was the only interview I had or sat in on with respect to White." (Price Aff. ¶ 6.)  Price's Consultation Note indicates, however, that Price engaged in "intermittent conversation" with White during their flight from Alabama to Nebraska, and that Price made "clinical observation[s]" during their conversation that he used to form a conclusion that White was "free from any indication of gross psychopathology." (Price Aff. Ex. 3B, ECF No. 74-2.)

On March 16, 1989, Searcey, Stevens, and DeWitt traveled from Alabama to North Carolina to arrest Joann Taylor. (Seacey Aff. ¶ 20; Pl.'s Ex. 91 at 89-90.)  Searcey took a statement from Taylor, and a transcript of the statement has been included in the record. (Searcey Aff. Ex. 2I, ECF No. 71-3.)  Taylor told Searcey that she was present at the time of Helen Wilson's murder along with Joseph White (whom she knew only as Lobo) and "another boy" whose name she did not remember. (Id. at 3.)  She said that she believed the homicide occurred between 5:30 and 7:00, and that Wilson lived in a light colored, one-story house. (Id. at 2-3.)  She also said that White was going to do yard work at Wilson's house. (Id. at 3-4.)  Stevens then tried "to refresh" and "unboggle" Taylor's memory, and he suggested to her that "this is February," and White "wouldn't be doing yard work in February would he?" (Id. at 4-5.)  Taylor agreed. (Id. at 5.)  Stevens and Searcey then continued questioning Taylor, and she described her recollection of the homicide.  She stated that the group drove to Wilson's house in a "light blue small car" that belonged to the other man who was with them. (Id.)  As White spoke with Wilson on the front porch, Taylor asked Wilson for permission to use the restroom. (Id. at 6.)  As Wilson showed Taylor to the restroom, White and his friend entered the house and blocked the door. (Id.)  They refused Wilson's orders to leave, and when Taylor tried to leave the house White threatened her daughter's life and held a knife to her throat. (Id. at 6-7.)  According to Taylor, White and his friend then began to struggle with Wilson. (Id. at

29

7.)  She did not remember the struggle ever leaving "the front area of the house."  (Id.)[23]  She said that White and his friend then raped Wilson, but she was unable to remember what Wilson was wearing.  (Id. at 7-8.)

Searcey then said, "Now is it possible since you['re] having a rough time bringing this to your mind that you could be confused as to maybe the location [of] the residence, is that possible?" (Id. at 8.)  Taylor replied, "Yeah with my personality disorder it's hard[,] my psychologist even in Beatrice said I would have trouble."  (Id.)  Stevens then asked Taylor specific questions about the location of the bathroom in the house and the furnishings in the living room.  (Id.)  After Taylor responded to these questions, Stevens asked whether she remembered seeing a bedroom.  (Id.) Taylor said that she did, and she described the location of the bedroom in relation to the bathroom. (Id. at 9.)  Stevens asked whether Taylor remembered "any kind of struggle or any kind of a fight going on in the bedroom," and Taylor responded negatively, repeating that the struggle occurred in the living room.  (Id.)

Stevens asked Taylor whether she, White, or the other man were wounded during the struggle, and Taylor responded negatively.  (Id. at 10.)  Searcey then asked Taylor whether she had spoken with anyone about the homicide before, and Taylor responded, "No I had totally blocked [White] out of my mind."  (Id.)  Searcey asked Taylor whether she was sure that she had not spoken about the crime with anyone, and Taylor responded that she was sure.  (Id.)

Searcey then told Taylor, "I have some problems here so I want to kind of throw some things at you and give you something to think about here and see if maybe it doesn't jog your mind a little bit . . . ."  (Id. at 11.)  Searcey informed Taylor that two different people had told him that she (Taylor) had spoken with them about the homicide, and he asked Taylor again whether she remembered "anything about that right now."  (Id. at 11.)  Taylor replied that she did not remember talking to anyone.  (Id.)  Searcey then asked Taylor whether it was "possible that the residence may have been of a large type of complex," and Taylor replied that it was possible.  (Id.)

Later during the interview, Searcey asked Taylor whether she knew Lisa Podendorf.  (Id. at 13.)  After Taylor responded affirmatively, Searcey asked Taylor whether she talked to Podendorf

---

[23] Recall that the crime scene indicated that a violent struggle occurred in Wilson's bedroom.

about the homicide.  (Id.)  Taylor replied that she could not remember.  (Id.)  The following
exchange then occurred:

> Searcey:    I want you to think real hard about this because see you stated that
>             your [sic] going to try and tell the truth as accurately as you know
>             okay?
>
> Taylor:     No verbal comment.
>
> Searcey:    So I want you to real concentrate [sic] and think about it.  Did you
>             ever make any comments to her about maybe the police finding an old
>             lady that might have died, that may have been killed by either
>             yourself or [White]?
>
> Taylor:     I'm not sure.
>
> Searcey:    I want you to think about that a little bit, I need a yes or no to that
>             okay.  Remember we want to get it out in black and white?
>
> Taylor:     I can't remember.
>
> Searcey:    Is it that you tried to forget about this?
>
> Taylor:     I have problems, there's a lot in my childhood I can't . . . .
>
> Searcey:    Okay, but there's probably some that you don't want to remember?
>
> Taylor:     I don't want to remember [White], the man is dangerous.
>
> Searcey:    Let's try and go back.

(Id. at 13-14.)

Stevens then interjected a line of questioning about whether Taylor believed, at one time, that
White was her father.  (Id. at 14.)  Taylor indicated that she did believe that White was her father at
one time–even though she was eighteen years old and White was nineteen.  (Id.)

Searcey then returned to the subject of Lisa Podendorf, and the following exchange occurred:

> Searcey:    . . . Lisa said that you made some specific comments about this
>             particular woman possibly having been killed, is that correct?
>
> Taylor:     I don't know.

31

Searcey:      Did you make any comments to her about anything about this woman
              or the area she might be?

Taylor:       I don't remember taking to anybody about it.

Searcey:      [Joann] how can you remember some things and then not the other
              things?

Taylor:       That's the way my mind is, it's fucked up literally, my psychologist
              will tell you.  It comes and goes when it wants to.  I can remember
              where I went to school and (unintelligible mumbling).

Searcey:      Did you ever make comments to Charlotte Mindenhall?

Taylor:       Not that I know of.

Searcey:      You realize that your [sic] talking about a real serious offense here
              right?

Taylor:       No verbal comment.

Searcey:      Okay.  You also realize that you know you have claimed to have been
              there when this took place?

Taylor:       Because I was told I was there.

Searcey:      Who told you that?

Taylor:       The cops that picked me up last night told me I was there.

Searcey:      But you did admit the fact that you were there and you did see some
              particular certain things happen that you told us, am I right or wrong?
              You did see something happen didn't you?

Taylor:       No verbal comment.

Searcey:      Right?

Taylor:       Yes.

Searcey:      Okay so you weren't told that were you?

Taylor:       No.

(Id. at 15-16.)  Searcey then asked, "Is it also possible that you did maybe make comments to people, but maybe you don't want to recall that now . . . [f]or fear of bringing someone else into it?"  (Id. at 16.)  Taylor replied that maybe she had made such comments, adding, "If I could remember who else was involved in it[,] I [would sing] like a carnary [sic] . . . ."  (Id.)

The interview was stopped for a break.  (Id. at 17.)  After the break, Searcey asked Taylor again whether she might have discussed the homicide with Podendorf.  (Id. at 20.)  On this occasion, Taylor said, "It could have come up in conversation."  (Id. at 21.)  When Searcey asked her what would have come up, Taylor replied, "Just that I knew that they might find a[n] old lady . . . [t]hat was hurt . . . [p]retty bad."  (Id.)  Searcey asked if Taylor "maybe [made] another comment to [Podendorf] about this old woman," and Taylor replied, "[t]hat she might be dead."  (Id.)  In response to further questioning from Searcey, Taylor said that Podendorf asked her how she knew about the incident, and Taylor then told Podendorf that she (Taylor) witnessed the incident and "knew the room" and the people involved.  (Id.)  Taylor also said that she "probably" spoke to Charlotte Bishop about the incident.  (Id. at 22-23.)

Searcey asked Taylor to describe again the car that belonged to the man who was with her and White during the crime, and on this occasion Taylor described the car as "a medium, regular size car" with a green body and a brown roof.  (Id. at 22-23; see also id. at 31.)

Stevens asked Taylor whether she wrote Cliff Shelden a letter from North Carolina that included "a little bit about what happened that night," and Taylor replied that she "could have," adding, "I remember writing him, but the contents of the letter I don't.  I wrote him a lot of times." (Id. at 24.)  Stevens questioned Taylor further about Cliff Shelden and Charlotte Bishop, and Taylor explained that Cliff Shelden was her "man," and after Taylor caught Shelden with Charlotte, Taylor tried to hurt Charlotte with boiling water.  (Id. at 25-26.)

Midway through the interview, Taylor described the location of the homicide as a red brick apartment building that she and the others entered through a back door.  (Id. at 29.)  She said that White took some of Wilson's money out of her purse.  (Id. at 32.)  She said that the group arrived at Wilson's apartment between 8 and 11, and left between midnight and 2.  (Id. at 33.)  Searcey asked Taylor whether she ever saw White do any tricks with money, and after Taylor indicated that she could not remember any, the following exchange occurred:

33

Searcey:        Did you ever see anybody play games or pull a trick on anybody that might have to do with any money?

Taylor:         [White] played Liars Poker a lot.

Searcey:        Did you ever see him do anything else with any

Taylor:         He could do ma– he could do hand tricks with it.

Searcey:        Did you ever see him do anything that might result in the destruction of money?

Taylor:         Hmmhmm.

Searcey:        What did he do?  What would he do?

Taylor:         He would tear it up.

Searcey:        And why would he do that?

Taylor:         He like doing it.  He thought it was funny, cute.

Searcey:        And what would he do when he'd do these this [sic] particular thing your . . .

Taylor:         He would just tear it in certain ways to make certain different pictures of . . .

Searcey:        And what would he do with that money after he tore it?

Taylor:         He would wad it up.

Searcey:        And where what [sic] would he do with it?

Taylor:         He'd pick it back up.

Searcey:        Would he throw it away?

Taylor:         All I know is he kept holding it in his hand.

. . . .

34

| | | |
|---|---|---|
| Stevens: | [Joann], you seen him that night, you seen Lobo take a five dollar bill out of that purse that night? |
| Taylor: | Hmmhmm. |
| Stevens: | And you seen him throw it on the ground? |
| Taylor: | (unintelligible) [yea he did yea] |
| Stevens: | Remember. |
| Taylor: | Yeah. |
| Stevens: | What happened to the other half of that five dollar bill? |
| Taylor: | He stuck it in his pocket. |

(Id. at 34-35.)

Taylor then agreed with Stevens that there was blood on the sheets and blood on the walls of the bedroom, and she said that the battle in the bedroom was "scary" and "gross." (Id. at 37-38.) Also, after saying repeatedly that she, White, and another male had been the only ones in Wilson's apartment, she agreed with Searcey that "[t]here could have been" another female in their group. (Id. at 39.) Searcey asked, "Was there a Beth?" and Taylor agreed. (Id.)

Near the end of the interview, Searcey accused Taylor of "protecting somebody" and "playing a game" with the investigators. (Id. at 43.) Taylor denied this, said she was trying to protect her daughter's life, and began crying. (Id.) Stevens questioned Taylor about the persons who were present during the homicide, and the following exchange occurred:

| | | |
|---|---|---|
| Taylor: | I don't remember being there. |
| Stevens: | You remember being there. |
| Taylor: | I remember being there, but it doesn't I don't remember. |
| Stevens: | You remember why, because [White] was. |
| Taylor: | Damn I wish I was high. |

35

(Id. at 45.)  She added later that she intended to "fracture" her own wrists after the interview because there was nothing else to do, she had "nothing to live for," and she would "die in Beatrice" if she were taken back there.  (Id. at 50-51.)

Stevens testified during his deposition that a story that does not match the crime scene is "no good whatsoever," but he added that "it's easy to lead somebody into getting the right answers you want."  (Pl.'s Ex. 91 at 62.)  He then opined that Searcey was using this tactic during his questioning of Taylor, stating,

> I'll give you an example.  Like, [']did you see the footstool in the dining room[?']  Well, naturally Joann's going to answer yes.  I could make Joaann answer yes or no to any question I wanted, put it in any way, shape or form that I wanted . . . Joann to answer.
>
> And that was my only problem working with Officer [sic] Searcey was his type of interrogating, that it was just too many interrogating questions there.  In other words, he almost give [sic] the person the answer before he asked the question.

(Pl.'s Ex. 91 at 62.)

Stevens also commented that Taylor "made so many different stories up" that he "didn't know which one to believe," but he felt that she "made this [story] up" about her involvement in the homicide and that he "could have probably straightened her out in a hurry" if Price and Searcey had not been there.  (Id. at 95.)

On March 17, 1989, Joann Taylor waived extradition, and Searcey, DeWitt, and Stevens transported her back to Beatrice on their plane.  (Searcey Aff. ¶ 20; Pl.'s Ex. 91 at 97.)  Stevens gave the following account of the return to Beatrice:

> There was a real bad storm come up. . . . And Joann was really scared.  She was crying.  She was petrified.
>
> I . . . wasn't too happy with it.  And I thought that we . . . probably should have landed and waited the storm out.  I'm not too sure about the state patrolman that was driving the airplane.  Somewhere along the line, I think that he even said he was going to have to.
>
> And I recall DeWitt saying that he was a licensed pilot, that he would be able to help him.

> And I couldn't . . . figure out why . . . it was so important that we get there, fly through this storm, why we [had to] get there that night.
>
> Well, I found out when we got back to Beatrice at the airport, that all of [the] reporters are there and the press was there and everybody's there waiting.
>
> And I just - - I called the police department from Beatrice, . . . told them to come pick me up, I wanted no part of it.  I didn't talk to nobody.

(Pl.'s Ex. 91 at 97-98.)

After she was "booked into jail, Taylor gave Searcey and Smith another statement.  (See Searcey Aff. ¶ 20; Searcey Aff. Ex. 2J, ECF No. 72-1.)  Her statement indicates that earlier in the day, Searcey and Stevens presented Taylor with a packet of six photos "for the purposes of attempting to identify the male subject" mentioned by Taylor in her previous statement.  (Id. at 2.)  Taylor said that she identified the subject as Tom Winslow, and she said that seeing his photograph helped jog her memory.  (Id. at 3, 6.)  In contrast with her North Carolina statement, Taylor now said that she did not fear White, but she was very much afraid of Winslow, and Winslow was the one who threatened her during the homicide.  (Id. at 5-6.)  She said that there was blood across the bed and on the wall of the bedroom, that "Wilson was messed up real bad," that "Beth" was present during the homicide too, and that one of the men had a bloody nose.  (Id. at 8.)  She also said that she thought the men meant to rob and hurt Wilson, but not kill her.  (Id. at 14.)

Later that day, DeWitt contacted Price at Joann Taylor's request and asked him to "visit with Ms. Taylor due to her emotional distress."  (Price Aff. Ex. 3C, ECF No. 74-2.)  According to Price's consultation note, Taylor indicated that she was scared during her flight to Beatrice, and she expressed "considerable fear for her wellbeing from Mr. Winslow."  (Id.)  Price's note states that Taylor's borderline personality disorder seemed "to be in better control than at any time during the clinical contact with her in the past,"[24] and he opined that there were no indications of delusions, hallucinations, phobias, or problems with short- or long-term memory.  (Id.)  He added that there were "no indications that [Taylor] was legally incompetent or legally insane."  (Id.)

---

[24] In his affidavit, Price states that he "counseled with [Taylor] many years prior."  (Price Aff. ¶ 7.)

After Taylor completed her statement, Searcey drafted an affidavit to support an arrest warrant for Winslow and delivered it to Smith. (Searcey Aff. ¶ 22.)  The court issued the warrant on March 17, 1989, and Winslow was arrested later that same day and booked into the Gage County Jail. (Id.)  At 11:15 p.m. that evening, Winslow told GCSO Dispatcher Kim Bryson that he wanted to speak with Searcey.  (Searcey Aff. Ex. 2K, ECF No. 72-1.)  He told Bryson that he lied during his use immunity statement, and that his conscience was bothering him.  (Id.)  According to Bryson, Winslow said, "[Y]a see I lied because Beth Johnson sent me a letter when I was in Lincoln after Deputy Searcey had talked to her.  In her letter she said that she could not go to prison have leave [sic] her kids with no mother.  So I lied about what I said in the statement." (Id.)  Bryson contacted Searcey, who came down to the sheriff's office to speak with Winslow.  (Id.; Searcey Aff. ¶ 23.)  Winslow waived his right to counsel and gave a statement to Searcey.  (Searcey Aff. ¶ 23.)  According to Searcey, "Winslow stated that he lied about his involvement in the Wilson homicide and returned to his original story that he was not involved at all in the homicide.  He stated that he had only loaned his car to White.  When confronted about his numerous lies, he shut down and asked to be returned to his cell." (Id.)

After Thomas Winslow's conversation with Searcey, Winslow was deemed to have violated his use immunity agreement.  (Smith Aff. ¶ 19.)[25]  The Gage County Attorney's Office filed a complaint against him for the murder of Helen Wilson.  (Id.)

On March 18, 1989, Searcey took a statement from Beth Robinson.  (Searcey Aff. ¶ 24.)  According to Searcey, Robinson's statement "did not lead to any helpful information." (Id.)  It appears, however, that her statement provides an alibi for Joann Taylor and Thomas Winslow.  As he took her statement, Searcey asked Robinson where she was on the night of Helen Wilson's murder–though it appears that he initially used the wrong date in his question.  (Searcey Aff. Ex. 2L at 1-2, ECF No. 72-1.)  Robinson said that on February 5, 1985, at about 8:30 or 9:00 in the evening, she was in an apartment with Joann Taylor, Tom Winslow, and Charlotte Crumb.  (Id. at 2.)  She said that the group watched television and talked during the evening.  (Id.)  She also said that no one

---

[25] It is unclear who made the determination that Winslow violated his immunity agreement.

left the apartment that evening, and no one else showed up at the apartment later during the evening. (Id.)

Also on March 18, 1989, Searcey and Stevens traveled to Oklahoma to interview Mark Goodson. (Searcey Aff. ¶ 25.) Goodson said that on March 2, 1985, he gave a statement to BPD Officer Baldwin about Joann Taylor. (Searcey Aff. Ex. 2M, Statement at 2, ECF No. 72-1.) During his 1985 statement, Goodson told Officer Baldwin that he called Joann Taylor in North Carolina because he had heard that Joann was "trying to frame [him]" for the Wilson murder. (Id. at 3.) Taylor then told Goodson that she and White had murdered Wilson and that she "put the blame" on Goodson to try "to cover their tracks." (Id.) According to Goodson, Taylor said that they "did it" because "the old lady wouldn't give them money." (Id.) During his 1989 statement, Goodson denied having any involvement in the homicide. (Id. at 4-5, 10.)

Searcey states that on March 21, 1989, he "was present when Price evaluated Deb Shelden at the request of her counsel." (Searcey Aff. ¶ 26.) There is no indication in the record that Price evaluated Deb Shelden in March 1989, however. Price states that he "consulted with" Deb Shelden on April 24, 1989, and had "a second interview" with her on June 16, 1989. (Price Aff. ¶¶ 8-9.) These interviews will be discussed below at the appropriate chronological points.

On March 21, 1989, Lincoln Police Officer Van Butsel interviewed Cynthia McMahan in Lincoln, Nebraska. (Searcey Aff. Ex. 2O, ECF No. 72-1.) It appears that a copy of Van Butsel's report was sent to Searcey. (Id. at 1.) McMahan told Van Butsel that Charlotte Bishop told her that she (Bishop) learned about the Wilson homicide from Joann Taylor on the night that it happened. (Id. at 2-3.) Bishop also said that "Beth" was "connected with it." (Id. at 3.) Van Butsel inferred that "Beth" was Beth Winslow, who was the wife of Tom Winslow. (Id.) Searcey inferred that Bishop (via McMahan) had implicated Beth Johnson.[26] (Searcey Aff. ¶ 27.)

On March 22, 1989, Taylor and Winslow submitted blood, hair, and saliva for testing. (Searcey Aff. ¶ 28.) Also on March 22, 1989, Smith drafted a letter to DeWitt stating, "At this point,

---

[26] Searcey does not indicate whether Beth Winslow and Beth Johnson are the same person. Other documents in the record suggest, however, that Beth Johnson and Beth Winslow are indeed the same person. (See, e.g., Smith Aff. Ex. 1G at 1, ECF No. 69-1.) If they are, this fact would seem to explain why Winslow spoke falsely about his involvement in the Wilson homicide in an effort to protect Beth Johnson. (See Searcey Aff. Ex. 2K, Searcey Aff. ¶ 23.)

it is my understanding that all investigation in this matter will be coordinated with you." (Smith Aff. Ex. 1G at 1, ECF No. 69-1.)  Smith's letter lists the steps that he understood would be taken as the investigation progressed.  (See generally id.)

On March 24, 1989, Stevens and Searcey interviewed Deb Shelden.  (Searcey Aff. ¶ 29.)[27] Stevens and Searcey each prepared reports about this interview, and there are material inconsistencies between their reports.  In his report, which was prepared on March 24, 1989, Stevens wrote that Deb remembered Clifford Shelden receiving a letter from Joann Taylor, and although Deb did not read the letter herself, Clifford read it and advised Deb that Taylor admitted to killing Wilson.  (Pl.'s Ex. 32 at 1, ECF No. 106-26.)  According to Stevens' report, Deb also said that the letter may have mentioned Joseph White, but she was not sure.  (Id. at 2.)  When asked why she did not provide this information to the police, she responded, "You know Joann, everything she ever said was a lie."  (Id.)[28]   According to Searcey's report, which was prepared on April 20, 1989, Deb claimed that she "read the letter herself and that JoAnn Taylor had made a statement in that letter that Joseph Edgar White alias Lobo and . . . JoAnn Taylor were responsible for killing Helen Wilson."  (Pl.'s Ex. 33 at 2, ECF No. 106-27.)

On March 25, 1989, Searcey and Stevens interviewed Darren Munstermann, who said in a recorded statement that at the time of the Wilson homicide, he was living with Joann Taylor, Charlotte Bishop, and Cliff Shelden.  (Searcey Aff. ¶ 30; Searcey Aff. Ex. 2R at 4-5, ECF No. 72-1.) Munstermann said that on the night of the homicide he was home by himself, and that he went to bed around 11:00.  (Id. at 5-6.)  He said that he saw Joann, Charlotte, and Cliff the next day, and he said that he did not remember any of them acting "unusual" or "strange" or "different."  (Id. at 6-7.)  He

---

[27] In his affidavit, Searcey states that he "took a voluntary statement from Deb Shelden." (Searcey Aff. ¶ 29.)  However, his report concerning this interview states, "No statement was taken from Debra Shelden by Sargeant [sic] Stevens or this deputy at that time."  (Searcey Aff. Ex. 2P at 2, ECF No. 72-1.)

[28] Stevens investigated this letter previously, however.  On January 25, 1989, he asked a Detective Domgard of the Lincoln Police Department to interview Cliff Shelden, and Cliff reported that he received a letter from Taylor "shortly after the homicide" and concluded that White, Taylor, and Goodson were involved in the murder.  (Pl.'s Ex. 1 at 5.)  Stevens discounted Cliff's information for a number of reasons.  (See Pl.'s Ex. 91 at 69-73.)

then explained that shortly after the homicide, Taylor said that she wanted to move back to South Carolina, and she left town.  (Id. at 7.)  After Searcey twice asked whether Joann Taylor was in a hurry to leave town, Munstermann said, "Yeah, now that you say it, I'm kinda remembering now." (Id.)  Searcey asked, "Now wasn't she a little [antsy]?" and Munstermann replied, "Yeah, I think she was [antsy] from, you know, what when that happened to [sic] when she left."  (Id.)  Searcey asked, "So she was a tad bit nervous, would you say?" and Munstermann replied, "I, I cou, [sic] I would say she was just a little bit."  (Id.)  Searcey added, "Really she wasn't acting normal.  Is that right, as you knew her.  Is that right or wrong?"  (Id.)  Munstermann responded, "I'd say, you know, that'd be right."  (Id.)  Searcey commented that it seemed that "a few things [were] coming back a little bit," and he then stopped the tape recording to give Munstermann time to "think" and "jog [his] mind."  (Id. at 8.)

When the interview resumed, Searcey asked Munstermann whether he had heard any comments from Joann Taylor about why she was leaving town, and Munstermann responded, "I don't think she told them exactly why, I think she just made up something then, you know made up an excuse to leave town."  (Id. at 8.)  Searcey asked, "Do you think it could have been possibly because she was involved in this homicide, and she was wanting to get the hell out of town?"  (Id.) Munstermann agreed.  (Id.)

Later during the interview, the following exchange occurred between Searcey and Munstermann:

BS      Now like I told you in a brief discussion before we started interviewing you, your name has come up in this situation, OK, I made you aware of that, is that not correct?

A.      Yes

BS      And I believe I made you aware that, that come from some of the people that are lodged in jail at this time?

A.      Yes

[Q]     If they was to make comments to me, [or] Sgt Stevens about you having been involved in that.  What would be your reply?

41

A.      I would say that they were trying, you know, to work a deal or something to get their sentence, you know, down, there [sic] just coming up with, pulling stuff out of the air, you know, people they knew, and trying to get everybody in on it

BS      So you think they may be fabricating?

A.      Yes

. . . .

BS      Tell you want I think, Jon.  I'm gonna be right up front with you.  No doubt in my mind you know about this thing, no doubt in my mind you were there.  OK I think the reason why you were there might of been maybe not at your choice.  That's what I think, OK.  And I think things happened and it got clear out of hand, clear out of hand, there ain't much you can do about it, right, not a hell of alot you can do because there's many people involved.  Am I right or wrong, got out of hand.  Your didn't go up there with that in mind, did you?

A.      I didn't go up there at all

BS      No, I think you were there, but what I'm saying is that I think it got out of hand, there wasn't much Jon could do about it.  Jon would like to help, but it's out of hand.  Too many other people took control of something and no matter what you can or no matter your [sic] saying, your [sic] being held back or whatever, or your [sic] threatened.  Your life means more to you than that doesn't it, doesn't it Jon?

A.      Yes it does, it does, nobody has threatened me, and nothing.  I came in here on my own.

BS      We understand that

A.      To help you guys out, and well I have to say, well I didn't have anything to do with it, I wasn't there, I didn't have any knowledge of it until I saw the paper last week.

BS      That's not what people are telling us, Jon.  OK.  What I'm saying to you is I think it's time to clean.  It's time to clean, you can't carry it around with you all the time.  It's been four long years.  Four long years, you can't carry that around all your life.  It'll tear you up Jon.  It will do a number on you.

A.     I know it would, that's why I just let, if something, if I was in on it, I would say something, because I have, I do have a conscience about myself, you know, some people don't have it, they would hold back stuff like that, but I'm not that kind of person to hold back anything, you know, anything to do with that.

(Id. at 10, 12-13.)  Munstermann then agreed to take a polygraph test, testify, and surrender a sample of his blood, hair, and saliva "for investigative purposes."  (Id. at 13.)

On March 30, 1989, BPD Sergeant Stevens interviewed Wilbur Brown, who was Lisa Podendorf's father-in-law.  (Searcey Aff. ¶¶ 31-32.)  Brown said that according to Lisa, Joann Taylor watched Wilson's murder, revealed this fact to Lisa, and threatened to kill Lisa if she made a statement about it.  (Searcey Aff. Ex. 2S, ECF No. 72-1.)

Later that same day, Searcey interviewed Wilbur Brown.  (Searcey Aff. ¶ 32.)  Most of Searcey's questions to Brown were about Sergeant Stevens and his interviews with Brown and another one of his daughters-in-law, who was called Margaret.  (See generally Searcey Aff. Ex. 2T, ECF No. 72-1.)  Searcey asked Brown, "Did [Stevens] make any comments about myself Officer Searcey?" and Brown replied, "Yeah he did he said Officer Searcey kept all the information to himself, he would not give me none of it."  (Id. at 4.)  Brown added, "Officer Stevens did say that if he'd of had one statement that I guess my daughter-in-law gave that you could of had that murder solved in three days after it happened, but I guess according to him he did not get that one information."  (Id. at 6.)

On March 31, 1989, Wilbur Brown was interviewed at DeWitt's office.  (Searcey Aff. Ex. 2W, ECF No. 72-2.)  Sergeant Stevens, Deputy Searcey, Sheriff DeWitt, and BPD Captain Elvin Waltke were present during the interview.  (Id. at 11.)  Captain Waltke conducted the interview.  (See generally id.)  Brown eventually repeated his statement that Joann Talyor told Lisa Podendorf that she (Taylor) was in the apartment when Wilson was killed, and that Lisa relayed this information to Brown.  (Id. at 10.)  It appears that initially, however, Brown denied that Lisa told him anything about the matter.  (Id. at 1-2, 4.)  Brown repeated his statement that on March 30, 1989, Stevens told him that Searcey "kept all the information to himself."  (Id. at 6.)  Brown also said, however, that when Searcey initially spoke with Lisa about the case, Searcey told her not to tell anybody what she knew.  (Id. at 4.)  On or about March 31, 1989, at DeWitt's request, Stevens was told to stay out of

43

the Wilson case because he was "muddying the waters." (Pl.'s Ex. 91 at 109-110.) It appears that at this point, Stevens was once again excluded from the sheriff's office's investigation.

On April 10, 1989, Searcey informed Cindy Reiber of her <u>Miranda</u> rights and took a statement from her. (Searcey Aff. ¶ 36.) Reiber told Searcey that about six months before the date of her statement, Clifford Shelden told her that Tom Winslow knew something about the murder of Helen Wilson. (Searcey Aff. Ex. 2X at 3, 7, ECF No. 72-2.) She added that after Tom Winslow got out of jail in Lancaster County "a month ago," he said that Joann Taylor told him that she and White murdered Wilson. (<u>Id.</u> at 3-4, 7.) Reiber also said that she was married to Tom Winslow for approximately two years beginning on January 9, 1987, and that Winslow never said anything about the Wilson homicide before. (<u>Id.</u> at 4, 7-8.) Reiber said that Lisa Podendorf also told her that Joann Taylor claimed to have murdered Wilson. (<u>Id.</u> at 10.) Reiber explained that the murder "was the big talk about that time," and she and Lisa were both suspicious of Joann after the murder because "she had just up and took off and she hadn't been seen since then." (<u>Id.</u>) Finally, Reiber said that Tom Winslow did not come forward about the Wilson homicide because Joann Taylor threatened to "bring his name right in the middle of it" and "drag him down with her." (<u>Id.</u> at 14.)

On April 12, 1989, Searcey and Lamkin took a statement from Clifford Shelden at the Lancaster County Correctional Center. (Searcey Aff. ¶ 37; Searcey Aff. Ex. 2Y at 1, ECF No. 72-2.) Clifford Shelden said that on the night of the Wilson homicide, he was in the hospital and was so ill that he was unable to walk. (Searcey Aff. Ex. 2Y at 3.) He added that he was in the hospital receiving treatment for approximately three days. (<u>Id.</u>) Searcey asked Clifford when he learned about the Wilson homicide, and Clifford said that he received a letter about it from Joann Taylor a week or two after it occurred. (<u>Id.</u> at 5.) Searcey asked whether he could have received the letter several months after the homicide, and Clifford agreed that he received it three or four months later. (<u>Id.</u> at 5-6.) Clifford said that in the letter, Joann Taylor wrote that she, Joseph White, and Tom Winslow broke into Wilson's place, took between eight hundred and eighteen hundred dollars from her apartment, sexually assaulted her, and murdered her. (<u>Id.</u> at 6-7.) Clifford added that Tom Winslow also described the assault upon Wilson to him. (<u>Id.</u> at 8-9.) Clifford said that, according to Winslow, Joann Taylor also participated in the sexual assault of Wilson by kissing Wilson's lips and breast. (<u>Id.</u> at 9.) Winslow also said that Clifford's wife, Deb, was involved in the homicide,

44

but Clifford did not believe him because Winslow "lies about everything." (Id. at 13.)  More specifically, Clifford said that according to Winslow, Deb was present during the homicide, White pushed Deb when she tried to help Wilson, and Deb struck a mirror and received a cut on her head. (Id. at 13-14.)

Searcey and Lamkin took a statement from Deb Shelden on April 13, 1989. (Searcey Aff. ¶ 38; Searcey Aff. Ex. 2Z, ECF No. 72-2.)  I noted previously that Searcey and Stevens took a statement from Deb Shelden on March 24, 1989. Lt. Fitzgerald described Deb Shelden as someone who "appeared to be the type that was kind of easily led," and "maybe hung out with [the other people involved in this case] because . . . maybe it brought a little importance to herself." (Pl.'s Ex. 99 at 72-73.)  The record also suggests that Deb Shelden received psychological services from Price's office sometime in the past.  (Price Aff. ¶ 8.)  Price characterized Shelden as "intellectually slower" than Joann Taylor and said that she was "very desirous of being cooperative" with the investigators.  (Price Aff. Ex. 3L at 61-62, ECF No. 74-2.)

During her April 13 statement, Deb Shelden said that on the night of the Wilson homicide, she was in her apartment with Charlotte Crumb when Tom Winslow came by and asked if she (Deb) would go with him to see Clifford Shelden at the hospital.  (Searcey Aff. Ex. 2Z at 3-5.)  Deb said that she and Tom Winslow then left the apartment and drove to Kathy Bartek's apartment.  (Id. at 4.)  Upon their arrival at Kathy Bartek's apartment, Deb Shelden and Tom Winslow asked Joann Taylor and Joseph White if they were ready to go see Clifford.  (Id. at 5.)  The four then left Kathy Bartek's apartment at 7:30 p.m., but instead of going to the hospital, they went straight to Helen Wilson's apartment.  (Id. at 5-7.)[29]  Deb Shelden was familiar with the location of Helen Wilson's apartment because Wilson was her great-aunt.  (Id. at 7.)  The group forced its way into Wilson's apartment, led by Joann Taylor and Tom Winslow, and demanded money.  (Id. at 9.)  After other members of the group forced Winslow to the floor of her bedroom, Deb Shelden tried to help Wilson.  (Id. at 10.)  Joseph White then pushed Deb Shelden, and Deb fell and struck the back of her head.  (Id. at 13.)  According to Deb, White, Taylor, and Winslow then took Wilson to the living

---

[29] As noted above, Wilson's son told investigators that he was with Wilson from about 6:45 p.m. until 9:45 p.m. on the night of the homicide; thus, he would have been present if, as Shelden claims, her group went directly to Wilson's apartment at 7:30 p.m.

room, held her down, and placed a pillow over her face while Winslow and White took turns sexually assaulting her.  (Id. at 15-19.)  White, Taylor and Winslow then searched through the apartment looking for money.  (Id. at 20.)  The group then left and returned to Deb Shelden's apartment, and Deb Shelden went to the bathroom to wash blood out of her hair.  (Id. at 22-23.)  Deb said that when she came out of the bathroom, "everybody else" was just leaving.  (Id. at 23.)  She added that she did not come forward with information about the crime because she was scared.  (Id. at 26.)

On April 14, 1989, at approximately 9:43 a.m., Deb Shelden signed a "waiver form" allowing the investigators to obtain blood, hair, and saliva samples from her.  (Pl.'s Ex. 33 at 5.)  Searcey and Lamkin then transported Deb Shelden to the Beatrice Community Hospital, where the samples were collected.  (Id.)

Later that day at approximately 3 p.m., Searcey and Lamkin interviewed Deb Shelden for a second time.  (Searcey Aff. ¶ 39.)  It is not clear whether Searcey and Lamkin learned by this time that Deb Shelden's blood type was not B; however, there is evidence that the April 14 interview occurred just before Deb Shelden's arraignment at 4:50 p.m., at which time counsel was appointed to represent her.  (Pl.'s Ex. 119.)  Searcey told Deb Shelden that he wanted to "go over the interview" that was conducted on April 13 and "basically [ask] . . . the same questions" to ensure that he understood her statement and to verify that her answers "were true and accurate."  (Searcey Aff. Ex. 2AA at 3, ECF No. 73-1.)  During her April 13 interview, Deb Shelden said that only she, Joann Taylor, Tom Winslow, and Joseph White participated in the Wilson homicide.  During her April 14 interview, however, Deb Shelden said that James Dean was also at Kathy Bartek's apartment, and that he came along with the others to Helen Wilson's apartment.  (Id. at 7-10, 11-12.)  Deb said that James Dean watched Winslow, Taylor, and White attack Wilson, but he did not participate.  (Id. at 30-31.)  When asked why she did not remember Dean's presence before, Deb Shelden said she guessed she "was blocking it."  (Id. at 31.)  She also said that there was no one else in Wilson's apartment, and she was sure that Kathy Bartek did not come with the group to Wilson's apartment because Kathy had two children at home.  (Id. at 49-50.)

During the April 14 interview with Deb Shelden, Searcey also revisited Deb's claim that the group drove to Wilson's apartment at 7:00 p.m. on the night of the homicide:

Searcey:        I believe you stated you left your apartment at approximately seven or a little after . . . .

Shelden:        Yes.

Searcey:        Is that correct?

Shelden:        Yes.

Searcey:        And you were over at the Dean and the Kathy Bartak residence for sometime . . .

Shelden:        Yes.

Searcey:        Approximately an hour is that correct or longer?

Shelden:        Yes, that I know of it was an hour.

Searcey:        Can you give me the approximate time to the best of your knowledge and I want you to think about this answer before you give it, that you may have arrived to the apartment complex where Helen Wilson lived?

Shelden:        I cannot, I don't know the time we left or not.

Searcey:        Can you give me a span of time that you may have arrived there?

Shelden:        I cannot, I don't know.

Searcey:        Can you tell me the approximate time you may have left there?

Shelden:        I would say we left . . . Kathy's at I would say probably eight-thirty or quarter till because I told them that it was about time to go because their [sic] going to quit visiting pretty soon.

Searcey:        But you really have no knowledge of what time it was at anytime?

Shelden:        I didn't . . .

Searcey:        Are you a person who pays attention to time?

Shelden:        No not to [sic] much.  I mean you know if I have to go somewhere then I'll make sure I know what time it is.

47

Searcey:        But normally you don't pay attention to what time it is?

Shelden:        I don't watch it all the time no.

(Searcey Aff. Ex. 2AA at 56.)

Searcey drafted an affidavit in support of an arrest warrant for James Dean on April 13 or 14, 1989.  (Searcey Aff. ¶ 40.)  It is not clear whether Searcey drafted this affidavit before or after his second interview with Deb Shelden.  As noted above, however, Deb Shelden implicated James Dean in the homicide during her April 14 statement, but not during her April 13 statement.  In any event, a warrant was issued for Dean's arrest on April 14, 1989, and DeWitt, Searcey, and Lamkin executed the warrant that same day.  (Searcey Aff. ¶ 40.)  Following his arrest, Dean was booked into the Gage County Jail.  (Id.)  Smith filed complaints charging Deb Shelden and James Dean with aiding or abetting the killing of Helen Wilson "in the perpetration of or attempt to perpetrate any sexual assault in the first degree, robbery, kidnapping [sic] or burglary."  (Smith Aff. ¶ 25.)

On April 15, 1989, James Dean was taken to the Beatrice Hospital so that "biogenetic samples" could be taken for testing.  (Searcey Aff. ¶ 41.)  That same day, Kathy Bartek appeared at the GCSO and asked for information about James Dean, whom she identified as her boyfriend.  (Id. ¶ 42.)  DeWitt advised Kathy Bartek that Dean had been arrested in connection with the Wilson homicide, and Bartek responded that Dean could not have participated in the homicide because he was with her in Lincoln at the time of the crime.  (Id.)  DeWitt asked Searcey and Lamkin to interview Bartek, and during this interview Bartek admitted that she and Dean were in Beatrice in the early evening hours of February 5, 1985.  (Id.)  She also said that Joann Taylor, Tom Winslow, and Joseph White came to her residence at approximately 8:00 or 8:30 p.m. on that evening, and that they left together in Tom Winslow's vehicle.  (Id.)

On April 24, 1989, Price consulted with Deb Shelden at the request of her attorney.  (Price Aff. ¶ 8.)  As I noted previously, it appears that Price's office provided some sort of services for Deb Shelden prior to 1985, though the precise date and nature of these services is not described in the record.  (See id.)  During the April 24 consultation, Price informed Deb Shelden that he would evaluate her, but the evaluation would not be confidential.  (Id.)  He also informed her that he had been involved with the GCSO's investigation of the Wilson homicide.  (Id.)  According to Price, Deb

48

Shelden then consented to the evaluation. (Id.) After conducting a 90-minute evaluation, Price concluded that Deb Shelden was "within the normal range of intellectual function and that she met the criteria to be found competent to stand trial and to enter into agreements and contracts knowingly and willingly." (Id.) That same day, Deb Shelden signed a plea agreement stating that she would "testify truthfully in any and all cases and give total cooperation to the State of Nebraska regarding the homicide of Helen L. Wilson." (Smith Aff. Ex. 1O, ECF No. 70-1.) For its part, the State pledged to "recommend the minimum sentence of 10 years" if Deb Shelden complied with the terms of the agreement. (Id.) On April 26, 1989, Smith, Deb Shelden, and Shelden's attorney initialed an amended plea agreement stating that Deb Shelden would also plead guilty to an amended information charging her with "aid[ing] and abetting for Second Degree Murder of Helen L. Wilson." (Id.)

On April 29, 1989–approximately two weeks after his arrest–James Dean was transported to Lincoln, Nebraska, for a polygraph test. (Harlan Aff. ¶ 8.) The test results indicated deception. (Smith Aff. ¶ 29.) On May 2, 1989, Smith, DeWitt, and Price consulted with James Dean. (Price Aff. ¶ 10.) Dean continued to maintain that he was not involved in the homicide. (Id.) According to Price, "After [Dean] was confronted with the polygraph results as well as the testimony that led to his arrest, he continued to deny being in Wilson's apartment, but he began to show that he was doubting the veracity of his own denials." (Id.) Price formed an opinion "that Dean responds negatively and emotionally to violence and was overwhelmed by the violence he witnessed" in Wilson's apartment. (Id.) Price states, "It was my opinion that Dean is not a particularly violent person, that he is repulsed by ultra violence, that he witnessed ultra violence while in Wilson's apartment and that the degree of violence that he witnessed overwhelmed him emotionally and he repressed the memory." (Id.) Price's consultation report states that as the session progressed, Dean "began to realize that the polygraph was revealing at least at the subconscious level his awareness that he was present in the apartment but could not reconcile his being present with the conscious belief that he was not there." (Price Aff. Ex. 3F, ECF No. 74-2.) The report also states that the group had "a rather extended discussion" with Dean that caused Dean to be "developed to the scenario that it was likely that Mr. Dean was present in the apartment, [and] per his testimony and the testimony of an eye witness he was not actively involved in any act of violence." (Id.) Price

49

indicated that Dean needed "continuing supportive therapy" to help him recall the memories that, according to Price, Dean repressed. (Id.) Price also indicated that Dean "was agreeable" to receive this therapy and that Dean's attorney permitted the therapy to proceed outside his presence. (Id.)

James Dean's account of the time period between his April 14, 1989, arrest and his initial statement on May 8, 1989 (which will be discussed below), differs from that of the defendants. Dean claims that shortly after his arrest, he was told by Searcey and Lamkin that he "could get the death penalty if he did not cooperate" with them. (Pl.'s Ex. 146 ¶ 18, ECF No. 113-5.)[30]   On April 15, 1989, Searcey, DeWitt, and Lamkin interviewed Dean and "kept saying" that "if you don't tell us what really happened, we're going to put you in the electric chair, put you to death." (Pl.'s Ex. 122 at 39-40, ECF No. 111-5.)[31]   Dean claims that he asked for an attorney shortly after his arrest, but none was appointed for a number of days–though he was repeatedly questioned for lengthy periods. (Pl.'s Ex. 146 ¶¶ 18-20.)  He adds that the officers continued to question him outside the presence of his attorney (after one was appointed) and to advise him that he would get the electric chair if he did not cooperate. (Id. ¶¶ 21, 25.)  On April 29, 1989, Lamkin and Searcey threatened Dean as they drove to Lincoln for the polygraph test, telling him again that if he did not tell the truth, they would "[p]ut [him] in the electric chair." (Id. ¶ 22.)  Sometime shortly after the polygraph test, Dean says that Searcey and Lamkin transported him to Wilson's apartment and showed him the living room. (Id. ¶ 23.)  Thereafter they transported him to Marshall's Truck stop and told him "exactly what [he] had for breakfast the night of the murder." (Id.)

Dean also claims that Price consulted with him four or five times after he completed his lie detector test, and that Price did not identify himself as a law enforcement officer until approximately

_____

[30] Plaintiff's Exhibit 146 is James Dean's affidavit, which is dated November 17, 2010. The defendants object to my consideration of this affidavit on the grounds of "Hearsay, Speculative and self-serving." (Defs.' Br., Attach. 1 at 19, ECF No. 130-1.)  In the defendants' reply brief in support of their motion to strike, the defendants argue that Dean's affidavit is "self-serving" and "should be disregarded" because it is not "supported by documentation." (Defs.' Reply Br. at 3-4, ECF No. 134.  See also Defs.' Reply Br. at 6-9, ECF No. 128.)  These objections are overruled.

[31] When asked whether he thought these men "had the power to put you in the electric chair," Dean answered that he "[w]asn't sure" and "was really dumb to the law." (Pl.'s Ex. 122 at 40.)

the third meeting.  (Pl.'s Ex. 146 ¶ 24.)  He says that DeWitt, Searcey, and Dean's attorney were all present during his second consultation with Price, and that during this consultation Dean was shown "a number of crime scene photographs," including "a nude picture of Helen Wilson" that made him upset.  (Id.)  Dean adds that on May 1, 1989, DeWitt, Searcey, Price, and Smith showed Dean and his attorney "a video . . . which showed graphic images of Helen Wilson and the crime scene."  (Id. ¶ 25.)

In short, Dean initially claimed to have no involvement in the Wilson homicide, but during the interim between his arrest and his initial statement he was questioned repeatedly by Searcey, Lamkin, and DeWitt; he was shown crime scene photos and other case materials; he was taken to visit the crime scene itself; he was given a polygraph examination; he was counseled repeatedly by Price that he was repressing his memory of the crime; and he was frequently threatened that a lack of cooperation would place him in "the electric chair."  (Pl.'s Ex. 122 at 39-40, 62-63, 71; Pl.'s Ex. 146 ¶¶ 18-20, 23-26.)  Dean says that this process terrified him, and because of this treatment Price was able to convince him that he "actually repressed the memory of the crime."  (Id.)  Thereafter, Dean agreed to accept a plea bargain and cooperate with the officers.  (Id.)  He claims that he believed then that all of his information about the case was coming back to him in his dreams, but he knows now that all of the information that he provided in his statements was first given to him by Searcey, Lamkin, DeWitt, and/or Smith through the use of photos, videos, and/or "leading questions."  (Id. ¶¶ 25-26.)

On May 8, 1989, James Dean gave a recorded statement "in preparation to reach a plea agreement."  (DeWitt Aff. ¶ 17.)  DeWitt, Smith, Harlan, and Dean's attorney were present during the statement.  (Id.)  This was the first statement taken from Dean since his arrest on April 14, 1989.  During his May 8 statement, Dean said that he could now remember being in Wilson's apartment when she was killed, and that Joann Taylor, Tom Winslow, Joseph White, and Deb Shelden were also there.  (DeWitt Aff. Ex. 4F, Statement at 2, ECF No. 74-4.)  He added that Kathy Bartek was not present in the apartment, but someone else could have been.  (Id. at 5, 6.)  Dean said that he could not remember many other details about the incident, but he suggested that he might be able to remember more things in the future.  (Id. at 3.)  Smith then asked Dean, "James this is a very important question.  Prior to this time we've asked you about this and . . . you denied that you were

51

there.  Can you tell me now why you were saying that you were there?"  (Id. at 4.)  Dean responded, "Well I, I feel that I remembered it in my sleep.  I obviously had some kind of a subconscious block or something I don't know what it was for sure and I couldn't remember and I thought I was telling the truth naturally and I said I was not there."  (Id.)

Later that day, DeWitt delivered dinner to Dean at the Gage County Jail.  (DeWitt Aff. ¶ 18.)  According to DeWitt, Dean said "that he felt better that he had told the truth about the Wilson homicide," and "he had to get it off his mind."  (Id.)  He added that "he held out so long because he was afraid someone would hurt him if he told the truth."  (Id.)

On May 10, 1989, Searcey and Lamkin interviewed James Dean.  (Searcey Aff. ¶ 43.)  During this interview, Dean provided more information about the night of the homicide, but there were still many gaps in his recall.  (See generally Searcey Aff. Ex. 2CC, ECF No. 73-2.)  Among other things, Dean noted that when the group drove to Wilson's apartment building, he thought they might be going to visit Kathy Gonzalez, who also lived in the building.  (Searcey Aff. Ex. 2CC, Statement at 31-32, ECF No. 73-2.)  Dean said that Kathy Gonzalez was Joseph White's girlfriend.  (Id.)  At one point during the interview, Searcey asked Dean if he could describe where he, Tom Winslow, Joann Taylor, Joseph White, and Deb Shelden sat in Winslow's car as they drove to Wilson's apartment.  (Id. at 10.)  Dean responded, "Ah ah I couldn't do that," adding, "You guys showed a diagram of it so that would ruin . . . ."  (Id.)  Later in the interview, he indicated that he got all his information in "a dream," and that he did not remember being involved in the incident until after he saw "the psychiatrist."  (Id. at 29, 31.)

On May 11, 1989, Deb Shelden completed a polygraph examination.  (Smith Aff. ¶ 30.)  According to the examiner, Deb Shelden's "story goes along with what all has been said in the past," and the examiner concluded that she appeared to be truthful.  (See Smith Aff. Ex. 1R at 2, 4, ECF No. 70-1.)  The following excerpt from the polygraph examiner's report concerning James Dean is noteworthy, however:

> It was obvious that Debra [Shelden] had to have considerable "coaching" or whatever to tell what was supposedly the truth.  In many instances in the statement she gave [to investigators], she could not "remember" and then later would come up with some pretty exact details.  So, either she was not wanting to level at the very beginning or else was hesitant to tell what really happened as she saw it.

(Smith Aff. Ex. 1Q at 2, ECF No. 70-1.)

On May 17, 1989, Dean agreed to plead guilty to charges of aiding and abetting second degree murder and to "give total cooperation" to the investigation of the Wilson homicide.  (Pl.'s Ex. 125, ECF No. 111-8.)  On that same date, Searcey took another statement from Dean.  (Searcey Aff. ¶ 44.)  It appears that DeWitt and Dean's attorney were also present during Dean's statement.  (Searcey Aff. Ex. 2DD at 2, ECF No. 73-2.)  Dean said that sometime between 8 and 10 o'clock on the night of the homicide, Deb Shelden, Tom Winslow, Joann Taylor, and Joseph White picked him up at Kathy Bartek's house, and the group drove to Helen Wilson's apartment building.  (Id. at 2-3.)  He said he had "an idea" that another woman was present at the time of the homicide, but he did not want "to put a wrong name in there" and cause problems for the officers.  (Id. at 4-5.)  He described this person as having shoulder-length light brown hair and a medium to heavy build.  (Id. at 8.)  He added that the person was wearing a white shirt and tennis shoes "that had grey backs to [them]."  (Id.)  Dean said that he left Wilson's apartment, and when he came back he watched Joseph White and Tom Winslow taking turns sexually assaulting Wilson while Joann Taylor licked Wilson's chest and held her arms down.  (Id. at 5-6.)

On May 18, 1989, Searcey obtained a photo of Kathy Gonzalez from the BPD.  (Searcey Aff. ¶ 45.)  Then on May 24, 1989, Searcey took another statement from James Dean.  (Id. ¶ 47.)  Once again, DeWitt and Dean's attorney were present during the statement.  (Searcey Aff. Ex. 2FF at 1, ECF No. 73-3.)  During this statement, Dean said that as he drove around town with Tom Winslow, Deb Shelden, Joann Taylor, and Joseph White on the night of the homicide, White and Taylor started "a conversation about robbing somebody."  (Id. at 2.)  The group then went to Wilson's apartment, knocked on the door, and forced its way in.  (Id. at 2-3.)  According to Dean, at this point the group was joined by another person, and he now remembered that this person was Kathy Gonzalez.  (Id. at 3.)  Dean also reported that when he left the apartment, he "went and shut the lights off," adding, "I don't remember you know exactly, but I . . . think I did go shut the lights off because when we come out the lights were off."  (Id.)  He said that when he came back to the apartment, Tom Winslow had something around Wilson's neck and was dragging her into the bedroom.  (Id.)  Joseph White began to assault Wilson sexually, "[a]nd then Kathy [Gonzalez] hollered from the bathroom, . . . [']I've been injured.[']"  (Id. at 4.)  Dean said that he did not see Kathy Gonzalez become injured,

but he recalled hearing the sound of something breaking, and he saw Gonzalez holding a cloth that he believed to be stained with blood.  (Id. at 6-7.)  He said that the group left Wilson's apartment and drove to a truck stop for breakfast, and Tom Winslow and Deb Shelden argued about money along the way.  (Id. at 8.)

Also on May 24, 1989, Searcey and Lamkin interviewed Deb Shelden in the presence of her attorney.  (Searcey Aff. ¶ 48; Searcey Aff. Ex. 2GG, ECF No. 73-3.)  On this occasion Deb Shelden said that she remembered seeing Kathy Gonzalez at Wilson's apartment during the homicide. (Searcey Aff. Ex. 2GG at 3-4.)  She also said that Kathy Gonzalez's nose began to bleed "quite a bit" at some point.  (Id. at 5.)  According to Deb Shelden, Gonzalez then left the apartment and did not return.  (Id. at 8-9.)  When asked why she had not mentioned Gonzalez's presence before, Deb Shelden said, "I didn't remember her at first, but I've been thinking about the case and everything, and I had a nightmare, and I remembered her."  (Id. at 11.)  She explained that a few days before the interview, she told the sheriff that she "had decided in [her] mind that there was another person," and she asked Searcey to show her a picture.  (Id. at 12.)  She described the person that she wanted to see in a picture as a "heavy set" woman with "dishwater blond hair" who was wearing blue jeans, a white jacket, and grey topped tennis shoes on the night of the homicide.  (Id. at 11-13.)  It seems that Searcey then showed Deb Shelden a picture of Kathy Gonzalez, and Deb Shelden said that Gonzalez had been with the others at Helen Wilson's apartment during the homicide.  (See id.)

On May 25, 1989, Searcey, Lamkin, and DeWitt traveled to Denver, Colorado, and arrested Kathy Gonzalez.  (Searcey Aff. ¶ 49.)  That same day, Smith filed a complaint charging that Gonzalez did "aid, abet, procure or cause another to kill Helen Wilson in the perpetration of or attempt to perpetrate any sexual assault in the first degree, kidnapping [sic] or burglary." (Smith Aff. ¶ 31.)  Kathy Gonzalez was transported to Beatrice and taken to the hospital, where "biogenetic samples were taken from her."  (Searcey Aff. ¶ 50.)  She was then taken to the Gage County Jail. (DeWitt Aff. ¶ 23.)  On May 26, 1989, Searcey learned that Gonzalez's blood was type B positive. (Pl.'s Ex. 130 at 1-2, ECF No. 111-13.)

Also on May 26, 1989, Price and Meints interviewed Kathy Gonzalez.  (Price Aff. ¶ 12.)[32]
Gonzalez said that she knew Joseph White and had met Joann Taylor when she was living in
Beatrice.  (Price Aff. Ex. 3I at 5, ECF No. 74-2.)  Gonzalez explained that White lived with her for
about a week, but she kicked him out of her apartment "because he refused to take a bath."  (Id. at
7.)  She said that she did not know Helen Wilson and did not associate with others who lived in the
apartment building.  (Id. at 8.)  Gonzalez said that she heard about Wilson's death "the next day"
while she was at work, and she saw that "cop cars" were still at her apartment building when she got
home.  (Id. at 7.)  She also said that she was at home during the murder, and she had been doing
laundry and watching a movie that evening, but she did not hear anything.  (Id. at 8.)

Price asked Gonzalez whether she "ever had any memory problems before," and Gonzalez
responded negatively.  (Id. at 8.)  Price asked, "How about something really terribly frightening like
something that really had an impact emotionally . . . ?" and again Gonzalez responded negatively,
adding, "the worst things that ever happened I can remember."  (Id.)  Price asked, "Do you think it
is a possibility that you might have been there and just have a complete blank?"  (Id. at 9.)  Gonzalez
replied that if that were possible, she would like to find out.  (Id.)  She asked Price whether he
hypnotized people, and Price responded that he could not do that because "the courts have been up
and down on whether it could be [admissible]."  (Id.)  He added, however, that sometimes traumatic
things "[w]ill come back to you in some ways often in dreams in little bits and pieces will come to
you like pieces of a jig saw puzzle that don't make a lot of sense and after a few dreams or even a
few days enough pieces will come together [and you will] start having some recall."  (Id. at 10.)
Price also suggested that it would be "questionable" if only "one person alone" had placed her there
during the crime, but in this case "a couple people placed you there."  (Id. at 8, 10.)  Gonzalez asked,
"What happens if I don't remember?"  (Id.)  Price responded, "Then it's up to a court to decide . .
. ."  (Id.)  Gonzalez denied being involved, and she said she even remembers the movie she watched
on the night of the homicide.  (Id. at 11.)  Price then told Gonzalez that if she were "there and not
participating" it would be "a very different situation" than if she were "there participating," and he

---

[32] At this point, counsel had been appointed to represent Gonzalez; however, a fee record
suggest that Gonalez's attorney did not confer with her, or otherwise begin working on her case,
before May 30, 1989.  (Pl.'s Exs. 131-132, ECF Nos. 111-14 to 111-15.)

asked her whether there was "a chance that [Joseph White] would implicate you if he thought he could get off by doing it?"  (Id. at 11-12.)  Gonzalez agreed that White was the sort of person who "would implicate somebody else to get out of something."  (Id. at 12.)  She said, "I don't know what to say . . . I thought about this and I realize what kind of situation I'm in and I don't know how to prove anything because I don't know what to say."  (Id. at 14.)  She said that she knew that she could not have hurt Wilson, but when she was arrested she "figured it would be easier to deal with all of this back [in Nebraska]."  (Id. at 14-15.)  She added, "[W]hat they said made sense[,] maybe I blocked it out I don't know."  (Id. at 15.)  Price said, "rest for a bit if you're willing and I'm willing to work with you on it you know."  (Id.)  Gonzalez said, "I want to know."  (Id.)  The following exchange then occurred:

| | |
|---|---|
| Meints: | You do have a few of the parts[,] I mean you remember somethings [sic] that they asked you about though, right? |
| Gonzalez: | What do you mean? |
| Meints: | The you know the la– yesterday when they interviewed you . . . |
| Gonzalez: | Yeah. |
| Meints: | You remembered a few of the things. |
| Gonzalez: | No. |
| Meints: | I mean like the . . . |
| Gonzalez: | They got kind of upset with me because all I could say is I don't know what to tell you. |

(Id. at 15.)

Price told Gonzalez that they would talk from time to time and "see what comes back."  (Id. at 17.)  He said, "But the important thing is the odds are at this time it looks like you were in but did in fact block it.  With two people pinpointing you in the event of [sic] each other, a good chance.  And if you can help you out by remembering it will help you. . . .  We don't want you held responsible for anything you didn't do and you know I have no idea what uh [White] or Joann and Winslow are going to say about you."  (Id. at 18.)  Gonzalez said, "I don't even know who this

Winslow is," and Price responded, "You apparently don't want to."  (Id.)  He added, "[I]f I had seen what took place I would have blanked it too."  (Id. at 19.)  Gonzalez asked whether remembering would "trigger anything," and Price responded that it would give her a "sense of relief."  (Id.)  Price added, "But we'll work with you, we're not out to railroad you in anyway okay?"  (Id.)  Gonzalez observed that there must be a lot of evidence against her even though she did not think she was present in Wilson's apartment.  (Id. at 20.)

On June 7, 1989, Searcey and DeWitt interviewed Dean once again.  (Searcey Aff. ¶ 51.) Dean said that he recalled some additional information about the night of the homicide.  (Searcey Aff. Ex. 2JJ at 1, ECF No. 73-3.)  He said that he recalled Joann Taylor mentioning the name Wilson while Taylor, Dean, Tom Winslow, Joseph White, and Deb Shelden were driving around in Winslow's car.  (Id. at 2.)  Earlier, the group had been talking about robbing someone.  (Id.)  He said that the group went to Wilson's apartment building, and the lights were off as they entered.  (Id.) According to Dean, a person wearing a white shirt suddenly appeared in the hall in front of them. (Id.)  This person was Kathy Gonzalez, and Dean said that Gonzalez joined in as the rest of the group entered Wilson's apartment.  (Id. at 2-3.)

On June 13, 1989, Dr. Roy mailed to Searcey a lab report that included an analysis of Gonzalez's blood.  (Pl.'s Ex. 141, ECF No. 111-24.)  The report indicates that one of the genetic markers in Gonzalez's blood (Gc 2-1) differed from one of the genetic markers that Roy identified in the type B blood that was found at the scene of Wilson's homicide (Gc 1).  (Compare Pl.'s Ex. 141, ECF No 111-24 with Pl.'s Ex. 90 at 4.)  I note in passing that Searcey claims to have reviewed "the blood reports from Dr. Reena Roy" that were prepared for the BPD.  (Searcey Aff. ¶ 7.)  I also note in passing that during White's trial, White and the state stipulated that, if Dr. Roy were called to the stand, she would testify that human blood "similar to that of Kathy Gonzalez" was found at the crime scene.  (Pl.'s Ex. 41, ECF No. 107-1.)  During her September 8, 1989, deposition, Dr. Roy initially said that Gonzalez "cannot be excluded as the donor of the Blood Group B in many of the bloodstains that [Dr. Roy] found" despite the discrepancies in the genetic markers–but it seems that Gonzalez could not be excluded only because Dr. Roy believed it likely that the type B blood from the crime scene (alleged to be Gonzalez's) was mixed with someone else's blood.  (Pl.'s Ex. 42 at

57

37-38.)   It also seems that, upon reflection, Dr. Roy said that she could not "be sure whether [Gonzalez] can or she cannot" be excluded.  (Id. at 38.)[33]

On June 16, 1989, Price interviewed Deb Shelden.  (Price Aff. ¶ 9.)  According to Price, he interviewed Deb Shelden at the request of her attorney, who was concerned about the "fragmented"

---

[33] Dr. Roy explained the significance of the assumption of mixed blood from multiple suspects clearly when discussing her analysis of Taylor's blood:

A.      Ms. Taylor is blood group O; ESD-2-1, PGM-2-1, ADA-a, AK-1, Gc-1, and Tf-C.

Q.      Was she the donor of any of the blood found at the scene of the crime?

A.      Ah, there is something that maybe we should go back again and regress a little bit.
        As I told you before, . . . I said that you should not exclude the possibility of a mixture of bloodstain as well as from Mrs. Wilson, as well as from other people.  This was back in 1985 and '86.
        Keeping that in mind, I would say I cannot exclude her, because she's also Blood Group O.  However, if you were just thinking of one person donating all the bloodstain, all the bloodstain that contained O - - only O Blood Group - - only then I would have to exclude her, simply because she's a ESD-2-1 and PGM-2-1, on my results.
        Again, I emphasize this is very likely that there is more than one person involved.  If that is the case, then I could not exclude her as being the source, because she will be able to donate the Blood Group O.

(Pl.'s Ex. 42 at 36-37.)  In other words, Taylor could not have been the sole source of all the type O bloodstain because of her genetic markers, but she cannot be excluded as the source of the blood if it is assumed that more than one person contributed to the stain.  Similarly, Gonzalez was not excluded as the source of the type B blood solely because of the assumption that multiple people contributed to the type B stains (which evidently could account for the discrepancy in the markers).

According to the stipulation entered during White's trial, type B blood "similar" to Gonzalez's was found on Wilson's gown, the bedspread, two sheets, and a pillowcase.  (Pl.'s Ex. 41 at 3.)  Based on Dr. Roy's testimony, Gonzalez could have contributed to these stains if all five are assumed to be mixtures of blood that could account for the divergent markers, but Gonzalez could not have been the sole source of any one of them.

nature of her recall.  (Id.)  Price told Shelden that she would have better recall if she relaxed and that she might recall more in dreams.  (Id.)

Also on June 16, 1989, Kathy Gonzalez completed a polygraph examination.  (Smith Aff. ¶ 32.)  The examiner noted that he "might have some difficulty in getting a valid exam" due to Gonzalez's weight (which forced him to "wrap" her forearm instead of her upper arm)[34] and her shallow breathing. (Smith Aff. Ex. 1T at 2, ECF No. 70-3.)  He also noted that Gonzalez "really did not look 'guilty'" based on his evaluation of "everything," including her "pre-test interview."  (Id.)  Nevertheless, his report states,

> After the test was completed and the attachments were removed, I told Kathy that she did not look very good and was not nearly as calm as she thought, at least according to the chart.  I also knew that she was a bit unlike Jimmy Dean, that she was not going to admit anything at this stage until there was something more to convince her that she was in a corner.  I told her that irregardless, she had to level with her attorney as there was no way he was going to be able to defend her without knowing the full truth.
>
>       . . . .
>
> You are probably playing a waiting game with Kathy.  When she finds out about the blood test and that she is in the big leagues, it might be a whole different story.

(Id. at 6.)  Evidently, the examiner had been told that Gonzalez's "blood has been identified" at the crime scene.  (Id.)

On June 23, 1989, Lamkin interviewed James Dean.  (Lamkin Aff. ¶ 18.)  Dean said that he recalled that when he, Tom Winslow, Joann Taylor, Joseph White, and Deb Shelden were driving in Tom Winslow's car on the night of the homicide, Wilson's name came up during the course of a conversation. (Lamkin Aff. Ex. 5E at 2, 4, ECF No. 75-2.)  He also said he wanted "to make sure we specify that . . . the lights [in the hallway of Wilson's apartment building] were off when we entered the door."  (Id. at 5.)  He described leaving Wilson's apartment as she was being assaulted and returning in time to overhear Kathy Gonzalez, who was in Wilson's bathroom, say that she had been injured.  (Id.)

---

[34] The examiner had a similar problem when interviewing Deb Shelden, whose forearm he also "wrapped" for the purposes of the exam.  (See Smith Aff. Ex. 1R at 4.)

Lamkin took another statement from James Dean on July 16, 1989.  (Lamkin Aff. ¶ 19.)
Once again, Dean claimed to have recalled more details about the events that occurred on the night
of the homicide.  Dean said that he, Joann Taylor, Joseph White, Tom Winslow, and Cliff Shelden
had a conversation about a week before the homicide, and the group talked about stealing money
from an "old lady."  (Lamkin Aff. Ex. 5F at 2, ECF No. 75-2.)  On the night of the homicide, Joann
Taylor told Dean and Tom Winslow that nobody would be home at Wilson's house, and that they
should "hit it."  (Id. at 6.)  Taylor, Winslow, Dean, White, and Deb Shelden then left in Winslow's
car, and the group eventually made its way to Wilson's apartment.  (Id. at 9-10.)  On the way to the
apartment, Dean learned that Kathy Gonzalez would also participate in the crime.  (Id. at 10-11.)
As in his previous statement, Dean described leaving Wilson's apartment and returning to hear
Kathy Gonzalez stating that she had been hurt.  (Id. at 16-17.)  He added, however, that he heard
something break in the bedroom before he left the apartment, and at one point he saw Gonzalez in
the bathroom holding a bloody rag to her chin.  (Id. at 17, 23.)  When he was asked whether he knew
where Gonzalez was when she became injured, he said that he did not want to speculate, adding, "I
don't want to do anything that's gonna harm this testimony."  (Id. at 23.)  Dean also said that he
knew "for a fact" that White "tore a five dollar bill in half," though he only "heard it rip."  (Id. at 21.)
According to Dean, White had "a stack of money in his hand" that was two or three inches thick.
(Id.)  The transcript of Dean's statement indicates that he had written down facts on a piece of paper,
and he consulted this paper during his statement.  (Id. at 24.)

On July 18, 1989, Searcey interviewed Cliff Shelden again.  (Searcey Aff. ¶ 52.)  Cliff told
Searcey that he had never heard of Kathy Gonzalez, and he had never heard Joann Taylor, Joseph
White, or anyone else planning to rob anyone.  (Searcey Aff. Ex. 2KK at 4-5, ECF No. 73-3.)  He
did agree with Searcey that, a few days before the homicide, he was present in Kathy Bartek's and
James Dean's residence when various people "possibly" went into the bathroom and "possibly" had
"some discussions," but Cliff was not a party to those possible discussions  (Id. at 5-6, 7.)  Cliff
Shelden also said that his wife Deb had never discussed her involvement in the Wilson homicide
until she wrote him a letter sometime "within the last several months" stating that "according to Tom
. . . Winslow's statement . . . she was there," and that Deb "was forced and basically threatened" to
go to Wilson's apartment.  (Id. at 6-7.)

60

On August 10, 1989, Joann Taylor's attorney interviewed Deb Shelden.  (Searcey Aff. ¶ 53.)  Searcey was present during the interview.  (See id.)  Deb Shelden said that she, Winslow, Taylor, White, and Dean drove around Wilson's apartment building several times until they saw the lights at the apartment building flash on and off.  (Searcey Aff. Ex. 2LL at 8-9, ECF No. 73-4.)  Deb Shelden later came to believe that Kathy Gonzalez was the one flashing the lights.  (Id. at 9.)  She described the group's attempt to rob Wilson, though she claimed that she had "blocked" out some of the incident.  (E.g., id. at 14.)  Deb Shelden said that during a struggle, Wilson kicked Kathy Gonzalez, Kathy's nose started bleeding, and Kathy ran out of the apartment.  (Id. at 15.)  Deb Shelden also said that she tried to pull White off of Wilson, but White knocked her back, causing her to hit her head and lose consciousness.  (Id. at 16.)  She awoke to see White and Winslow sexually assaulting Wilson, and Taylor was holding a pillow over Wilson's head.  (Id. at 16-21.)

On or about August 21, 1989, Searcey received a letter from James Dean's attorney stating that Dean "had a little flash of memory recently while he was sitting and watching television," and this "memory was of seeing Clifford Shelden . . . standing in a doorway."  (Searcey Aff. Ex. 2MM, ECF No. 73-4.)  Dean told his attorney that "the recollection of seeing Cliff at some time is very vivid and he is sure it was Cliff because Cliff has red hair and is the only one in the group they ran around with who has the reddish hair."  (Id.)  DeWitt declined to take a statement from Dean, however, because "the recollection was too fragmentary at this time to try to record."  (Id.)  Searcey also declined to take a statement from Dean because he believed that Cliff Shelden was in the hospital on the night of the murder and "could not have been there."  (Searcey Aff. ¶ 54.)

On August 30, 1989, Searcey interviewed Joann Taylor in the presence of Richard Smith, Kent Harlan, and others.  (Searcey Aff. ¶ 56.)  During this interview, Taylor said that on February 5, 1985, she was "getting high partying" with Joseph White and Tom Winslow, adding that they were "smoking pot which was laced with . . . angel dust . . . snorting cocaine, popping yellowjackets, popping purple monster, and drinking beer heavily on top of all of it."  (Searcey Aff. Ex. 2OO at 2-3, ECF No. 73-4.)  She and White then began to argue about whether to get more drugs, and White threatened to hurt Taylor or her daughter if she did not come along with him.  (Id. at 3.)  White, Taylor, and Winslow then picked up James Dean and Deb Shelden, and eventually the group ended up at Wilson's apartment.  (Id. at 4-5.)  According to Taylor, White began to argue with Wilson,

61

slapped her, and pushed her toward her bedroom.  (<u>Id.</u> at 6.)  Deb Shelden tried to help Wilson, but White shoved her, and Deb hit her head.  (<u>Id.</u> at 7.)  Taylor said that she too tried to help Wilson, but White "belted" her and dislocated her jaw.  (<u>Id.</u>)  She added that her jaw had been dislocated before, so she "just popped it back in."  (<u>Id.</u>)  She described watching White and Winslow rape Wilson, trying again to intervene, and having flashbacks of her own rape.  (<u>Id.</u> at 8.)  Taylor said that at some point, Kathy Gonzalez came into Wilson's apartment and "was walking around kind of just checking things out."  (<u>Id.</u> at 9.)  Taylor added that she believed that Gonzalez had blood on her and may have been hit.  (<u>Id.</u> at 9-10.)  Taylor denied putting a pillow over Wilson's face or licking her body.  (<u>Id.</u> at 11.)

During this interview, Taylor mumbled to herself, "Come on Jo you can do it you've got to," when trying to describe details about the apartment.  (<u>Id.</u> at 11.)  When Smith confronted her with James Dean's and Deb Shelden's statements that Taylor participated in the assault upon Wilson, Taylor cried and said, "I know what I remember.  I can't force myself to do any better."  (<u>Id.</u>)  She then said, "Fuck it.  You can't keep bringing this back, I can't take it your [sic] torturing me . . . . And I will not go through this torture.  My mental health is at stake for it."  (<u>Id.</u> at 12.)  Smith reminded Taylor that her plea agreement required her to testify truthfully, and he indicated that he would "ask for a polygraph."  (<u>Id.</u>)  Taylor replied that she was "doing the fuckin [sic] best I can," and said, "We'll go through with this but in the fuckin [sic] morning you'll have a fuckin [sic] corpse in your jail."  (<u>Id.</u>)

Taylor said that she did not remember talking to Lisa Podendorf about the crime, but she admitted it was possible.  (<u>Id.</u> at 14-15.)  After a break in the interview, Taylor said, "I think it might be better if you start asking me some questions that might help bring it back better."  (<u>Id.</u> at 15.)  She then admitted that it "was possible" that she held a pillow while she was "up by [Wilson's] head."  (<u>Id.</u> at 16.)  She denied touching Wilson, but she said that it was possible that she admitted to Searcey during her statement in North Carolina that she "may have been involved in possibly killing an older woman," and she "possibly could have" told "a witness" that she and White "basically were the ones responsible for Helen Wilson's death."  (<u>Id.</u> at 16-17.)  Searcey reminded Taylor of her agreement to tell the truth, and Taylor responded that the officers were going to "screw it around" and Smith would use her statement against her.  (<u>Id.</u> at 17-18.)

There was a pause in the interview, and Smith said, "Before we go on, I presume the [counsel has] advised her that I have to make a recommendation to a certain number of years." (<u>Id.</u> at 18.) Taylor's counsel indicated that he did "advise[] her," and "she said that she wants to say something." (<u>Id.</u>) Taylor said that she was scared, she cried, and she said, "They'll get to Rachell. I know they will." (<u>Id.</u>) Taylor then agreed with Searcey that she did hold a pillow over Wilson's face. (<u>Id.</u> at 18-19.) She continued to deny having any "physical activity" with Wilson, exclaimed, "I'm not gay," and threatened to give James Dean a "nice kicking" after Smith indicated that Dean was the person who accused her of having contact with Wilson. (<u>Id.</u> at 19.) Taylor began to cry again, and another break was taken because she was "having a little problem with composure." (<u>Id.</u> at 20.) After the break, Taylor admitted that she discussed a plan to rob Wilson with the "other people involved," watched the lights go on and off in Wilson's building while the group was driving around, searched for money in Wilson's apartment, and told Lisa Podendorf on the following morning that she and White were responsible for Wilson's death. (<u>Id.</u> at 20-22.)

On September 12, 1989, DeWitt and Smith questioned James Dean. (DeWitt Aff. ¶ 29; DeWitt Aff. Ex. 4I, ECF No. 74-4.) Dean said that he, White, Winslow, Taylor, Cliff Shelden, and Darren Munstermann talked about robbing Wilson sometime before February 5, 1985, and that White and Winslow talked about wanting to have sex with "an old lady." (DeWitt Aff. Ex. 4I.) He said that he had not mentioned this information before because he "spaced it off" and because Munstermann and Cliff Shelden were not present during the homicide. (<u>Id.</u>) Dean also said that he believed Kathy Gonzalez was already in Wilson's apartment when the other group arrived. (<u>Id.</u>)

On September 13, 1989, DeWitt and Smith interviewed Cliff Shelden, who again said that Joann Taylor talked to "several different people," including Winslow, Dean, and White, in the bathroom of Kathy Bartek's apartment about a week prior to the Wilson homicide. (DeWitt Aff. Ex. 4J at 1-2, ECF No. 74-4.) Cliff also said that at some unspecified time, he encountered Tom Winslow at the Diagnostic and Evaluation Center in Lincoln, and Winslow told him that the robbery was planned because Taylor and White needed money to get out of town. (<u>Id.</u> at 1.)

On September 23, 1989, Smith and DeWitt interviewed Darren Munstermann. (DeWitt Aff. ¶ 31.) Darren said that he and James Dean talked about robbery generally at some unspecified time, but "no names were mentioned that he can remember." (DeWitt Aff. Ex. 4K, ECF No. 74-4.)

63

Sometime later during the interview, Joann Taylor and Munstermann "confronted each other" in DeWitt's office, but the substance of their confrontation is not described in DeWitt's report or affidavit, and it is not clear why the two were brought together.  (Id.)  Munstermann remembered arguing with Taylor sometime near the date of the homicide "because he didn't want Joanne [sic] to be getting high and doing drugs."  (Id.)  He added that "he didn't remember anything for sure." (Id.)

Price's deposition was taken on September 28, 1989.  (DeWitt Aff. ¶ 32; Price Aff. ¶ 15.) During his deposition, Price said that he "did not use either relaxation or hypnosis with any of the criminal defendants and that [he] did nothing to suggest a version of the homicide for any of the criminal defendants to accept as their own."  (Price Aff. ¶ 15.)  Price noted that he performed psychological services for Joann Taylor in the past, that "she had been a severe borderline personality disorder,"[35] that he thought Taylor had improved, and that he was frustrated and angry "as a therapist" to see his work go "down the tube."  (Price Aff. Ex. 3L at 22-23, ECF No. 74-2.) He also said that before he interviewed Taylor, he "was in hopes . . . that she had not lost reality." (Id. at 30-31.)  Price added that he, or someone else in his clinic, had also worked with Deb Shelden, Tom Winslow, and James Dean prior to the Wilson homicide.  (Id. at 50-51.)

Price also testified that shortly after the Wilson homicide, he was "asked for some indications of what type of person would commit that type of crime."  (Id. at 12.)  He testified, "My impression at that time . . . was that it was a one-person crime; that the degree of violence would indicate a great degree of anger on the part of the perpetrator, and that very likely there was anger directed at an older

---

[35] According to Price, "[a] borderline personality disorder is someone who has difficulty getting close to people, difficulty trusting, has lots of shifts in moods, can be very happy, very sad.  They can become very angry very quickly.  If someone gets very close to them, they can become very angry.  If someone withdraws from them, they can become very angry.  They are an unstable person who is often overly reactive to situations and especially the interpersonal relationships.  Many will have histories of being neglected or abused children, sexually abused victims.  They will fluctuate between child-like behavior and adult behavior, appropriate and inappropriate behavior."  (Price Aff. Ex. 3L at 38-39.)  He added that borderline personality disorder "can result in psychotic breaks at times," and he was aware that another mental health professional reported that Taylor experienced hallucinations.  (Id. at 54-55.)

female person, very likely a mother or grandmother . . . ." (Id.)  He added that his "profile apparently was nowhere near correct." (Id. at 13.)

On October 3 or 4, 1989, DeWitt and Smith interviewed Clifford Shelden.  (DeWitt Aff. Ex. 4L, ECF No. 74-4.)  Shelden said that he now remembered that, according to Winslow, Kathy Gonzalez "was supposed to be a lookout and give them a signal." (Id.)

On October 6, 1989, Joseph White underwent a polygraph examination.  (Smith Aff. Ex. 1U at 1, ECF No. 70-3.)  According to the examiner, White said that he was familiar with "some of the principals in the case," but he denied being involved in the Wilson homicide.  (Id.)  The examiner found readings "indicative of deception" when White was asked questions about his participation in the Wilson homicide.  (Id. at 4-5.)  The examiner's report states,

> [White] may have had some kind of favorable report to him by the Psychiatrists that he was not suppressing or whatever and come to Lincoln feeling confident, there is no doubt in my mind that he is certainly responding on the polygraph to memory no matter how he denies that he can not remember anythinng.
>
> I visited with him for some 25 minutes after I had completed his test and told him he definitely had to level with his attorney or attorneys as to what had happened as there was no way they could do an adequate job for him without knowing all the truth. . . .
>
> In my opinion, this man did everything but tell me the truth on his polygraph test and I knew it was fruitless at this stage to expect him to change his story from not being able to remember.  He remembers.

(Id. at 5.)

Joann Taylor, Tom Winslow, James Dean, Deb Shelden, and Kathy Gonzalez ultimately "entered into plea agreements and pleaded to various criminal charges." (Smith Aff. ¶ 37.)  The case against Joseph White was tried before a jury, and "several" of the individuals who pleaded guilty testified against White.  (Id.)[36]  White was convicted of felony murder.  (Id.)

In the aftermath of White's conviction, the sheriff's department was publically critical of the BPD's investigation.  (Pl.'s Ex. 89 at 38, 47-50; Pl.'s Ex. 99 at 65.)  Luckeroth recalled DeWitt

---

[36] Winslow refused to testify against White.  (Pl.'s Ex. 104 at 50, ECF No. 109-14.)

making a statement that the BPD's investigation of the Wilson case was "atrocious" and the "worst investigation he[ had] ever seen done by a police department. (Pl.'s Ex. 89 at 38, 50.)

The defendants admit that recent DNA testing "showed that the semen found inside Helen Wilson did not match the DNA of [White]." (Answer ¶ 9, ECF No. 46.) The plaintiff has submitted a document purporting to show that in 2008, DNA testing of the samples taken from Bruce Allen Smith revealed that the sperm and blood evidence found in Wilson's apartment matched Smith's profile. (E.g., Pl.'s Ex. 100.) Although I cannot consider this document due to the plaintiff's failure to establish its authenticity, it does not appear that there is any genuine dispute on this point. (Compare Compl. ¶ 37 with Answer ¶ 9.) Nor does there appear to be any dispute that as a result of this testing, White was pardoned and released from prison on or about November 7, 2008. (Compl. ¶ 37; Answer ¶ 9.)

**4.   Procedural History**

On July 15, 2009, White filed a three-count complaint against Defendants Richard T. Smith, Burdette Searcey, Gerald Lamkin, Kent Harlan, Mark Meints, Jerry O. DeWitt, Wayne R. Price, the GCSO, the Gage County Attorney's Office, and the County of Gage, Nebraska. (See generally Compl., ECF No. 1.) The GCSO, the Gage County Attorney's Office, Harlan, and Meints have since been dismissed from this action, and Smith has been dismissed insofar as he has been sued in his individual capacity. (See Mem. & Order on Defs.' Mot. to Dismiss, ECF No. 43; Mem. & Order on Pl.'s Mot. to Dismiss, ECF No. 135.) In addition, to the extent that the complaint alleges a claim of "false arrest or false imprisonment in violation of the Fourth Amendment" or "state law claims based on malicious prosecution or other torts," those claims have been dismissed. (See Mem. & Order on Defs.' Mot. to Dismiss, ECF No. 43.)

Now before me is a motion for summary judgment filed by Defendants Searcey, DeWitt, Price, and Lamkin (hereinafter "the defendants"). (ECF No. 61.) The defendants submit that summary judgment must be entered in their favor because they are entitled to qualified immunity from suit. (Id. at 2.)[37] For the following reasons, the defendants' motion will be denied.

_____

[37] In truth, the defendants' motion is broader than I have stated; however, it appears that the defendants filed their motion–and identical supporting papers–in cases filed by White, Dean, Gonzalez, Winslow, Taylor, and some of the arguments raised by the defendants are inapplicable

## B.    Standard of Review

A motion for summary judgment shall be granted by the court "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See also Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Haigh, 632 F.3d at 468. See also Scott v. Harris, 550 U.S. 372, 378 (2007) (explaining that on summary judgment, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" (alteration in original)); Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

"Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" McKenny v. Harrison, 635 F.3d 354, 358 (8th Cir. 2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "An official is entitled to qualified immunity against a § 1983 action unless (1) the facts, construed in the light most favorable to the party seeking damages, establish a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." Id. (citing Pearson v. Callahan, 555 U.S. 223 (2009)).

## C.    Analysis

The plaintiff's claim is that the defendants conspired to manufacture evidence in order to obtain false testimony against the plaintiff, and thereby violated the plaintiff's due process rights. (See Compl. ¶¶ 38-40; Pl.'s Br. at 72, 91.) The defendants do not dispute that, at the time of the events that have given rise to this action, it was clearly established that if officers knowingly "use

---

in White's case. See generally Dean v. Smith, No. 4:09cv3144; Gonzalez v. Smith, No. 4:09cv3146; Winslow v. Smith, No. 4:09cv3147; and Taylor v. Smith, No. 4:09cv3148.

false evidence, including false testimony, to secure a conviction, the defendant's due process rights are violated." Wilson v. Lawrence County, 260 F.3d 946, 954 (8th Cir. 2001) (citing Napue v. Illinois, 360 U.S. 264, 269 (1959) ("First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . ."); Mooney v. Holohan, 294 U.S. 103, 112 (1935) ("[Due process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.")). (See also Defs.' Reply Br. at 24 (citing Wilson, 260 F.3d at 954); Defs.'s Br. at 59.) In other words, the defendants concede the second component of the qualified immunity inquiry. Their motion is based upon the first component; specifically, they argue that the facts in evidence do not establish that White's due process rights were violated, nor do they establish that the defendants engaged in "conscience shocking" behavior.[38] (Defs.' Br. at 59-72.) I find, however, that when the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor, the record establishes that the defendants engaged in conscience-shocking conduct that violated White's due process rights.

_____

[38] In order to "sustain a substantive due process claim," a plaintiff must show that the defendants engaged in "conscience-shocking behavior." Sheets v. Butera, 389 F.3d 772, 778 (8th Cir. 2004). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)). "[T]he threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. (quoting Lewis, 523 U.S. at 848 n.8). See also Moran v. Clarke, 296 F.3d 638, 643 (8th Cir. 2002) ("The Fourteenth Amendment guarantees '[s]ubstantive due process[, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.' To that end, the Fourteenth Amendment prohibits 'conduct that is so outrageous that it shocks the conscience or otherwise offends judicial notions of fairness, [or is] offensive to human dignity.'" (quoting Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998)) (internal quotation marks omitted)).

1.   **Burdette Searcey**

Viewed in a light favorable to the plaintiff, the evidence establishes that Searcey engaged in the following conduct:

First, early in his investigation Searcey credited statements from witnesses that tended to implicate White and his alleged accomplices, even when those statements came from questionable sources and contradicted readily verifiable facts.   For example, Searcey evidently credited Podendorf's claim that she discussed the Wilson homicide with Taylor on February 6, 1985, at 7:30 or 8:00 a.m., after seeing police cars outside Wilson's apartment.   Podendorf's claim could not have been reasonably considered to be accurate, however, because Wilson's body was not discovered until approximately 9:30 a.m. on February 6.   (Compare Searcey Aff. Ex. 2B at 4 and Searcey Aff. Ex. 2C at 3-5 with Smith Aff. Ex. 1A at 1.)   Similarly, Searcey credited Charlotte Bishop's statements about a February 6, 1985, conversation between Bishop and Taylor that allegedly occurred in Bishops's apartment, but Bishop and Taylor had been evicted from the apartment on February 5. (Compare Searcey Aff. Ex. 2B at 6 with Pl.'s Ex. 19.)   As with Podendorf's statement, Bishop's statement is highly questionable on its face (though certainly not necessarily false in all respects). Furthermore, Bishop was widely known to be unreliable, and the BPD had already determined that Taylor's claims of involvement in the homicide were wholly without merit.[39]   Nevertheless, Searcey relied on both Bishop's and Podendorf's statements to secure warrants for the arrest of White and Taylor.   (Pl.'s Ex. 112 at 3-5.)

Second, for several years, Searcey did not disclose to the BPD information he obtained during his independent investigation of the Wilson homicide.   (E.g., Pl.'s Ex. 89 at 32-33; Pl.'s Ex. 91 at 52-53; Pl.'s Ex. 99 at 44-46.)   Moreover, there is evidence that Searcey told Lisa Podendorf not to tell anyone else about her alleged conversation with Taylor on February 6, 1985, during which Taylor allegedly admitted her involvement in the Wilson homicide.   (E.g., Searcey Aff. Ex. 2T at 4-6; Searcey Aff. Ex. 2W at 4-6.)

---

[39] I note in passing that if the documents submitted by the plaintiff are authentic, Searcey would have known that the BPD had rejected Taylor's claims when he reviewed the BPD records upon joining the sheriff's department.

Third, Searcey drafted untimely and inaccurate reports about his investigation.  Indeed, Searcey seems to have made no written reports during his independent investigation of the Wilson homicide in 1985, but instead drafted a report years later, on February 28, 1989.  (See Searcey Aff. Ex. 2B.)  It appears that DeWitt asked Searcey to write a report about his investigation in 1987 or sometime during the first half of 1988, but there is no evidence that Searcey drafted a report prior to February 28, 1989.  (E.g., DeWitt Aff. ¶ 4.)  Furthermore, although the defendants claim that Searcey's February 28, 1989, report persuaded Smith and DeWitt to allow Searcey to proceed with his official investigation of the Wilson homicide, this claim is not supported by the record.  Searcey began his investigation in January 1989, before he drafted his report.  (Compare id. with Searcey Aff. ¶¶ 13-15.)

There are discrepancies between Searcey's February 28, 1989, report and other sources of information about the homicide.  For example, Searcey claims that Podendorf had independent knowledge that a torn $5 bill was left in Wilson's apartment, but Searcey's February 28 report includes no mention of this fact.  (Compare Searcey Aff. Ex. 2B with Searcey Aff. ¶ 12.)  Also, in his February 28, 1989, report, Searcey wrote that Winslow loaned his car to White and Taylor on the night of the homicide.  (See Searcey Aff. Ex. 2B at 5.)   In his February 13, 1989, statement, however, Winslow claimed that he loaned his car to White, Taylor, and Cliff Shelden on the night of the homicide.  (See Pl.'s Ex. 18 at 4-5.)  Because Cliff Shelden was in the hospital at the time, he could not have borrowed the vehicle.  Searcey's report simply omits Winslow's implausible claim about Cliff Shelden's involvement.

The February 28, 1989, report is not the only inaccurate report that was prepared by Searcey.  On March 24, 1989, Searcey and Stevens interviewed Deb Shelden and prepared separate, inconsistent reports about the interview.  Stevens' report, which is dated March 24, 1989, states that 1) Deb remembered that Cliff Shelden received a letter from Taylor; 2) Deb did not read the letter herself; 3) Cliff told Deb that in this letter, Taylor admitted to killing Wilson; 4) Deb was not sure whether White was mentioned in the letter; and 5) Deb did not find Taylor to be credible.  (Pl.'s Ex. 32.)  Searcey's report, which is dated April 20, 1989, states that Deb read Taylor's letter herself and remembered that the letter implicated both Taylor and White in the Wilson homicide.  (Pl.'s Ex. 33.)  The report  includes no mention of the fact that Deb found Taylor's letter to be incredible.

70

In summary, there is evidence that on at least two occasions (i.e., February 28, 1989, and April 20, 1989), Searcey drafted untimely reports that inaccurately documented information about the Wilson homicide, and these inaccuracies tended to strengthen Searcey's case against White and his alleged accomplices.

Fourth, Searcey drafted and signed misleading affidavits.  On March 14, 1989, Searcey prepared and signed an affidavit in support of warrants for the arrest of White and Taylor.  (Pl.'s Ex. 112.)  As I noted above, in his affidavit Searcey relied upon Podendorf's claim that she discussed the Wilson homicide with Taylor after observing police cars at Wilson's apartment complex at approximately 7:30 a.m. on February 6, 1985.  (Id. at 3.)  Although Searcey's affidavit does note that Wilson's body was discovered "at approximately 9:00 a.m. on February 6, 1985, (id. at 2), it does not disclose that Podendorf claimed to have discussed the homicide with Taylor after viewing the police cars at 7:30 or 8:00 a.m. that morning, (id. at 3).  Instead, Searcey's affidavit states that Podendorf observed the police cars and spoke with Taylor "within 24 hours of the Wilson homicide's discovery."  (Id. at 3.)  It is reasonable to conclude that Searcey's affidavit was left deliberately vague in order to lend plausibility to Podendorf's statement.[40]

Also, on May 25, 1989, Searcey drafted a warrant for the arrest of Kathy Gonzalez.  (See Pl.'s Ex. 128.)  In this affidavit, Searcey stated that Debra Shelden and James Dean "positively identified" Kathy Gonzalez as being present in Wilson's apartment during the homicide.  (See id. at 2.)  However, Searcey did not mention that Deb Shelden had claimed previously that only she,

---

[40] In the same affidavit, Searcey also relied upon Charlotte Bishop's statement that Taylor came to Bishop's apartment on February 6, 1985, and admitted her involvement in the Wilson homicide.  (Pl.'s Ex. 112 at 4-5.)  As noted above, Bishop and Taylor had been evicted from their apartment on February 5, (see Pl.'s Ex. 19); thus, Bishop's statement is implausible at best.

Searcey's affidavit also states that "within approximately one week of the Helen Wilson homicide, Ada Joann Taylor and Joseph White . . . left Beatrice, Gage County, Nebraska, and have not been seen or heard of since."  (Pl.'s Ex. 112 at 6.)  As I noted in Part I.B. above, White did leave Beatrice shortly after the homicide, but he discussed the Wilson case with Sgt. Stevens and obtained Sgt. Stevens' permission before leaving town.  (Pl.'s Ex. 1 at 3.)

These omissions, combined with what seems to be a deliberate effort by Searcey to gloss over the inherent implausibility of Podendorf's statement, raise serious questions about Searcey's veracity in this affidavit.

71

Taylor, Winslow, and White were involved in the homicide.  (<u>See generally</u> Searcey Aff. Ex. 2GG at 11.)  Nor did Searcey disclose that Deb Shelden claimed to have remembered Gonzalez's involvement in a nightmare, (Searcey Aff. Ex. 2GG at 11), or that Dean's statements about the homicide were all in the nature of "recovered memories," (DeWitt Aff. Ex. 4F at 4).  Also, Searcey did not describe the "single-photo lineup" procedure he used to ensure that both Deb Shelden and James Dean identified Kathy Gonzalez.  (<u>See</u> Searcey Aff. ¶¶ 45; Searcey Aff. Ex. 2FF at 3-4; Searcey Aff. Ex. 2GG at 11-13.)

Fifth, and perhaps most seriously, there is evidence that Searcey fed information to White's alleged accomplices, coached and led interviewees, and pressured these interviewees using threats, deception, and manufactured evidence to act as if they had independent knowledge of Searcey's version of events.  Many of these interviewees may be fairly characterized as psychologically vulnerable, if not disturbed.  Using these tactics, Searcey was able to generate compelling cases against White and others that culminated in White's erroneous conviction.

Several of Searcey's efforts to manipulate witnesses' statements appear in, or can be easily inferred from, the transcripts of his interviews with the alleged witnesses.  Joann Taylor's, James Dean's, and Deb Shelden's interviews provide the most striking examples.  Taylor initially gave a statement that implicated herself, White (whom she could identify only as "Lobo," though she claimed to have been dating him), and an unknown "boy" in the Wilson homicide, but her statement was wildly incompatible with the facts of the case.  (<u>See</u> Searcey Aff. Ex. 2G; Searcey Aff. Ex. 2I at 2-8.)  For instance, she claimed–wrongly–that Wilson lived in a house; that White went to Wilson's house to trim trees; that the crime occurred between 5:30 and 7:30 p.m.; and that Wilson was stabbed in the body.  (Searcey Aff. Ex. 2G.)  On March 16, 1989, Searcey and Stevens interviewed Taylor, and during the course of this interview they reconstructed Taylor's statement to match up with certain basic facts (e.g., that Wilson lived in an apartment rather than a house; that the offense could not have happened between 5:30 and 7:30 p.m.) and Searcey's theory of the case (e.g., that Taylor, Winslow, and White drove to Wilson's residence in a "brown over green" car rather than a light blue car).  (<u>See, e.g.</u>, Searcey Aff. Ex. 2I at 3-45.)  Taylor was also coached into confirming that she spoke about the offense with Podendorf and Bishop, though initially she denied talking about the offense with anyone.  (<u>See id.</u> at 10, 13-23.)  A detailed summary of Taylor's

interview appears above, and these details need not be repeated here.  As Stevens noted in his deposition, Taylor's statement was the product of the investigators' manipulation, (Pl.'s Ex. 91 at 62, 95), and the result of Searcey's conduct was shocking.

James Dean denied all involvement in the Wilson homicide from the time of his arrest on April 14, 1989, until May 8, 1989, when he made his first recorded statement.  (E.g., DeWitt Aff. Ex. 4F at 4; Pl.'s Ex. 146 ¶¶ 18-25.)  During the interim, Searcey and others threatened Dean, (e.g., Pl.'s Ex. 146 ¶¶ 22, 25); took him to view Wilson's apartment, (Pl.'s Ex. 146 ¶ 23); showed him crime scene photos and a video, (Pl.'s Ex. 146 ¶¶ 24-25); gave him information that fit their theory of the case, (e.g., Pl.'s Ex. 146 ¶¶ 23, 25); and, after Price completed several counseling sessions with Dean and convinced him that he had repressed his memory of his involvement in the crime, (e.g., Pl.'s Ex. 146 ¶¶ 24-26), fed him the facts that he had allegedly repressed, (Pl.'s Ex. 146 ¶¶ 25-27).  Dean adds that his testimony at White's trial was the product of specific coaching from Searcey. (Pl.'s Ex. 146 ¶ 29.)

Together with Lamkin, Searcey also coached Deb Shelden into providing false testimony that fit the investigators' evolving narrative.  On April 13, 1989, Deb Shelden said that she, Winslow, Taylor, and White were the only people involved in the homicide.  (E.g., Searcey Aff. Ex. 2Z at 5-7.) As will be discussed in more detail below, tests conducted on April 14, 1989, likely indicated that Deb Shelden was not the source of the type B blood found in Wilson's apartment.  Searcey and Lamkin re-interviewed Deb on April 14, 1989, prior to her arraignment, and on this occasion Deb "remembered" that Dean was also present during the homicide.  (Searcey Aff. Ex. 2AA at 7-10, 11-12, 30-31.)  She added that no other persons were present during the homicide.  (Id. at 49.)  Later, however, Searcey showed Deb a picture of Kathy Gonzalez, and on May 24, 1989, Deb gave a new statement to Searcey and Lamkin "identifying" Gonzalez as another person who participated in the homicide.  (Searcey Aff. Ex. 2GG at 4-5, 11-13.)  The polygraph examiner relied upon by the defendants noted, "It was obvious that Debra had to have considerable 'coaching' or whatever to tell what was supposedly the truth.  In many instances in the statement she gave, she could not 'remember' and then later would come up with some pretty exact details."  (Smith Aff. Ex. 1Q at 2.)

73

Additional examples of Searcey's witness coaching abound in the record.  For instance, Charlotte Bishop told Searcey that when she went out for cigarettes on the night of February 5, 1985, she saw police cars "all around" Wilson's apartment building.  (Searcey Aff. Ex. 2D at 7-8.) However, because police cars did not visit Wilson's apartment building until after Wilson's body was discovered on the morning of February 6, Searcey attempted to coach Bishop into adjusting her statement about the police cars.  (Id. at 8.)  During his March 25, 1989, interview with Darren Munstermann, Searcey coached Munstermann to state that Taylor was in a hurry to leave Beatrice after the Wilson homicide, was nervous, and "wasn't acting normal."  (Searcey Aff. Ex. 2R at 7.) During an April 12, 1989, interview, Clifford Shelden told Searcey and Lamkin that he learned about the Wilson homicide within about two weeks of its occurrence because Joann Taylor wrote him a letter about it.  (Searcey Aff. Ex. 2Y at 5.)  Searcey led Cliff to agree that he actually received Taylor's letter months after the crime.  (Id. at 5-6.)  Finally, during a May 10, 1989, interview with James Dean, Searcey asked Dean to describe where he, Winslow, Taylor, White, and Shelden sat in Winslow's car as they drove to Wilson's apartment, but Dean refused because the officers had just shown him a diagram of that very information.  (Searcey Aff. Ex. 2CC at 10.)

In short, the record is replete with evidence showing that Searcey manipulated witnesses' statements in order to build a false case against White and a number of his alleged accomplices.

Sixth, the record supports a reasonable inference that Searcey manufactured evidence so that he could account for the type B blood found in Wilson's apartment without collapsing his case against White.  On March 17, 1989, Taylor identified Winslow as the person who, according to Taylor, participated in the homicide along with her, White, and someone named "Beth."  Taylor told Searcey that "one of the guys nose [sic] was bleeding."  (Searcey Aff. Ex. 2J at 8.)  On March 22, 1989, Taylor and Winslow submitted blood samples for testing.  (Searcey Aff. ¶ 28.)  The BPD had determined previously, however, that Winslow's blood type is A, (see Pl.'s Ex. 101), and Taylor and White were known to have blood type O, (see Pl.'s Ex. 1 at 3; Pl.'s Ex. 29 at 51-52).[41]  On March 25, 1989, Searcey accused Darren Munstermann being involved in the homicide, and Munstermann agreed to provide a blood sample.  (Searcey Aff. Ex. 2R at 13.)  It is not clear whether Munstermann

---

[41] The lead involving "Beth" was evidently abandoned by the investigators.

74

did in fact surrender a blood sample; however, it appears that Munstermann was not treated as a serious suspect.  On April 13, 1989, Searcey obtained a statement from Deb Shelden, and Deb implicated herself in the homicide.  (See Searcey Aff. Ex. 2Z.)  Deb said that she, Taylor, White, and Winslow were involved in the Wilson homicide; that no other persons were present; and that she (Deb) received a cut on her head while in Wilson's apartment.  (Id. at 5-6, 13, 22-24.)  During the morning of April 14, 1989, Searcey obtained a blood sample from Deb Shelden, (Pl.'s Ex. 33 at 5), but the record indicates that Deb Shelden's blood type is AB, (Pl.'s Ex. 32 at 2).  Searcey and Lamkin then re-interviewed Deb Shelden at approximately 3 p.m. on April 14, 1989–again, just prior to Deb's arraignment (and the appointment of her counsel).  (Searcey Aff. ¶ 39; Searcey Aff. Ex. 2AA; Pl.'s Ex. 119.)  On this occasion, Deb Shelden said that James Dean was also present during the homicide, adding that she must have been "blocking" her memory about Dean during her April 13 interview.  (Searcey Aff. Ex. 2AA at 7-10, 11-12, 30-31.)  Dean was arrested on April 14, 1989, and he consented to allow the GCSO to obtain a sample of his blood on April 15, 1989.  (Searcey Aff. ¶¶ 40-41; Pl.'s Ex. 123 at 1.)  A report dated April 15, 1989, indicates that Dean's blood type is O.  (Pl.'s Ex. 123 at 2.)  As described above, Dean denied involvement in the Wilson homicide for weeks, but ultimately he became convinced that he was involved in the homicide and that he was repressing his memory of it.  He implicated Kathy Gonzalez in the homicide after Searcey showed him a photograph of her, adding that Gonzalez was somehow injured in Wilson's apartment.  (E.g., Searcey Aff. ¶ 45; Searcey Aff. Ex. 2FF at 3-4, 6-7.)  Under questioning from Searcey and Lamkin, Deb Shelden then corroborated Dean's statement about Gonzalez's involvement–even though she said twice previously that no one else was involved in the crime.[42]  (Searcey Aff. Ex. 2GG at 4-5.) Gonzalez was arrested based on Dean's and Deb Shelden's statements, and after Gonzalez was found to have blood type B, Searcey did not target any other suspects in the case.  (Searcey Aff. ¶¶ 49-50; Pl.'s Ex. 130 at 1-2.)  Indeed, when Dean "remembered" seeing yet another person in the apartment

---

[42] As with Dean, Searcey showed Deb Shelden a picture of Gonzalez just prior to her new statement.  (Searcey Aff. Ex. 2GG at 11-13.)  Deb Shelden said that she did not remember Gonzalez "at first," but remembered Gonzalez's involvement when she had "a nightmare."  (Id. at 11.)

(i.e., Cliff Shelden), Searcey and DeWitt disregarded his claim and declined to take Dean's statement.  (Searcey Aff. ¶ 54; Searcey Aff. Ex. 2MM.)

The foregoing facts, viewed in a light favorable to the plaintiff, show that Searcey generated evidence about suspect after suspect in a shocking, blatantly unlawful fashion in order to build a case for the sheriff's department against White and White's alleged accomplices.  As each new suspect's blood was tested, and the test results excluded them as possible sources of the blood found in Wilson's apartment, Searcey obtained modified statements implicating new suspects.  When he was finally able to incorporate a suspect with type B blood into his narrative, he began to ignore Dean's "repressed memories."

Seventh, Searcey disregarded leads and evidence that tended to exculpate White or discredit Searcey's own witnesses.  For instance, Beth Robinson gave a statement that provided Taylor and Winslow with an alibi for the Wilson homicide, but Searcey determined that the statement "did not lead to any helpful information."  (Searcey Aff. ¶ 24; see also Searcey Aff. Ex. 2L.)  Similarly, after Dean made an implausible claim that he "remembered" seeing Cliff Shelden in a doorway at Wilson's apartment, Searcey and DeWitt disregarded Dean's claim and declined to take Dean's statement.  (Searcey Aff. Ex. 2MM; Searcey Aff. ¶ 54.)  Also, on June 13, 1989, Dr. Roy mailed to Searcey an analysis indicating that one of the genetic markers in Gonzalez's blood did not match a marker in the blood found in Wilson's apartment.  (Compare Pl.'s Ex. 141 with Pl.'s Ex. 90.)  Though Searcey claims to have reviewed the relevant blood reports from the crime scene, (Searcey Aff. ¶ 7), it appears that he disregarded the discrepancy.  It merits mention, however, that Dr. Roy did not exclude Gonzalez as a contributor to the blood stains, despite the discrepancy, because she assumed that multiple people contributed to each of the type B stains found in the apartment.

Finally, Searcey denied White and Dean access to counsel during questioning.  The transcript of White's March 16, 1989, interrogation shows clearly that Searcey, DeWitt, Price, and Stevens continued to question White despite White's repeated requests for counsel.  (Searcey Aff. Ex. 2H at 17, 24, 26.)  Dean also states that following his arrest on April 15, 1989, Searcey, Lamkin, and DeWitt questioned him repeatedly while ignoring his requests for counsel.  (Pl.'s Ex. 146 ¶¶ 18-21, 25, 28.)

76

The question is not close.  It is reasonable to infer, based on the evidence in the record, that Searcey knowingly fabricated evidence to convict White wrongfully.  Searcey's conduct shocks the conscience, and he is not entitled to qualified immunity.

**2.   Jerry DeWitt**

Construed in a light favorable to the plaintiff, the evidence shows that DeWitt engaged in the following conduct: He coordinated Searcey's investigation into the Wilson homicide.  (See, e.g., Smith Aff. Ex. 1G at 1, ECF No. 69-1, Defs.' Br. at 64, ECF No. 62.)  He traveled with Searcey to arrest White and Taylor.  (DeWitt Aff. ¶¶ 8-9.)  He directed Stevens, who was skeptical of the case against White, to stay out of the investigation and stop "muddying the waters."  (Pl.'s Ex. 91 at 109-110, ECF No. 109-1.)  He threatened Dean with electrocution unless he cooperated with the investigators.  (Pl.'s Ex. 122 at 39-40, 62-63; Pl.'s Ex. 146 ¶ 26.)  He denied Dean access to counsel during questioning.  (Pl.'s Ex. 146 ¶¶ 18-20.)  He participated in the interview during which Price persuaded Dean to try to "recover" repressed memories of the homicide.  (DeWitt Aff. ¶ 17; Pl.'s Ex. 146 ¶ 24.)  He fed information about the homicide to Dean, including photos and videos, and allowed Dean to claim that he recalled this information independently in his dreams.  (Pl.'s Ex. 146 ¶¶ 25-26.)  Also, he declined to document Dean's recollections that were inconsistent with the narrative formulated by the investigators.  (Searcey Aff. Ex. 2MM.)  In short, DeWitt oversaw–and directly participated in–the manufacturing of a case against White through the use of false evidence, threats, deception, and the willful neglect of inconsistent evidence.  A reasonable officer would have understood that such conduct clearly violated White's due process rights.  See Wilson v. Lawrence County, 260 F.3d 946, 951, 954-55 (8th Cir. 2001) (citing, inter alia, Anderson v. Creighton, 483 U.S. 635, 638, 640 (1987)).  DeWitt is not entitled to qualified immunity.

**3.   Wayne Price**

The evidence, construed in a light favorable to the plaintiff, shows that Price participated in the manufacturing of false, unreliable evidence against White by encouraging Dean, Deb Shelden, and Gonzalez to dream up "memories" of their participation in the Wilson homicide.  (Pl.'s Ex. 146 ¶¶ 24-26; Price Aff. Ex. 3I at 8-15, 17-20; Price Aff. ¶ 9.)  To facilitate this effort, Price took a therapeutic tack with White's alleged accomplices–some of whom were familiar to Price from his psychological practice–and offered to engage in "therapy" sessions with them, thereby obscuring his

role as an investigator.  (E.g., Price Aff. ¶¶ 8, 10; Price Aff. Ex. 3F; Pl.'s Ex. 122 at 76-77;  Pl.'s Ex. 146 ¶ 24; Price Aff. Ex. 3I at 8-20; Price Aff. Ex. 3L at 50-51.)  Using false and/or manufactured evidence, polygraph test results, and his psychological expertise, Price persuaded Dean, who had been maintaining his innocence, that he was involved in the homicide; that he was aware, subconsciously, of being involved in the homicide; that he had repressed his memories of the crime; and that he could benefit from therapy sessions with Price, even though Price was a deputy sheriff. (E.g., Price Aff. Ex. 3F; Pl.'s Ex. 146 ¶¶ 24-26.)  Price then did engage in a number of therapy sessions with Dean–sometimes outside the presence of Dean's counsel–during the interim between Dean's arrest and his first recorded statement.  (Pl.'s Ex. 146 ¶¶ 24-25.)  Through Price's efforts, Dean became convinced that he was truly recalling the homicide in his dreams.  (Id. ¶¶ 25-26.)  Dean now claims, however, that the details of his "memories" were actually fed to him by Searcey, Lamkin, and DeWitt.  (Id. ¶ 25, 27, 29.)

Price also participated in the interrogation of White.  (Searcey Aff. ¶ 19; Searcey Aff. Ex. 2H.)  During that interrogation, Price continued questioning White after White invoked his right to counsel–though it should be noted that White agreed to answer Price's questions.  (Searcey Aff. Ex. 2H at 26-27.)  Sometime later, Price complained that Stevens did not try to obtain a confession from White during the interrogation.  (Pl.'s Ex. 91 at 80-81.)

In short, there is evidence that Price knowingly participated in a conspiracy to manufacture, and in the manufacture of, false evidence against White.  See Sheets v. Butera, No. 8:03cv5010, at 16 (D. Neb. Sept. 23, 2003) ("To survive a motion for summary judgment based on qualified immunity on a claim such as this, a plaintiff must at least produce evidence tending to show, for example, a 'purposeful police conspiracy to manufacture, and the manufacture of, false evidence.'" (quoting Moran v. Clarke, 296 F.3d at 646)).  Price is not entitled to qualified immunity.

**4.    Gerald Lamkin**

When construed in a light favorable to the plaintiff, the evidence shows that Lamkin also participated in the manufacture of false evidence against White.  Lamkin's involvement in various aspects of the conspiracy has been noted above.  To refresh, and by way of example, on April 13, 1989, Searcey and Lamkin took a statement from Deb Shelden, and Deb implicated herself, White, Taylor, and Winslow in the Wilson homicide.  (Searcey Aff. Ex. 2Z at 5-7, 24, 26.)  Deb also

78

indicated that she was the source of the type B blood found in Wilson's bedroom.  (Id. at 12-14, 22-23.)  On April 14, 1989, Lamkin and Searcey obtained blood tests on samples taken from Deb Shelden, and these tests would have shown that Deb's blood was not type B.  (Pl.'s Ex. 33 at 5; Pl.'s Ex. 32 at 2.)  Searcey and Lamkin immediately took another statement from Deb, and Deb implicated a new suspect (i.e., James Dean) for the first time.  (Searcey Aff. Ex. 2AA at 7-12, 31.)  After Dean's arrest, Lamkin questioned Dean while disregarding Dean's requests for counsel, threatened Dean with the death penalty unless he cooperated, took Dean to view the inside of Wilson's apartment, and, together with Searcey, DeWitt, and Smith, fed Dean information that the investigators would later claim was recovered from Dean's memory.  (Pl.'s Ex. 146 ¶¶ 18-20, 23, 25-28.)  In light of the foregoing, I cannot conclude that Lamkin is entitled to qualified immunity.

In summary, the record includes evidence that, construed favorably to the plaintiff, shows that Searcey, DeWitt, Price, and Lamkin abused their power in a shocking fashion, engaged deliberately in improper conduct, and fabricated a false case against White.  The defendants' motion for summary judgment must be denied.

In support of their motion, the defendants argue that they cannot be held liable merely because they were mistaken about White's guilt, and "[t]he mere fact that a witness/defendant in a criminal case at one time gives one version of [a] story and at another time [gives] a different version is not grounds for a finding that the law enforcement officers involved violated any clearly protected constitutional rights."  (Defs.' Br. at 73.)  I agree with the defendants that changing stories do not, in and of themselves, indicate that evidence has been fabricated by law enforcement officers.  In this case, however, there is far more evidence supporting the plaintiff's claim than "changing stories."  The evidence does not indicate that the defendants were merely mistaken, or were simply thrown off by the changing stories of White's alleged accomplices.  Rather, there is evidence that the defendants themselves manipulated the alleged accomplices' stories in a blatant, unlawful effort to obtain convictions in the Wilson case.

The defendants also argue that their motion should be granted because this case is analogous to Sheets v. Butera, No. 8:03cv5010, at 16 (D. Neb. Sept. 23, 2003).  (Defs.' Reply Br. at 24-27.)  In Sheets, the court concluded that 1) there was no evidence that the plaintiff's alleged accomplice was coerced into confessing falsely against Sheets; 2) no threats or promises were made to induce

the accomplice's testimony; 3) the accomplice was not questioned outside the presence of counsel; 4) there was no indication that the accomplice was "fed" information; 5) the accomplice was not "targeted" for investigation; 6) Sheets presented no evidence that police manufactured, or conspired to manufacture, false evidence; 7) Sheets presented no evidence of questionable procedures; and 8) Sheets presented no evidence that officers purposefully ignored evidence that would exonerate him. Sheets, No. 8:03cv5010, at 15-17. The instant case is distinguishable on each and every point.

Finally, the defendants cite the deposition of Corey O'Brien as evidence that the investigators could not reasonably have known that White and his alleged accomplices were innocent absent the DNA evidence linking Bruce Smith to the crime. (Defs.' Reply Br. at 27-29.) O'Brien's assessment may be helpful to the defendants' case, but it does not alter my conclusion that the facts, construed in a light favorable to the plaintiff, establish that the defendants knowingly manufactured false evidence to secure the plaintiff's conviction.

The plaintiff's evidence shows that Searcey, DeWitt, Price, and Lamkin purposefully conspired to manufacture–and did manufacture–a case against White using false evidence. This is sufficient to establish that the defendants violated White's due process rights. The defendants, therefore, are not entitled to qualified immunity.

It merits mention that my findings should not be interpreted as a comment about the merit of any separate claims that Taylor, Winslow, Dean, Gonzalez, Shelden, or others have raised or might raise in another lawsuit involving the Wilson investigation. I am concerned here only with the case against White. Nor should my findings be interpreted as a determination that the constitution prevents officers from asking leading questions, engaging in any form of deception, or informing suspects that they face (or may face) capital charges. Again, those questions are not before me; this case concerns allegations of a conspiracy to build a case against a suspect using false evidence, and my decision is intended to address that issue.

Also, it merits mention that I have made no determinations about the credibility of any of the witnesses, nor have I weighed any of the evidence submitted by either party. These functions, along with "the drawing of legitimate inferences from the facts[,] are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). At this stage of the proceedings I am

required by law to "believe[]" the plaintiff's evidence and draw reasonable inferences in his favor, <u>see</u> <u>id.</u>; whether a jury will do the same remains to be determined at trial.

**IT IS ORDERED** that the defendants' motion for summary judgment, ECF No. 61, is denied, and the defendants' motion to strike, ECF No. 129, is granted in part as explained in the memorandum accompanying this order.

Dated August 8, 2011.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge